# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OKLAHOMA

IN RE:                          )
                                )                    Filed/Docketed
                                )                    Jul 20, 2017
TODD A. SWENNING,               )        Case No. 15-11408-R
                                )        Chapter 11
         Debtor.                )

## ORDER GRANTING IN PART AND DENYING IN PART APPLICATION FOR APPROVAL AND FINAL ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES PURSUANT TO 11 U.S.C. § 330 OF DOERNER, SAUNDERS, DANIEL & ANDERSON, LLP

Before the Court is the Application for Approval and Final Allowance of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 330 of Doerner, Saunders, Daniel & Anderson, LLP ("DSDA") (Doc. 189), as supplemented and amended (Doc. 204) (collectively the "Fee Application"), and the United States Trustee's Statement Regarding Application for Approval and Final Allowance of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 330 of Doerner, Saunders, Daniel & Anderson, LLP (Doc. 198), as supplemented (Doc. 208).  A hearing to consider the application was held on May 5, 2017.  Upon consideration of testimony and documentary evidence presented, the pleadings, the arguments of counsel, and the record in this case, the Court finds and concludes as follows:

## I.    JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a) and (b)(2)(A) and (B), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.   PROCEDURAL HISTORY

At approximately 4:30 p.m. on July 28, 2015, DSDA, on behalf of Debtor Todd A. Swenning ("Debtor"), filed a petition for relief under Chapter 11 of the Bankruptcy Code. On July 29, 2015, at 9:12 a.m., DSDA filed an Application for Employment of Doerner, Saunders, Daniel & Anderson, L.L.P. as Counsel for Debtor.[1]  The Court entered a text order granting DSDA's employment application effective as of July 29, 2015.[2]

On April 19, 2016, it appearing that Debtor was unable or unwilling to manage the estate consistent with his fiduciary duties as a debtor in possession, the Court issued an order to show cause why a Chapter 11 examiner should not be appointed to investigate potential "fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor."[3]  On April 22, 2016, the United States Trustee ("UST") moved for dismissal or appointment of a Chapter 11 trustee.[4]  After an evidentiary hearing, the Court found overwhelming cause to dismiss the case.[5]  Creditors, however,

---

[1]Doc. 7.

[2]Doc. 21.

[3]Order to Show Cause Why a Chapter 11 Examiner Should Not be Appointed (Doc. 70) at 3, *citing* 11 U.S.C. § 1104(c).  In the Order, the Court noted that "[t]he record as a whole raises issues as to the accuracy of the Schedules and Statement of Financial Affairs, accuracy of Debtor's Monthly Operating Reports, and accuracy of other statements made by or on behalf of Debtor, and suggests that the estate may possess preference, fraudulent transfer, turn-over, and/or post-petition transfer actions that should be pursued for the benefit of creditors."  Id. at 2.

[4]United States Trustee's Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint a Chapter 11 Trustee (Doc. 77).

[5]See Transcript of Bench Ruling issued on May 23, 2016 (Doc. 122).

believed that their best interests would be better served by a Chapter 11 trustee, so rather than dismissing the case, the Court granted the motion to appoint a trustee.

On June 1, 2016, Todd Frealy was appointed as the Chapter 11 trustee of Debtor's estate ("Trustee").[6]   Trustee filed an application to retain the firm of Levene, Neale, Bender, Yoo & Brill, L.L.P. as counsel for Trustee,[7] which the Court approved with an effective date of June 1, 2016.[8]   Trustee did not file an application to employ DSDA as an estate professional.   DSDA continued rendering services after Trustee was appointed, however. For instance, DSDA supplied Trustee documents it had obtained from Debtor, as well as work product it created while representing the estate.   DSDA also acted as an intermediary between Trustee and Debtor.

In December 2016, the Court confirmed the Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016,[9] as amended by stipulations entered into between and among Trustee and certain claimants and objecting parties.   The stipulations were incorporated into the Order Confirming Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016.[10]   Under the terms of the confirmed plan ("Plan"), Trustee has continued to serve as a trustee for the purposes of making distributions

---

[6]Order Approving Appointment of Chapter 11 Trustee (Doc. 110).

[7]Application for Employment of Levene, Neale, Bender, Yoo & Brill L.L.P. as Counsel for Chapter 11 Trustee (Doc. 123).

[8]Text-only order (Doc. 124).

[9]Doc. 160.

[10]Doc. 180 (entered on January 3, 2017).

3

required by the Plan, prosecuting avoidance actions and claim objections, and performing other duties required under 11 U.S.C. § 1106[11] and the Plan.

DSDA filed its Fee Application within the Plan's deadline for asserting administrative expense claims, requesting compensation for services rendered from July 28, 2015, through January 31, 2017, in the amount of $127,891.50,[12] and reimbursement of expenses in the amount of $1,432.53.  Trustee and the UST informally advised DSDA of their objections to certain components of the Fee Application, and after meetings and discussions, DSDA, Trustee, and the UST arrived at a compromise figure of $109,887.60 in fees.[13]

At the Court's request, the UST filed a pleading outlining the categories of objections that Trustee and the UST brought to DSDA's attention and which resulted in the agreed reduction.[14]  Objectionable fees included those for time spent prior to DSDA's employment and for time spent after Trustee was appointed.   In addition, the UST targeted some services it deemed duplicative and some entries that lacked detailed descriptions of the services.

---

[11]Unless otherwise specified, all text references to a "§" herein are to sections of the Bankruptcy Code, title 11 of the United States Code.

[12]Fees were billed in the following categories: Bankruptcy/Case Administration - $72,296.50; Debtor's Business - $900.00; Creditor Matters - $2,624.00; Plan and Disclosure Statement - $25,174.50; Trustee Appointment - $17,257.50; and Trustee Compliance and Requests - $9,639.00.

[13]United States Trustee's Statement Regarding Application for Approval and Final Allowance of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 330 of Doerner, Saunders, Daniel & Anderson, LLP (Doc. 198) at 2.  The resolution reduced DSDA's fee request by $17,904.81, or approximately 14%, but left DSDA's expense reimbursement request intact.

[14]Supplement [to Doc. 198] (Doc. 208).

The Court's independent review of the Fee Application identified additional categories of services that were potentially non-compensable.[15]  The Fee Application was set for hearing to permit DSDA to address–

- whether services rendered in drafting and filing disclosure statements and plans were reasonably likely to benefit the debtor's estate when, at the time the services were rendered, the debtor's disclosure of assets, transfers, and pre and post-petition expenditures was incomplete;  debtor's tax returns had not been filed and the status of tax liabilities was not known; orders to amend and supplement reports, and to show cause why an examiner should not be appointed were pending; and a motion to dismiss, or in the alternative, appoint a Chapter 11 trustee was pending;

- whether services rendered to unsuccessfully urge debtor to open a DIP account are compensable; and

- whether DSDA takes issue with any of categories of services the United States Trustee identified as non-compensable.[16]

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Time Spent Prior to DSDA's Employment

Approval of DSDA's employment application was "effective as of July 29, 2015,"[17] the date the application was filed. The Fee Application, however, includes 7.8 hours of services performed on July 28, 2015.  The petition and numerous other documents were filed

---

[15]See In re Albrecht, 245 B.R. 666, 672 (B.A.P. 10th Cir. 2000), *citing* In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 841 (3d Cir. 1994) (court has independent duty to insure that the fee sought is allowable under the applicable provisions of the Bankruptcy Code). And the Bankruptcy Code authorizes the Court, on its own motion and in the absence of any objections, to "award compensation that is less than the amount of compensation that is requested."  11 U.S.C. § 330(a)(2).

[16]Order Setting Hearing on Application for Approval and Final Allowance of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 330 [of DSDA] (Doc. 209).

[17]Text-only order (Doc. 21).

between 4:30 p.m. and 5:18 p.m. on July 28, 2015. DSDA's employment application was filed at 9:12 a.m. on July 29, 2015.[18]  DSDA did not request that the Court approve its employment as of the date or time the petition was filed, but DSDA argued that the application was filed substantially contemporaneously with the petition, and it would have been silly to ask for nunc pro tunc retention in such circumstances.

Regardless of whether the effective date of retention was July 28th or July 29th, however, it appears that the July 28th services were rendered prior to the time the petition was filed and are therefore not compensable as administrative expenses. The time entries indicate that attorney Sam Bratton and a paralegal were communicating with Debtor; revising the petition, schedules, and other first-day pleadings; and finalizing and filing the petition, schedules, and creditor list.  Debtor's obligation to pay for these services arose prepetition, and therefore the claim is a prepetition unsecured claim.[19]  Thus, the Court will disallow compensation for services rendered on July 28, 2015, in the amount of $1,803.00.[20]

B.      Time Spent After Appointment of Trustee

DSDA requests fees in the amount of $13,032.00 for work performed after Trustee was appointed.  DSDA summarizes these services as follows:

---

[18]See DSDA Exhibit 5.

[19]DSDA did not disclose a prepetition claim against the estate in its Bankruptcy Rule 2014 Statement (Doc. 8). If it had, the Court would not have approved DSDA's employment unless it waived the claim.  See 11 U.S.C. § 327(a) (professionals employed by the estate cannot hold "an interest adverse to the estate").

[20]The Fee Application also includes a charge of $150.00 for services performed prepetition on January 1, 2015.  Fee Application at 37.  DSDA agrees that this item should be deducted from its fee request because the work related to a different client altogether.

Applicant responded to Trustee requests for information and assistance in case management, Plan drafting and implementation, including: Furnish the Trustee and Trustee's counsel numerous documents, spreadsheet and other work product at the Trustee's request; assistance with transition of accounts; obtain information from the Debtor and transmit to the Trustee; response to inquiries regarding account management and accounting; assist with transfer of funds; coordination of meetings with the Debtor and conference calls with the Trustee; furnish the Trustee information regarding background and parties in interest; conferences with [Trustee and his counsel] regarding plan administration issues; negotiate settlements of trustee avoidance and recovery claims and the claim of Desert Regional Hospital; respond to Trustee request for input to Plan, dealing with objections and Plan feasibility; respond to requests to obtain information from Debtor for Plan purposes; numerous conferences and communications with Trustee and Trustee's counsel regarding Plan implementation and Debtor's compliance.[21]

These services are not compensable by the estate because DSDA was not employed by the estate at the time they were rendered. Debtor's role as debtor in possession terminated on June 1, 2016, upon Trustee's appointment. Trustee did not employ DSDA as an estate professional, and the Court did not authorize DSDA under § 327 to render services to Trustee or the estate. It matters not whether Trustee or the estate benefitted from DSDA's involvement after June 1, 2016.[22] The fact that DSDA was not an estate professional at the time is definitive, as is borne out by two cases that bind this Court.

---

[21]Fee Application at 2-3. Services performed after Trustee was appointed were billed in two categories: Trustee Compliance and Requests ($9,639.00) and Bankruptcy/Case Administration ($3,393.00).

[22]Mr. Bratton testified that the post-Trustee services were necessary and beneficial to the estate because Debtor was simply too busy to attend to Trustee's requests for information and compliance. Fair enough. But Debtor, as an individual benefitting from all the protections conferred by the Bankruptcy Code, had continuing statutory duties to, among other things, cooperate with Trustee and turn over books, records, and estate property to Trustee. See 11 U.S.C. § 521. In assisting Debtor in carrying out these duties, DSDA rendered services to Debtor, not to the estate.

7

In <u>Lamie v. U.S. Trustee</u>,[23] the United States Supreme Court considered whether a debtor's attorney who rendered services after his client's Chapter 11 case was converted to one under Chapter 7 could be awarded compensation under § 330(a)(1).[24]  The attorney had been duly employed under § 327 to represent and assist the debtor in possession in carrying out his fiduciary duties in the Chapter 11 case,[25] but had not been employed by the Chapter 7 trustee after conversion.[26]  Section 330, the justices observed, limited the "class of persons

---

[23]540 U.S. 526 (2004).

[24]Section 330(a)(1) provides–

After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328 and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—

> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

[25]Under § 327, "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  11 U.S.C. § 327(a). With some exceptions not relevant here, a debtor in possession in a Chapter 11 case has all rights and powers of a trustee, including the right to employ professionals under § 327.  See 11 U.S.C. § 1107(a).

[26]The attorney in <u>Lamie</u> "continued to provide legal services to ESI, the debtor, even though he did not have the trustee's authorization to do so.  He prepared reports detailing debts incurred and property acquired since the initial filing; he amended asset schedules; and he appeared at a hearing on an adversary complaint."  <u>Lamie</u>, 540 U.S. at 532.

eligible for compensation" to "one of three types of persons: trustees, examiners, and § 327 professional persons."[27]   When the debtor in possession was displaced by the Chapter 7 trustee as the representative of the estate, the attorney lost his status as a professional person employed under § 327, and therefore could not be compensated by the estate.  "Adhering to conventional doctrines of statutory interpretation, we hold that § 330(a)(1) does not authorize compensation awards to debtors' attorneys from estate funds, unless they are employed as authorized by § 327.  If the attorney is to be paid from estate funds under § 330(a)(1) in a Chapter 7 case, he must be employed by the trustee and approved by the Court."[28]

        In the case of In re Schupbach Investments, LLC,[29] the Tenth Circuit Court of Appeals held that a debtor's attorney could not be compensated from the estate for services rendered after the debtor was no longer a debtor in possession.  The Schupbach court pointed out that under §1101(1), "the debtor-in-possession's ability and duty to perform the functions of a trustee [is eliminated] in cases where a qualified trustee is serving those functions."[30] "[W]hen a debtor's status as debtor-in-possession terminates, this also terminates an attorney's authorization under § 327 to provide service[s] as an attorney for the debtor-in-

---

        [27]Id. at 534.  The Lamie case was decided before § 330(a)(1) was amended, in 2005, to include ombudsmen appointed under §§ 332 and 333 as additional persons eligible for compensation from the estate.

        [28]Id. at 538-39.  The central issue in Lamie concerned whether Congress, when it amended § 330(a) in 1994, intentionally deleted "debtor's attorney" from the list of persons eligible for compensation, or whether its omission of "debtor's attorney" was a scrivener's error.  Circuits were split on the issue.  The Supreme Court rejected the proposition that Congress made a mistake, and applied § 330(a) as drafted.

        [29]808 F.3d 1215 (10th Cir. 2015).

        [30]Id. at 1222.

possession."[31]   In order to be compensated with estate funds, "services must be both authorized and necessary."[32]

DSDA's retention as an estate professional under § 327 likewise expired when Debtor's status as debtor in possession terminated on June 1, 2016.  The Court has no authority under § 330(a) to award DSDA fees from the estate for services DSDA performed after Debtor was displaced by Trustee.  Accordingly, DSDA's request for fees in the amount of $13,032.00 for services rendered after June 1, 2016 is denied.

DSDA also asks to be reimbursed for expenses it incurred after the Trustee's appointment.  These expenses total $940.47.  Since only professionals employed by the estate under § 327 are entitled to reimbursement under § 330(a)(1), these expenses are disallowed.

C.     Time Spent Trying to Persuade Debtor to Open a DIP Account

Pursuant to the UST's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, "[a]ll pre-petition bank accounts controlled by debtor must be closed immediately upon the filing of the petition, and Debtor shall immediately open new debtor-in-possession operating, payroll and tax accounts at a United States Trustee Authorized Depository."[33]   Further, "[w]ithin fifteen (15) days of filing the petition, debtor

---

[31]Id., *citing* Lamie, 540 U.S. at 532.

[32]Id. at 1222 n.9.  See also In re Bresnick, 406 B.R. 582 (Bankr. E.D.N.Y. 2009) (when a Chapter 11 trustee was appointed, the debtor's status as debtor in possession terminated and debtor's counsel was no longer employed by the estate.  Accordingly, debtor's counsel could not obtain compensation from the estate for work performed after trustee's appointment).

[33]Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, ¶ 4.

must provide the United States Trustee with a sworn statement describing all pre-petition accounts by depository name, account number, and account name, verifying that each such pre-petition account has been closed. . . .  Additionally, proof of closing old accounts and opening new accounts must be provided."[34]  Debtor certified that he read and understood these Operating Guidelines and Reporting Requirements, and his counsel, Mr. Bratton, certified that he read and reviewed them with Debtor.[35]

One of the most fundamental duties of a debtor in possession is being accountable for property of the estate.[36]  It is incumbent upon counsel for a Chapter 11 debtor to insure that its client closes prepetition accounts and opens appropriate DIP accounts immediately upon filing the petition in order to create a bright-line demarcation between prepetition and postpetition property, and to insure that estate funds are safeguarded in an authorized financial institution.  Debtor did not immediately close his prepetition accounts or open DIP accounts upon filing.  Mr. Bratton advised the Court that he had left the task of closing and opening bank accounts to Debtor, and assumed that it had been done.

Debtor's August 2015 and September 2015 monthly operating reports ("MORs") were filed on October 23, 2015.  Although Debtor certified in his MORs that he had not disbursed funds from any account other than a debtor in possession account, the bank statements attached to the MORs indicated that Debtor was depositing his post-petition income – estate

---

[34]Id.

[35]Initial Report (Doc. 20), Attachment A.

[36]See 11 U.S.C. § 1107(a) (a debtor in possession "shall perform" all duties of a trustee under 11 U.S.C. § 1106(a)(1), including the duty under 11 U.S.C. § 704(a)(2), to "be accountable for all property received").

funds – into an account not styled as a DIP account, and was disbursing funds from that account.  Not only was it not a DIP account, it was a prepetition account jointly held by Debtor and his non-debtor wife.  Mr. Bratton should have known this; he and his paralegal prepared, compiled, and filed the monthly operating reports.  In later MORs, Debtor acknowledged that he had disbursed funds from a non-DIP account, but apparently Debtor and Mr. Bratton did not find anything wrong with that.

On many occasions, however, the UST, and then Court, called upon Mr. Bratton to explain why this debtor continued to ignore the UST's Chapter 11 operating guidelines and § 345 of the Bankruptcy Code which governs deposits of estate funds.[37]  Mr. Bratton represented that Debtor had attempted to open a DIP account, but was unsuccessful due to the unwillingness of banks in the Palm Springs area, where Debtor resided, to enter into the DIP depository agreement required by the UST.  On its own, the Court easily identified several banks in the Palm Springs area that offered DIP accounts, and conveyed this information to Mr. Bratton.

On February 17, 2016, the Court *ordered* Debtor to comply with DIP account requirements.  From that date through the date Trustee was appointed, DSDA spent 6.6 hours in attorney time, and billed $2,475.00, investigating the history of its communications with Debtor about opening a DIP account, communicating with Debtor's personal banker, drafting a report to the Court regarding the efforts made to obtain a DIP account, contacting banks

---

[37]Although the counsel for the UST communicated with Mr. Bratton and perhaps Debtor about the DIP account requirements, with unsatisfactory results, she did not bring the issue to the attention of the Court.  In the Court's view, when a Chapter 11 debtor refuses to comply with the UST's operating and reporting guidelines with respect to the safekeeping of estate funds, a motion to dismiss is appropriate.

suggested by the Court, investigating requirements for opening a DIP account, and communicating with Debtor about each of these tasks.  None of this resulted in Debtor establishing a DIP account.[38]  DSDA's services in this endeavor were not only untimely, but also ineffective.

Accordingly, DSDA's request to be paid $2,475.00 for 6.6 hours spent in connection with Debtor's failure to open a DIP account is disallowed.

D.      Time Spent Drafting Plans and Disclosure Statements

1.      *Background*

At a status conference held on February 17, 2016, Mr. Bratton represented that the case was going well, and that once cash flow projections were finalized, he would be in a position to file a plan and disclosure statement.  Having reviewed the entire record prior to the conference, however, the Court harbored doubts about the accuracy of Debtor's disclosures to date, and also about Debtor's ability to faithfully execute a plan.

Of particular concern were Debtor's schedules and statement of financial affairs ("SOFA"), which did not adequately explain what happened to more than a quarter of a million dollars that Debtor earned in the 60-day period prior to filing the petition.  Mr. Bratton expressed surprise that Debtor earned that much in the 60-day pre-filing period.  Mr. Bratton himself had filed Debtor's Payment Advices Certification, however, along with four payment advices from Tenet Healthcare Corporation representing income totaling $254,733.  On his schedule of assets, Debtor represented that on the petition date, he had $500 in a

---

[38]Debtor opened a DIP account approximately one year after the petition was filed, but by then, Debtor was no longer a debtor in possession.

13

checking account, $50 in cash, vehicles valued at $17,000, household goods valued at about $15,000, security deposits of $8,500, and a 401K valued at $200,000.  Mr. Bratton doubted that Debtor funded his 401K with those earnings, so the where did all that money go?  In paragraph 3(a) of Debtor's SOFA, where payments of debts made within the 90-day prepetition period (*i.e.*, the preference period) must be reported, Debtor listed payments totaling approximately $88,000, including payments of $34,320 for malpractice insurance and about $24,000 to his bankruptcy attorneys.  But only $64,000 of the $88,000 in payments were made in the 60-day prepetition period – the period in which Debtor earned $254,733.[39] Debtor's prepetition disposition of in excess of $190,000 was unexplained.

Also at the status conference, the Court inquired into the financial status of Debtor's wholly owned professional corporation that sheltered his medical practice (the "PC").  From Debtor's monthly operating reports, it appeared that the PC paid Debtor a net salary (after tax withholding) and a year end distribution, which had been deposited into Debtor's personal checking account (the one he held jointly with his wife).  Debtor habitually spent all of his salary and distributions on personal living expenses, reserving nothing for administrative expenses or plan payments. So how did Debtor intend to fund a plan?  Was the PC accumulating funds?  Mr. Bratton said no – the PC was a pass-through entity that did not accumulate funds.

---

[39]According to his SOFA, Debtor earned an additional $47,000 from other sources in 2015, apparently outside the period reported in the Payment Advices Certification. Thus, according to the schedules and SOFA, Debtor had earned over $300,000 in 2015, but retained only $550 as of the petition date.

At this point in the case, Debtor had not prepared or filed any periodic reports on the PC's "value, operations, and profitability" as required by the Bankruptcy Rules.[40]  These periodic reports were to be signed by the Debtor under penalty of perjury, and  incorporate a valuation estimate of the PC, a balance sheet, a statement of the PC's profit or loss, a statement of the PC's cash flows, and a statement regarding shareholders' equity.  Seven months into the case, the Court –  and parties in interest – were in the dark as to the sources and amounts of the PC's income, and how those funds were being spent.

Mr. Bratton was unable to provide complete or satisfactory responses to the Court's inquiries during the status conference.  Accordingly, the Court ordered Debtor –

> to file a report (or amend previously filed reports) to address the following: (1) account for the disposition of Debtor's 60-day prepetition earnings as represented on his Payment Advices Certification (Doc. 11); (2) provide the August 2015 bank statement omitted from the August 2015 MOR; (3) certify that Debtor has opened and funded appropriate DIP accounts, including a tax escrow account; and (4) account for credits and debits for all Chase accounts in Debtor's name including account 1321 from the petition date to the present. On or before 3/18/2016, and every 60 days thereafter until further order of the Court, Debtor to file the report required by Bankruptcy Rule 2015.3 in connection with all entities in which Debtor holds a controlling interest.[41]

As of the date of the status conference, DSDA had already spent 13.6 hours on developing a plan and disclosure statement, resulting in fees of $5,100.50.

On March 2, 2016, DSDA filed a report addressing some of the matters raised at the status conference (the "March 2nd Report").[42]  Debtor's explanation of his disposition of

---

[40]See Fed. R. Bankr. P. 2015.3(a).

[41]Minute (Doc. 46).

[42]Report (Doc. 54).

prepetition earnings was worthless.  Instead of accounting for each expenditure made during the time period, Debtor grouped his expenditures into five general categories:  Tax deposits - $100,000; domestic support - $40,000;[43] prepetition creditors (per SOFA) - $88,000;[44] moving expenses - $20,000; and deposits and rent - $21,000.  The whole point of disclosing prepetition transfers is to determine whether any of the transfers were preferential or fraudulent as to creditors.  An analysis cannot be performed if the disclosure does not identify the specific creditor paid, when the debt was incurred, and the date and amount of each payment.  Without this information, how could DSDA assist Debtor in complying with his fiduciary duty to discover and recover estate property for the benefit of creditors?  DSDA's inability to verify Debtor's oral representations with bank records and other financial documents[45] certainly should have triggered doubts as to the credibility of information supplied by Debtor for the purposes of drafting a disclosure statement and plan.

DSDA also represented in the March 2nd Report that although Debtor still had not

---

[43]Debtor had not disclosed any domestic support obligation payments in his response to SOFA ¶ 3(a) ("[l]ist all payments on . . . debts to any creditor made within **90 days** immediately preceding the commencement of this case . . . .   Indicate with an askerisk (*) any payments that were made to a creditor on account of a domestic support obligation"), or in response to SOFA ¶ 3(c) ("payments made within **one year** . . . to or for the benefit of creditors who are or were insiders") (emphasis original).  SOFA (Doc. 12).

[44]Remember, however, that the payments totaling $88,000 disclosed in the SOFA were made over a 90-day prepetition period; only $64,000 of those payments were made from Debtor's 60-day earnings of $264,733.  Even this general disclosure is demonstrably inaccurate.

[45]At the hearing in May 2016, Debtor testified that he had given the prepetition bank statements to Mr. Bratton, but when the Court asked Mr. Bratton where they were, he responded that he did not know if the prepetition bank statements were included in the statements provided by Debtor, a response that undermined both Debtor's and Mr. Bratton's credibility.

opened a DIP account, he had at least successfully removed his wife's name from the account that held the estate's funds.  DSDA also represented that the PC held four bank accounts, and Debtor's wife had no interest in the PC's accounts.[46]  DSDA also represented that Debtor's retirement account had a balance of $200,000, all of which was funded sometime prior to December 2014.  The round number suggests that DSDA again did not review documents to verify Debtor's representations.  The issue of whether Debtor transferred some of the 60-day prepetition income into his retirement account in an attempt to hinder creditors was still unresolved in the Court's mind.

On March 22, 2016, DSDA filed a Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Todd A. Swenning Holds a Substantial or Controlling Interest (the "Rule 2015.3 Report").[47]  Briefly, Debtor disclosed that he formed the PC on April 6, 2015; the PC was a pass-through entity; the PC had no tangible assets except office equipment; the PC had not prepared any financial statements, balance sheets, profit and loss statements, or cash flow statements in the ten months of its existence; and the PC had operated at a loss due to hospital advances exceeding collections, which overpayments constituted a liability that would be paid from future revenues.  According to the report, the PC's accountant was preparing a cash flow pro forma for use in connection with Debtor's plan proposal, even though no actual cash flow statements existed.  Further,

---

[46]After the PC's bank statements were filed of record and subjected to inquiry, Debtor admitted that his wife had access to the PC's accounts and that she withdrew funds using a debit card associated with one of the PC's accounts for personal expenses.  DSDA knew or should have known that Debtor's wife was an active debit card holder, as the PC's bank statements summarized "total card purchases" by Debtor on his card, and by his wife on hers.

[47]Doc. 56.

although the required financial statements would eventually have to be prepared in connection with filing 2015 tax returns, both Debtor and the PC had obtained six month extensions of their filing deadlines.

On April 4, 2016, the Court ordered Debtor to amend or supplement the reports after finding the March 2nd Report and the Rule 2015.3 Report "grossly insufficient," lacking in "meaningful information," and non-compliant with Bankruptcy Rule 2015.3.[48] Between the time DSDA submitted the reports and the Court issued its order, DSDA spent another 11.1 hours on plan and disclosure statement matters, billing $3,960.00.

The amended or supplemented reports were to include an accounting of Debtor's actual expenditure of his prepetition earnings,[49] copies of the PC's raw bank statements and an accounting of actual monthly cash flow, calculation and proof of payment of post-petition tax obligations, and details regarding the PC's "over-advance" liability.

At this point, it was obvious to the Court, and should have been obvious to DSDA, that until Debtor fully and accurately disclosed what happened to his prepetition income, and fully and accurately accounted for estate funds, it was premature to consider a disclosure statement or plan.  Further, the information that *was* provided in the reports – operating losses, postpetition debt, uncertain postpetition tax liability – did not augur well for feasibility.

---

[48]Order Requiring Debtor to Amend and Supplement Reports (Doc. 65).

[49]Debtor did not amend or supplement his March 2nd Report, and as a result, never explained his prepetition disposition of a quarter of a million dollars.

After the second disclosure order was entered, DSDA spent another 7.9 hours in this category, billing $2,911.50, before filing a disclosure statement and proposed plan of reorganization on April 7, 2016.  The disclosure statement warned that the financial and business information disclosed was based solely upon Debtor's representations and records, and that no professional had verified its accuracy.[50]  While such a caveat might pass muster in a case where a debtor entity has reputable in-house accounting professionals and systems, in this case, in light of the numerous disclosure deficiencies and the discovery that the PC had no accounting records, the Court finds that DSDA knew or should have known that the disclosure statement could not have been approved as providing adequate or accurate information.

On April 13, 2016, DSDA filed a supplement to the Rule 2015.3 Report ("Rule 2015.3 Supplement").[51]  The Rule 2015.3 Supplement did not provide proof that Debtor had paid all taxes owed on postpetition income or details concerning the PC's "over-advance" liability. Further, it stated that "[o]ther than the attached bank statements showing all receipts and

---

[50]The disclaimer stated, in full–

The financial and business information set forth in this Disclosure Statement and the Plan is based upon information furnished by Debtor and information found in the books and records of Debtor.  The information set forth in the Disclosure Statement and Plan is unaudited.  Debtor's professionals and advisors have not independently verified such information and make no representation as to the accuracy thereof.

Disclosure Statement (Doc. 67) at 2.

[51]Supplement to Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Todd A. Swenning Holds a Substantial or Controlling Interest (Doc. 68).

payments, Debtor does not have a detailed monthly cash flow statement for the P.C.  Neither the Debtor nor Debtor's counsel has the expertise or resources to generate monthly, detailed cash flow statements for the P.C."[52]  And the PC's accountant would not be able to generate actual cash flow statements until mid-May.  The disclosure statement and plan DSDA filed on April 7, 2016, contained monthly cash flow projections through 2021, yet at that time, no professional had analyzed the bank statements or other financial documents to determine the PC's actual revenue and actual legitimate expenses.

The PC's bank statements, now filed of record, represented account activity from July 1, 2015, to March 31, 2016.  They painted an alarming picture of the misuse of, and lack of accounting for, approximately $650,000 of cash flowing through the account during that nine month period.  These documents confirmed that Debtor made no effort to properly manage or safeguard the revenue stream for the benefit of his creditors – again, from this sum, no reserve had been established to pay administrative expenses or to fund the proposed plan.  Yet the plan DSDA filed projected that Debtor would make plan payments to creditors ranging from $9,000 to $32,000 per month.[53]

On April 19, 2016, the Court entered its Order to Show Cause Why a Chapter 11 Examiner Should Not Be Appointed ("Show Cause Order").[54]  A few days later, the UST filed its motion to dismiss the case or appoint a Chapter 11 trustee, contending that Debtor was wholly unable or unwilling to perform the fiduciary responsibilities of safekeeping and

---

[52]Id. at 1.

[53]Debtor's Plan of Reorganization (Doc. 66) at 13-14.

[54]Doc. 70.

accounting for estate property.[55]  The UST's motion and the Show Cause Order were set to be heard on May 12, 2016.

In the period between April 19, 2016, when the Show Cause Order was issued, and the May 12th hearing date, DSDA spent 29.9 hours amending the disclosure statement and proposed plan.  This second plan,[56] filed on May 11, 2016, contemplated the appointment of a plan trustee to manage the finances of the PC (albeit, giving Debtor considerable leeway to spend PC funds), and to disburse under the plan the PC's net revenue, as well as whatever "net Disposable Income" Debtor might turn over to the plan trustee from his salary.[57] Inexplicably, this second plan vested all avoidance claims in Debtor to pursue, or not, at his discretion.[58] For this work, DSDA billed $10,728.00.

---

[55]United States Trustee's Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint a Chapter 11 Trustee (Doc. 77) at 6.  Mr. Bratton had been supplying the UST's office with copies of the PC's bank statements throughout the case, and therefore the UST had to know early on that not only was Debtor flouting the UST's operating and reporting guidelines, but he was also mishandling and dissipating estate funds. One of the most important duties of the UST, in this Court's opinion, is to "apply promptly" for relief after finding "material grounds for any relief under section 1112 of title 11."  28 U.S.C. § 586(a)(8).  Yet the UST did not file a motion to dismiss until after the Court issued its own order to show cause – in the ninth month of the case.

[56]Debtor's Amended Plan of Reorganization (Doc. 91).

[57]The plan left Debtor with unfettered discretion to spend his salary so long as he made monthly plan payments.  But he had no obligation to make the monthly plan payments in amounts projected.  "The amount of actual monthly payments to Plan Trustee may vary from projections by virtue of unforeseen or uncategorized expenses." Amended Plan at 7.

[58]Mr. Bratton later represented that he was amenable to amending the plan to vest those actions in a plan trustee, but he also stated that he did not believe there were any avoidance actions.

At the May 12th hearing, it was established that Debtor was liable to the hospital for $522,000 in over-advances.  Also, it was established that Debtor had been raiding his PC account to pay personal expenses that were not listed in his monthly operating reports.  For tax and bankruptcy reporting purposes, the PC made in excess of $110,000 of shareholder distributions to Debtor, which he and his wife spent.[59]  Because the receipt and expenditure of the shareholder distributions were not disclosed in Debtor's monthly operating reports, UST fees had not been paid on those disbursements.  More importantly, Debtor had not withheld or paid quarterly income taxes on the distributions.  Because of this, the accountant testified that he could not estimate Debtor's post-petition tax liability.

Debtor admitted he voluntarily paid $20,000 per month from his salary to his wife for domestic support long before a court order required it. He also caused the PC to pay her $3,500 per month to do his banking and otherwise act as his personal assistant.  Contrary to the representation made in the March 2nd Report, Debtor admitted that his wife did have signatory authority on the PC's operating account, and had a debit card in her name associated with the account, which she used, with Debtor's knowledge, to misappropriate tens of thousands of dollars to pay for personal travel and goods.  Debtor and his wife together also withdrew from the PC account, and did not account for, tens of thousands of dollars in cash.

---

[59]The PC's accountant prepared an exhibit that categorized approximately $110,000 of expenses paid by the PC as personal in nature. At the hearing, Debtor admitted that certain other expenses listed on the exhibit were mis-categorized as business expenses, including those for personal travel and life insurance, and those items should have been added to the personal expense total.  Accordingly, the shareholder distributions well exceeded $110,000.

Although Debtor maintained a Quicken account to organize and report his personal income and expenses, neither he nor his wife saw fit to keep track of the PC's income and expenses, and or create meaningful business records, in Quickbooks or any other accounting software, notwithstanding the advice of the PC's accountant in August 2015. Nor did Debtor task the accountant with setting up or keeping records.

At the hearing, Mr. Bratton admitted that Debtor had mishandled the PC's funds, but claimed that the "bleeding has stopped," and that Debtor was now willing to "accept some controls" to get money flowing to creditors, specifically, intervention by a plan trustee. In light of all the evidence adduced at the hearing, however, all of which DSDA knew or should have known (since DSDA always had access to the PC's bank statements), it is difficult to believe that Mr. Bratton thought the disclosure statements and plans had any chance of success.[60] Was Debtor really going to go after his wife to recover unauthorized post-petition transfers he made to her, or funds that she withdrew from the PC, to pay creditors? How would DSDA establish that "the proponent of the plan complies with the applicable provisions" of the Bankruptcy Code, that all UST fees had been paid, or that the plan was feasible?

After the hearing, DSDA spent an additional 6.5 hours revising the plan and disclosure statement, for which it billed $2,437.50. This third version was filed on May 19, 2016.

---

[60]At the hearing, counsel for the largest unsecured creditor, owed in excess of $1.2 million, said that the proposed treatment of his client in the second plan was unacceptable.

On May 23, 2016, the Court issued a bench ruling granting the UST's motion for the appointment of a Chapter 11 trustee. Thereafter, the Court entered an order denying Debtor's request to set the third disclosure statement for hearing, finding that the third disclosure statement, on its face, did not provide adequate information about matters raised at the May 12th hearing that remained unresolved. Debtor's schedules, SOFA, monthly operating reports, and other reports proved inaccurate, yet had not been amended. The extent of Debtor's unpaid post-petition tax liability was unknown due to unreported PC distributions. Potential avoidance actions had not been explored. The PC's records were in shambles. And, to put it mildly, the Court would have been hard pressed to make a finding that the plan had been filed in good faith in light of the disrespect Debtor paid to the fiduciary duties he assumed as a debtor in possession. Moreover, this third disclosure statement, like its predecessors, "disclaim[ed] its own accuracy."[61]

### 2. *Legal Analysis*

Under § 330(a)(1)(A), the Court may allow reasonable compensation for "actual, necessary services" rendered by a professional person employed under § 327.[62] Under § 330(a)(4)(A)(ii), however, the Court is prohibited from allowing compensation for "services that were not – (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of a case."[63] Services falling in this category are simply not compensable. In setting DSDA's Fee Application for hearing, the Court gave DSDA fair

---

[61]Order Denying Approval of Disclosure Statement, Doc. 103.

[62]11 U.S.C. § 330(a)(1)(A).

[63]Id. § 330(a)(4)(A)(ii).

notice that it would need to establish that it was entitled to fees in the Plan and Disclosure Statement category.

To be sure, estate professionals are not required to establish that services *actually* benefitted the estate to be compensable.[64]   "Whether the services were ultimately successful is relevant to, but not dispositive of, attorney compensation."[65]   In order to overcome an objection raised under § 330(a)(4)(A)(ii), however, a fee applicant must establish that at the time the services were rendered, and under the totality of the circumstances of the case, a reasonable lawyer would have considered the services likely to benefit the estate – an objective standard.[66]

In considering whether DSDA's work on the disclosure statements and plans is compensable, the Court must consider whether it was objectively reasonable at the time services were rendered, under the above-stated circumstances of this case, that the various disclosure statements and plans were likely to be approved.  Pertinent to the inquiry is what facts were known – and also what facts were unknown – when DSDA began formulating a plan.

First, it would have been apparent to a reasonable lawyer, from Debtor's and the PC's bank statements, that Debtor had consistently breached his fiduciary duties by failing to properly manage, account for, or exercise any financial restraint over funds belonging to the

---

[64]See, e.g., In re Woerner, 783 F.3d 266, 276 (5th Cir. 2015) (any requirement that an applicant prove "actual benefit" to the estate was superceded by 1994 amendments to § 330(a)).

[65]Id.

[66]Id.

bankruptcy estate.  One would have known that while creditors were stayed from enforcing their valid claims against Debtor, Debtor continued spending hundreds of thousands of dollars of estate money to support his lifestyle, and had set aside nothing to pay the mounting administrative expenses, insuring that creditors would realize nothing in the early years of a plan.  Also, one would have known that Debtor had allowed his wife to divert substantial funds from the PC, which Debtor should have recovered for the benefit of the estate.  A reasonable lawyer would have known that the cash flow projections DSDA proposed were not only highly speculative but also, given Debtor's irresponsible post-petition spending habits, unlikely to be met.

At the time DSDA began the plan process, a reasonable lawyer would have realized that crucial information was unknown: the schedules and SOFA were inaccurate and incomplete, the PC had no books or records, and hundreds of thousands of dollars of prepetition and post-petition cash had not been accounted for.  A reasonable lawyer would not draft and revise a disclosure statement or plan unless these omissions, deficiencies, and misstatements were remedied to the lawyer's satisfaction, and of record to the Court's satisfaction.

While Debtor largely stonewalled Court orders requiring disclosures and compliance, DSDA proceeded to draft and file the first plan and disclosure statement.  After the Court issued its Show Cause Order, and the UST filed its own motion, DSDA continued revising the plan and disclosure statement, filing a second version on the day before the May 12th hearing.  After the May 12th hearing, even though it was highly likely that the case would be

dismissed or an examiner or trustee would be appointed, DSDA filed a third plan and disclosure statement. None of the disclosure statements were set for hearing.

DSDA did not offer any testimony from an independent third party that its course of action was objectively reasonable. Although lawyers are not responsible for their clients' mistakes, when the client is a fiduciary that intentionally or carelessly handles trust funds, a reasonable lawyer would insure that the client appreciates the seriousness and consequences of such behavior, bring the client under control or withdraw from representation, and remedy all breaches before proposing that the client be allowed to administer future funds through a plan.[67] The Court finds that DSDA did not meet its burden to show that at the time it drafted the disclosure statements and plans, there was a realistic

---

[67]Hon. Ralph Kirscher succinctly summarized counsel's responsibilities in such a situation as follows–

> When undertaking representation of a debtor in bankruptcy, an attorney as a professional must inform the debtor of not only the benefits of bankruptcy, but also the burdens, including full and adequate disclosure of assets and financial information, reporting requirements, cooperation with any trustee, and any fiduciary obligations. An attorney will encounter difficult cases and difficult clients, but as a professional, an attorney must instruct the debtor on appropriate conduct and must develop client control. To foster such client control, an attorney must be: knowledgeable about the law; willing to communicate promptly with the client about all matters associated with the client's case; instructive on what alternatives and remedies are available to the client; knowledgeable about the parameters and limits of available alternatives and remedies, and unwilling to allow a client to direct or dictate the progress or activity in a case, if such activity is inconsistent with the requirements of the law. If an attorney believes a client is unwilling to listen and follow the advice of counsel, then the attorney must consider whether he/she is able to continue representing the client.

In re Berg, 268 B.R. 250, 262 (Bankr. D. Mont. 2001).

chance that a plan could be confirmed.  The services were not reasonably likely to benefit the estate nor were they necessary to the completion of the case.[68]

DSDA argued that its third plan and disclosure statement served as a template for Trustee's confirmed plan and disclosure statement, and that Trustee relied upon information DSDA gathered in formulating Trustee's plan.  After reviewing DSDA drafts and Trustee's drafts, it appears that Trustee incorporated into its disclosure statement some of the background information DSDA drafted, but other than those few paragraphs, the plans and disclosure statements filed by Trustee do not resemble DSDA's.  For gathering and drafting the background facts, the Court will award DSDA $1,500.00.  Accordingly, of the $25,617.00 requested for services related to the plan and disclosure statement, $24,117.00 is disallowed.

E.    Duplication

The UST identified certain of DSDA's time entries as non-compensable due to duplication of efforts.  In these entries, Mr. Bratton and a paralegal each billed time for participating in telephone conferences with Debtor, and for conferring and coordinating with each other in connection with tasks assigned to the paralegal.  Tasks delegated included obtaining information from Debtor, preparing reports (including the initial report and

---

[68]The Court's concern about compensating DSDA for its work on the plan and disclosure statement arose solely from the limitation on entitlement to compensation stated in § 330(a)(4)(A)(ii) for services not reasonably likely to benefit the estate or not necessary to the administration of the case.  If DSDA had succeeded in proving its entitlement to fees for these services, then the Court would have had to perform an analysis of the § 330(a)(3) factors as to the reasonableness of the fees. Since DSDA is not entitled to be compensated under § 330(a)(4)(A)(ii), however, the reasonableness of the fees requested in this category is a moot point.

monthly operating reports), and compiling exhibits and documents for filing. Delegating ministerial and non-legal tasks to paralegals and other non-lawyer staff is generally cost-effective. And lawyers have a duty to carefully instruct their non-lawyer staff about the scope and performance of the task, as well a duty to monitor the work and review the paralegal's work product. The Court finds that time spent by one lawyer and one paralegal participating in the same conference or telephone call, and conferring about the performance of delegated tasks is compensable.

DSDA concedes, however, that 8.3 hours billed on May 11, 2016, in the Trustee Appointment category includes 5.2 hours that DSDA reclassified to the Plan and Disclosure Statement category, and therefore 5.2 hours is billed twice. DSDA agrees that 5.2 hours should be deducted from the Trustee Appointment category as duplicative, resulting in a reduction of $1,950.00.

      F.    Insufficient description of work performed.

The UST noted eight time entries it believed contained insufficient or vague descriptions of the work performed.[69] Seven of the eight entries were made by paralegals who were working on financial documents that were to be filed or put into exhibit notebooks. The other entry was by Mr. Bratton for 1.2 hours in which he "[r]eview[ed] file and memos and work[ed] on reports."[70] In the context of the matters pending at the time the services were rendered, the Court finds that the descriptions, while not detailed, are sufficient to

---

[69]DSDA Exhibit 6 at 8-9.

[70]Id. at 9.

enable the Court to determine that the time spent and fees billed for these services are reasonable.

## IV.    CONCLUSION

DSDA requests fees in the amount of $127,891.50.  As detailed above, the following fees are disallowed: $1,803.00 for services rendered on July 28, 2015; $13,032.00 for work performed after Trustee was appointed; $150.00 for services performed on January 1, 2015, for a different client; $2,475.00 for time spent in connection with Debtor's failure to open a DIP account; $24,117.00 billed for plan and disclosure statement services; and $1,950.00 for services inadvertently billed in two categories.   The total amount disallowed is $43,527.00, resulting in a fee award of $84,364.50.

DSDA requests expense reimbursement in the amount of $1,432.53.  Expenses incurred after the Trustee's appointment in the amount of $940.47 are disallowed.  Thus, the estate shall reimburse DSDA for expenses in the amount of $492.06.

DSDA is authorized to transfer to itself $10,000.00 of the estate's funds from its trust account to partially pay the award.

Accordingly, the Fee Application is granted in part and denied in part.

**SO ORDERED** this 20th day of July, 2017.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE