**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

In re                                              **Case No. 15-11408-R**
**TODD A. SWENNING,**                              **Chapter 11**

                        **Debtor**

**CHAPTER 11 TRUSTEE'S NOTICE OF MOTION AND MOTION TO (1) DISMISS
CHAPTER 11 CASE (2) REQUIRE TURNOVER OF ESTATE FUNDS, AND (3)
APPROVE THE METHOD FOR MAKING FINAL DISTRIBUTIONS OF REMAINING
ESTATE FUNDS, AND NOTICE OF OPPORTUNITY FOR HEARING**

### NOTICE OF MOTION

**PLEASE TAKE NOTICE THAT,** pursuant to Sections 542 and 1112(b) of 11 U.S.C. §
101 et seq. (the "Bankruptcy Code"),[1] Todd A. Frealy, the Chapter 11 Trustee (the "Trustee") of
the bankruptcy estate of Todd A. Swenning, the Chapter 11 debtor herein (the "Debtor"), hereby
submits this motion (the "Motion to Dismiss") to (1) dismiss the Debtor's Chapter 11 case, with
a reasonable bar to refiling, (2) require the Debtor to turn over a recently received tax refund or
enter judgment against the Debtor for the amount thereof, and (3) approve the method for
making final distributions of remaining estate funds.

### NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and
consult your attorney about your rights and the effect of this document.** If
you do not want the Court to grant the requested relief, or you wish to have your
views considered, you must file a written response or objection to the requested
relief with the Clerk of the United States Bankruptcy Court for the Northern
District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than
24 days from the date of filing of this request for relief (which is by **no later than**

---

[1] Unless otherwise state, all Section references herein are to the Bankruptcy Code.

**May 27, 2019**. You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney and file a certificate of service with the Court.  If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice.  **The 24 day period includes the three (3) days allowed for mailing provided for in Fed. R. Bankr. P. 9006(f).**

\* \* \*

## MOTION

## I.

## INTRODUCTION

Chapter 11 cases and, in particular, the discharge to be granted in such cases, are for honest but unfortunate debtors.  In this case, the Debtor has demonstrated time and again that he is not dealing with creditors (or the Trustee and the estate) in an honest manner.  As further discussed below, the Debtor's misdeeds first resulted in the appointment of the Trustee.  After the Trustee confirmed his *Second Amended Plan Of Reorganization Dated November 10, 2016* [Dkt. 160] (the "Plan"), the Debtor continued to act in other than an above-board manner.  As a result, in February 2018, the Trustee filed his *Motion to Compel Performance Under Second Amended Plan of Reorganization Dated November* [Dkt. 226] (the "Motion to Compel") chronicling the Debtor's failure to abide by, and perform under, the terms of the Plan, efforts to make the Trustee constantly police the Debtor and his performance under the Plan, at great cost and to the detriment of creditor recoveries, as well as the Trustee's resulting inability to make over $104,000 in payments required by the Plan.  The Motion to Compel was granted.

Notwithstanding that the Motion to Compel was granted, since the time it was granted, the Debtor's malfeasance and failure to perform under the Plan has continued.  For example, the despite payment deficiencies under the Plan, the Debtor failed to turn over to the Trustee the $20,699 portion of a tax refund paid to the Debtor, which is one-half of the subject tax refund.

Further, the Debtor appears to be engaging in efforts to funnel additional funds out of the estate to his alleged former spouse, Melissa Swenning ("M. Swenning"), by making income tax overpayments and then asserting that the resulting refunds should be split evenly between him and M. Swenning despite the fact that the Debtor makes much more than M. Swenning and, therefore, generates higher income taxes.[2]   For example, despite the disparity in income and income taxes, and the lack of any apparent basis under the Debtor's separation agreement with M. Swenning for doing so, the Debtor paid $20,699  (*i.e.*, the other half of the foregoing tax refund) to M. Swenning.  The Debtor should be required to turn over the entire tax refund.

In addition, the Debtor failed to make a payment to the Trustee to purchase his non-exempt equity in vehicles, as required by the Plan, and the Debtor has continued to make payments not allowed by the Plan projections for extravagancies and other goods and services. As was the case leading up to the filing of the Motion to Compel, when the Trustee inquires of the Debtor regarding the foregoing matters, the Debtor delays, stonewalls, or provides untenable explanations.  Requiring the Trustee to heavily police the case and implementation of the Plan has resulted in much higher than expected post-confirmation administrative fees, which would ultimately diminish the projected distribution on allowed general unsecured claims under the Plan were the case to proceed.

As a result of the foregoing, as of May 1, 2019, over $177,000 in required Plan payments have not been made, which default amount continues to grow, and creditors have started sending letters to the Trustee demanding that he make payments required by the Plan.  However, the Trustee simply does not have funds to make such payments because of the Debtor's failure to perform under the plan and his active efforts to place funds beyond the reach of the Trustee.

---

[2] On multiple occasions, the Trustee requested that the Debtor provide copies of the returns resulting in the new tax refund and other information relevant thereto.  As usual, the Debtor failed to provide relevant information and documentation.  Since the Trustee is not aware of any basis for any tax refunds other than for income tax overpayments, the Trustee surmises that the new tax refund is for income tax overpayments.  Given the Debtor's failure to respond to requests for information about the new tax refund, the onus is on the Debtor to provide contrary evidence.

In consideration of the foregoing, there is ample cause under Section 1112(b) for dismissal or conversion.  Dismissal should be ordered over conversion because it is likely that the Debtor cannot qualify as a Chapter 7 debtor under the means test, and adding another layer of administrative costs will not benefit any creditors.  More importantly, the Debtor has clearly demonstrated that he does not deserve to get a discharge.  Thus, the case should be dismissed, and creditors should be allowed to pursue their claims and remedies against the Debtor.

In addition to dismissal, the Trustee requests that the Court approve the method for making final distributions of remaining estate funds pursuant to the distribution scheme under the Bankruptcy Code.

## II.

## STATEMENT OF FACTS

### A.  BACKGROUND.

1.      On July 28, 2015 (the "Petition Date"), the Debtor commenced this bankruptcy case by the filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

2.      On April 22, 2016, the United States Trustee (the "UST") filed a *Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint Chapter 11 Trustee* [Dkt. 77] (the "Trustee Motion").  A true and correct copy of the Trustee Motion is attached hereto as **Exhibit "1."**  As can be seen, the Trustee Motion was premised on, *inter alia*, the Debtor's (a) failure to open required debtor in possession bank accounts despite repeated demands from the UST to do so, (b) failure to properly report personal expenditures on the Debtor's monthly operating reports, (c) use of the account of his wholly owned entity, Todd D. Swenning, MD, PC (the "PC") to pay personal expenses with no response from the Debtor as to why it was happening, (d) repeated failure to respond to inquiries from the UST regarding tax issues, (e) failure to disclose all property, and (f) failure to accumulate funds to fund a plan of reorganization. (Trustee Motion, ¶¶ 10-14).

3.      On May 25, 2016, the Court entered its order [Dkt. 101] that, among other things, (a) granted the Trustee Motion to the extent it sought the appointment of a Chapter 11 Trustee and (b) directed the UST to appoint a Chapter 11 trustee and file an application for the approval of such trustee.

4.      On May 31, 2016, the UST filed its *Application for Order Approving Appointment of Chapter 11 Trustee* [Dkt. 109] (the "Trustee Application").

5.      On June 1, 2016, the Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Dkt. 110] pursuant to which the Court (a) granted the Trustee Application and (b) appointed Todd A. Frealy as the Chapter 11 Trustee.

**B.      THE PLAN, CONFIRMATION OF THE PLAN, AND THE COURT AND TRUSTEE'S AUTHORITY TO ENFORCE THE PLAN AND/OR ORDER DISMISSAL FOR FAILURE TO PERFORM UNDER THE PLAN.**

6.      On November 11, 2016, the Trustee filed solicitation versions of his (a) *Second Amended Disclosure Statement for Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016* [Dkt. 161] (the "Disclosure Statement") and (b) *Second Amended Plan of Reorganization Dated November 10, 2016* [Dkt. 160] (the "Plan").  A true and correct copy of the Plan is attached hereto as **Exhibit "2."**[3]

7.      On January 3, 2017, the Court entered an order confirming the Plan [Dkt. 180] (the "Confirmation Order").  A true and correct copy of the Confirmation Order is attached hereto as **Exhibit "3."**

8.      The Plan went effective on January 18, 2017 (the "Effective Date").

9.      Pursuant to the terms of the Plan and the Confirmation Order:

        a.      The Trustee is authorized to all take necessary and appropriate action to consummate the provisions of the Plan.  (Plan, ¶¶ II.C.2; Confirmation Order, ¶ B.)

        b.      The Court retained jurisdiction to, among other things, (1) interpret and implement the Plan, (2) to "resolve any disputes regarding the operation, implementation,

---

[3] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Disclosure Statement and Plan.

and interpretation of the Plan and the Confirmation Order", (3) to "construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto", (4) "[e]xcept as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Confirmation Order", and (5) to "issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules."  (Plan, ¶¶ II.D.6; Confirmation Order, ¶ D.)

       *c.*     *"A creditor or party in interest may bring a motion to convert or dismiss the Case under Section 1112 after the Plan is confirmed if there is a default in performing the Plan."*  (Plan, ¶ III.F.)

**C.**    <u>**FUNDING FOR THE PLAN, PLAN PROJECTIONS, REQUIRED PLAN PAYMENTS.**</u>

10.    The Plan is to be funded from, among others, the following sources (the "<u>Plan Funds</u>"):

       a.     Funds on hand on the Effective Date comprised of the Net P.C. Income (*i.e.*, the net income from the Debtor's wholly owned P.C.), as of the Effective Date, less a $10,000 retention to fund operations,

       b.     An expected federal tax refund in the amount of $59,000 for the 2015 tax year (the "<u>2015 Tax Refund</u>"),

c.      The Debtor's projected disposable income over five years from the Effective Date, which is comprised of (a) the Net P.C. Income less a $10,000 retention to fund operations, and (b) the Debtor's Salary, less necessary and reasonable expenses, which are collectively projected to total $2,092,320,

d.      A new value contribution in the amount of $9,500 to be paid by the Debtor to the Trustee from non-Estate assets within 2 years of the Effective Date (*i.e.*, by no later than January 18, 2019) to purchase the non-exempt equity in the Honda Cross Tour and Toyota Land Cruiser listed in the Debtor's Schedules, as amended (the "New Value Payment").

(*See* Plan, ¶¶ II.A and II.C.1.)

11.      In terms of payments to creditors, the Plan and Confirmation Order provide for

a.      The payment in full of the administrative claim of the UST for quarterly fees, with payments made as they become due,

b.      The payment in full of the administrative claims of professionals over a three year period from the Effective Date (*i.e.*, by no later than January 18, 2020) (the "Professional Admin. Claims"), with payments made on a quarterly basis,[4]

c.      The payment in full of the administrative claim of Desert Regional Hospital over a three year period from the Effective Date (*i.e.*, by no later than January 18, 2020) (the "Hospital Admin. Claim" and, with the Professional Admin Claims, the "Admin. Claims"), with payments made on a quarterly basis,

d.      The payment in full of the priority tax claim of the IRS over a five year period from the Petition Date (*i.e.*, by no later than July 28, 2020), with payments made on a quarterly basis,[5]

---

[4] The Professional Admin. Claim of the Trustee's counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), was to include post-confirmation professional fees and expenses incurred by LNBYB.
[5] The IRS's alleged secured claim for 2010 taxes was reclassified as a general unsecured claim.  (*See* Dkt. 216).

e.      The payment in full of the non-tax priority claim of M. Swenning with payments of $20,000 per month per the Agreed Temporary Joint Child Custody Plan (the "Temporary Support Agreement") and the order thereon entered on December 15, 2015 (the "M. Swenning Priority Claim"); a true and correct copy of the Temporary Support Agreement is attached hereto as **Exhibit "4,"**

f.      The payment of general unsecured claims in the estimated amount of approximately $1.686 million (the "General Unsecured Claims"), with payments projected under the Plan to start in 2020 and to total approximately $351,986 (or a 21% distribution).[6]

(*See* Plan, ¶ II.B)

12.      In order to control Plan Funds, the Plan provides that "after the Effective Date, the Debtor shall pay his Salary and the Net P.C. Income to the Trustee to hold for the benefit of creditors pursuant to the terms of the Plan."  (Plan, ¶¶ II.C.2.a (Receiving and Holding the Plan Funds)).

13.      The projected cash flow for the P.C. (the "P.C. Projections") and the Debtor (the "Debtor Projections") for the term of the Plan were attached to the Disclosure Statement as Exhibits "2" and "3," respectively, and are separately attached hereto as **Exhibits "5" and "6,"** respectively, for the Court's convenience.

**D.      THE DEBTOR'S INITIAL FAILURES TO PERFORM PLAN TERMS, THE MOTION TO COMPEL PLAN PERFORMANCE AND BREACHES THEREOF.**

14.      In February 2018, the Trustee filed his Motion to Compel [Dkt. 226].  A true and correct copy of the Motion to Compel, without attachments, many of which are duplicated here, is attached hereto as **Exhibit "7."**  The Motion to Compel was brought based on arguments that:

a.      The Debtor had failed to pay his salary over to the Trustee on a number of occasions, most recently (at the time the Dismissal Motion was filed) in January 2018.

---

[6] The Plan also included a convenience class of four general unsecured, each under $3,000, which totaled $4,273.10 and which were paid 75% on the dollar for a total of $3,177.83 pursuant to the terms of the Plan.

As noted in the Dismissal Motion, to the extent the Debtor argues this ever occurred because of a shortfall in funds required to pay payroll for the P.C., the Trustee notes that, if the Debtor had not caused the P.C. to utilize its funds to make well over $180,000 in Improper Payments (as defined and discussed in the Motion to Compel), the P.C. would have had sufficient funds to fund payroll.

b.      The chart (the "Plan Performance Chart") attached to the Motion to Compel as Exhibit "6" and attached hereto as **Exhibit "8,"** showed, *inter alia*, (1) payments required under the Plan through January 2018, (2) payments actually made under the Plan through December 2017, and (3) the deficiency in Plan payments through December 2017, reflecting that at that time the Debtor had underperformed and was deficient on Plan contributions required to make Plan payments by at least $104,945.12. The amount was actually larger at that time, as it did not include thousands of dollars in professional fees incurred by the Trustee's counsel, LNBYB, in seeking to enforce the Plan, which has been made more costly due to the Debtor's inability to provide timely, reliable financial information and to timely perform under the Plan (the "Plan Deficiency").

c.      The Plan and Debtor Projections provided for an estimated 2015 Tax Refund of $59,000 for the 2015 tax year, which ended up totaling $54,266.04.   The projected 2015 Tax Refund was based on information from the Debtor.   The initial 2015 Federal Income 2015 Tax Return (the "2015 Return") provided for the 2015 Tax Refund to be applied to 2016 federal income taxes.   The Trustee directed the Debtor prepare and file an amended 2015 Return (the "2015 Amended Return") to provide for the 2015 Tax Refund to be paid to the Debtor, and then to pay the 2015 Tax Refund over to the Trustee.   After the Effective Date, and after months of delay in preparing, purportedly

executing, and purportedly filing the 2015 Amended Return, the Debtor's accountants[7] provided the Trustee with a copy of the Debtor's 2015 Amended Return that would generate the 2015 Tax Refund in the amount of $64,266.04 and payment thereof to the Debtor.  The Trustee ultimately recovered the 2015 Tax Refund from the IRS, but only after having to issue an intercept letter to the IRS and after the Debtor's counsel requested, without any basis to do so, that the estate share a portion of the 2015 Tax Refund with the Debtor's alleged former spouse based on the assertion that she had an interest in the 2015 Tax Refund.

d.      The Debtor made numerous unauthorized transfers of funds that should have been paid to the Trustee to pay for, among other things, extravagant travel, over $11,500 in personal veterinary bills, fine dining, and cash withdrawals for other personal expenses (the "Improper Payments").  Attached to the Motion to Compel as Exhibit "13" and attached hereto as **Exhibit "9"** is a chart (the "Improper Payment Summary") summarizing a material number, but not all, of what the Trustee asserted, at the time the Motion to Compel was filed, were unauthorized payments of personal and other unnecessary and/or non-business expenses for the Debtor and likely others from the P.C. Account.  As noted in the Motion to Compel, the Improper Payments by the P.C. that were not provided for by the Plan budget and projections totaled approximately $186,000, which amount, in and of itself and certainly together with the 2015 Tax Refund, would be sufficient to cure all or nearly all of the Plan Deficiency existing as of December 2017.

15.      On March 3, 2018, the Court entered its order granting the Motion to Compel (the "Motion to Compel Order") [Dkt. 230].  A true and correct copy of the Motion to Compel Order is attached hereto as **Exhibit "16."**

---

[7] The Debtor's accountants are Healey & Associates, P.C. ("Healey"), which are also accountants for the P.C. Although Healy was employed in the bankruptcy case, Healey never filed a fee application and never had any of its fees or expenses approved, yet the P.C. has paid many thousands of dollars to Healey.

16.     The Motion to Compel Order provides, *inter alia*, that the Debtor was required to:

a.      (i) sign over and deposit all payments made to the P.C. into the Trustee's account within three (3) business days of receipt and/or (ii) sign over to the Trustee and send to the Trustee within three (3) business days of receipt all payments made to the P.C., and

b.      provide a monthly budget (the "P.C. Budget") for the P.C. to the Trustee no later than one week before the following subject month, which P.C. Budget shall include (i) line items in the amounts set forth in the P.C. Projections, plus (ii) any adjustments thereto and any additional line items and an explanation therefor.

(Motion to Compel Order, ¶¶ 4 and 9.)

17.     The Debtor breached the Motion to Compel Order multiple times by (a) not timely delivering to the Trustee payments made to the P.C. and (b) never providing monthly P.C. Budgets to the Trustee.

**E.      THE DEBTOR'S ADDITIONAL FAILURES TO PERFORM PLAN TERMS AND ATTEMPTS TO PLACE FUNDS OUTSIDE OF THE REACH OF CREDITORS.**

18.     Given the Plan Deficiency as of December 2017 and the need to eliminate it and any further deficiencies under the Plan in order to obtain a discharge, one would think that the Debtor would have strictly adhered to the terms of the Plan after the Motion to Compel was granted, but that has not been the case.  The Debtor has continued to disregard the terms of the Plan and to make the Plan as costly as possible to enforce, all at great cost to the estate and, therefore, its creditors.  The Plan has also gone further into deficiency due to the Debtor's failure to perform.  In regard to the foregoing, the Trustee provides the following information.

19.     **THE NEW TAX REFUND.**

a.      On March 4, 2019, the Trustee emailed the Debtor and his counsel inquiring as to $41,399.98 in funds deposited into the Debtor's trust account.  A true and correct copy of the March 4, 2019 email is attached hereto as **Exhibit "10."**

11

b.       On March 6, 2019, the Debtor responded that the foregoing deposits were tax refunds (the "New Tax Refund") from joint tax returns filed by him and M. Swenning and that he gave half of the amount, or $20,699.99, to M. Swenning.  A true and correct copy of the March 6, 2019 email is attached hereto as **Exhibit "11."**

c.       On March 7, 2019, the Trustee's counsel emailed the Debtor and his counsel requesting the following documents and information and turnover of the New Tax Refund.  A true and correct copy of the March 7, 2019 email is attached hereto as **Exhibit "12"** and provides as follows:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – *i.e.*, IRS, FTB, etc.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds.  As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

- Please let us know who initially deposited the refund checks.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr. Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

- Please advise as to the status of Dr. Swenning paying the hospital his ~$60k portion of the cure amount to the hospital.  Please be advised that, under the plan, such cure amount is to be paid from non-estate / non-plan funds.  Therefore, Dr. Swenning is prohibited from making the payment by having the hospital offset against amounts otherwise owed to Dr. Swenning or the P.C.

d.      On March 18, 2019, the Trustee sent an email to the Debtor and his counsel inquiring as to the status of responding to the foregoing requests.  *See* Exhibit 11.

e.      On March 26, 2019, the Trustee's counsel emailed the Debtor and his counsel (i) again inquiring as to the status of responding to the foregoing requests and (ii) indicating that without a response and better plan performance there was a likelihood of a motion to dismiss the case being filed by the Trustee and the loss of any discharge.  A true and correct copy of the March 26, 2019 email is attached hereto as **Exhibit "13."**

f.      On April 11, 2019, the Trustee emailed the Debtor and his counsel (i) ***yet again*** inquiring as to the status of responding to the foregoing requests, (ii) inquiring about continued spending out of the P.C. with no corresponding return, and (iii) and again (ii) indicating that without a response and better plan performance there was a likelihood of a motion to dismiss the case being filed by the Trustee and the loss of any discharge.  A true and correct copy of the April 11, 2019 email is attached hereto as **Exhibit "14."**

g.      On April 11, 2019, over a month after the requests were initially made, after numerous follow-ups on the requests, and only after threats of a motion to dismiss the bankruptcy case, the Debtor's counsel responded to the requests as follows:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – i.e., IRS, FTB, etc.

    **[RESPONSE]** Bill Healey [the Debtor's accountant] has this information. Dr. Swenning has requested it to be forwarded to you. I don't know the status, but I suspect that Healey's tax season has slowed down his response time.

    Dr. Swenning, please contact Bill and either have the documents sent immediately or advise the Trustee what Bill says.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

    Same as above. Bill Healey has the returns and can get them to the Trustee. Dr. Swenning, include this in your call to Healey.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

**[RESPONSE]** Bill Healey should also have this documentation, although Dr. Swenning or his bank should have copies of the refund checks. Dr. Swenning, when you call Healey confirm how the refunds were processed. He will know what documentation the trustee needs.

Dr. Swenning is glad to work with Healey to get any and all information to the trustee and will continue to do so, but we also have no objection if the trustee desires to contact Healey directly by letter, call or otherwise to discuss any aspect or request any financial information, at any time, without notice to Dr. Swenning or me.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds.  As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

**[RESPONSE]** I have the divorce case documents and will send them to you tomorrow. [Ultimately, the Debtor's counsel sent a copy of the Temporary Support Agreement as the purported basis for the split of the New Tax Refund]

- Please let us know who initially deposited the refund checks.

**[RESPONSE]** I believe Dr. Swenning deposited his half and gave Mrs. Swenning her half. Dr. Swenning please confirm to the Trustee or let the Trustee know how the refund checks were otherwise processed.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr. Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

Presently Dr. Swenning has no money to transfer to the trustee, which he has reported to you. We are working in earnest to secure private funding to make a proposal to the trustee to pay a lump sum to satisfy all plan payments. The tax refund would figure into that solution.  I can commit to you to have a proposal by the end of this month.

*See* Exhibit "14."

In other words, after delaying over a month to respond to the foregoing requests, the Debtor's response was basically to pass the buck to his accountants and require the Trustee to jump through additional hoops to obtain the requested information at considerable cost.   The

Debtor should have referred the Trustee to the Debtor's accountants as soon as the request was made, not a month later.  Further, the Debtor should obtain and provide the requested documents and information.  The Trustee should not have to incur additional expense and delay to obtain it.  Other than the foregoing, the Debtor never received any other information or documents in response to the foregoing requests pertaining to the New Tax Refund.  Classic Stonewall Swenning.

The Trustee also notes that the foregoing information regarding the New Tax Refund demonstrates that the Debtor appears to be engaging in efforts to funnel additional funds out of the estate to his alleged former spouse, M. Swenning.  The Debtor should not be making income tax overpayments and then asserting that the resulting refunds should be split evenly between him and M. Swenning despite the fact that the Debtor makes much more than M. Swenning and, therefore, generates higher income taxes.  Further, there is no evidence that M. Swenning was even entitled to any portion of the New Tax Refund.  The Temporary Support Agreement,[8] Exhibit "4" hereto, which is the purported basis for the split of the New Tax Refund, provides for M. Swenning to receive $20,000 per months in support but provides no basis for her to receive any amount of income tax refunds, let alone 50% of such refunds, particularly because her income is so much less than the Debtor's.

20.    **ADDITIONAL EXPENDITURES NOT INCLUDED IN THE DEBTOR PROJECTIONS.**  Prior to April 23, 2019, the Trustee emailed the Debtor and requested bank statements for his DIP account.  On April 23, 2019, the Debtor responded and provided the bank statements.  On the same date, the Trustee emailed the Debtor and his counsel and inquired about large transfers totaling over $24,000 made from the Debtor's DIP account, ostensibly from the New Tax Refund.  A true and correct copy of the April 23, 2019 email exchange is email is attached hereto as **Exhibit "15."**  The Debtor never responded to that inquiry.

---

[8] The "Temporary" Support Agreement dated November 2015 has apparently never progressed to a final dissolution and support agreement in the over three years since it was signed.  This certainly creates the appearance that the Temporary Support Agreement was a sham and merely a vehicle for paying $20,000 a month out of the estate and placing such funds outside the reach of creditors.

21.    **THE DEBTOR'S FAILURE TO MAKE THE PAYMENT REQUIRED TO PURCHASE EQUITY IN THE VEHICLES.**   As discussed above, pursuant to the Plan the Debtor was required by make the New Value Payment to the Trustee in the amount of $9,500 from non-Estate assets by no later than January 18, 2019 to purchase the non-exempt equity in the Honda Cross Tour and Toyota Land Cruiser listed in the Debtor's Schedules.  Despite the Trustee's demand for such payment and despite having received the New Tax Refund, the Debtor failed to make the payment, timely or otherwise.

22.    **THE LARGE AND GROWING PLAN DEFICIENCY AND CREDITOR DEMANDS FOR PAYMENTS.**  As the result of, among other things, the Debtor's failure to perform according to the terms of the Plan, the P.C. Projections, and the Debtor Projections, the Plan Deficiency of at least $104,945.12 as of December 2017 had grown to at least $130,342.41 just six months later, as of June 2018.  Included in the Plan Performance Chart, Exhibit "8" hereto, are (a) payments required under the Plan through June 2018, the date of the last disbursement under the Plan, (b) payments actually made under the Plan through June 2018, and (c) the deficiency in Plan payments through June 2018 in the amount of at least $130,342.41.

There have been no plan disbursements since June 2018, other than to M. Swenning, who appears to be the only creditor receiving full, timely payments under the Plan thus far.   As a result, the Trustee estimates that the Plan Deficiency has grown to at least $177,000 as of May 1, 2019, which amount is actually larger, because it does not include thousands of dollars in professional fees incurred by the Trustee's counsel in seeking to enforce the Plan, which has been made more costly due to the Debtor's refusal to provide timely, reliable financial information and to timely perform under the Plan.

Due to the large Plan Deficiency and the Trustee's inability to make timely Plan payments, creditors have started sending letters to the Trustee demanding that he make payments required by the Plan.  True and correct copies of the demand letters/emails from the IRS and Desert Regional Hospital (aka Tenet Healthcare) are attached hereto as **Exhibits "17" and "18,"** respectively.  However, the Trustee simply does not have funds to make such payments, because

of the Debtor's failure to perform under the plan and his active efforts to place funds beyond the reach of the Trustee.

23.     **CASH ON HAND AND OTHER MATTERS.**

The Trustee paid all taxes and payroll due on May 1, 2019. As of the filing of this Dismissal Motion the estate currently has $33,843.62 in the estate account and $74,701.50 in the payroll account. Provided the Trustee receives regular deposits from the Debtor during May 2019, the Trustee will pay taxes and payroll due on June 1, 2019. After accounting for the foregoing payments and expected additional deposits, the Trustee estimates that there will be approximately $100,000 in funds on hand if the case is dismissed soon after June 1, 2019, which amount may increase to the extent the Trustee receives the New Tax Refund or other funds (the "Remaining Funds").

As of the date of the filing of this Dismissal Motion, in addition to LNBYB's allowed administrative claim in the amount of $100,621.43, LNBYB incurred $72,516.26 in unpaid legal fees and expenses since the Effective Date for a total claim of $173,137.69, which amount will increase as a result of preparing for and appearing at the hearing on this Dismissal Motion and preparing any order on this Dismissal Motion. Attached hereto as **Exhibit "19"** is a summary of fees and expenses incurred by LNBYB from the Effective Date to the date hereof.

In consideration of the foregoing, the Plan, and related fee application orders, and after accounting for prior distributions pursuant to the Plan, the Administrative Claims are projected to total approximately $302,466.62, as follows:

| ADMINISTRATIVE CREDITOR | ORIGINAL CLAIM AMOUNT | LESS PAYMENTS MADE | PLUS ADDITIONAL FEES AND EXPENSES | CURRENT CLAIM AMOUNT |
|---|---|---|---|---|
| LNBYB (Trustee Counsel) | $ 100,621.43 | $ (26,028.53) | $ 72,516.26 | $ 147,109.16 |
| Trustee | $ 3,718.00 | $ (961.77) | | $ 2,756.23 |
| Hahn Fife (Trustee Accountants) | $ 20,128.50 | $ (5,206.80) | | $ 14,921.70 |
| Doerner Saunders (Debtor's Counsel) | $ 74,856.56 | $ (19,363.72) | | $ 55,492.84 |
| Feamster & Carroll (Debtor's Divorce Counsel) | $ 865.00 | $ (223.76) | | $ 641.24 |
| Desert Regional Medical Center | $ 110,000.00 | $ (28,454.55) | | $ 81,545.45 |
| **TOTAL** | **$ 310,189.49** | **$ (80,239.13)** | **$ 72,516.26** | **$ 302,466.62** |

17

## III.

## THE COURT SHOULD DISMISS THE CASE

**A.     GOOD CAUSE EXISTS TO DISMISS THE CASE.**

**1.     LEGAL STANDARD.**

Section 1112(b) provides, in relevant part, as follows:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b) (emphasis added).   Section 1112(b)(4) contains 16 examples of what constitutes "cause." 11 U.S.C. § 1112(b)(4).  The examples of "cause" for dismissal in Section 1112(b)(4) are not exclusive and "'[a] court may consider other factors as they arise and may 'use its equitable powers to reach an appropriate result in individual cases.'"  *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991) (*quoting* S.Rep No. 989, 95th Cong., 2d Sess. 117, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5903); *see also In re YBA Nineteen, LLC*, 505 B.R. 289, 302 (S.D. Cal. 2014) ("Cause is a flexible standard, subject to the Court's discretion, and does not necessarily involve one or all of those factors set forth in Section 1112(b)(4).'") (*citing* and *quoting In re Prods. Int'l Co.*, 395 B.R. 101, 107 (Bankr.D.Ariz.2008); 11 U.S.C. § 102(3).

**2.     THERE IS CAUSE FOR DISMISSAL UNDER SECTION 1112(b)(4)(A), (E), (M), AND (N).**

Among the examples of cause for dismissal under Section 1112(b)(4) are the following:

> (A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation,
>
> . . .

(E)     failure to comply with an order of the court,

…

(M)     inability to effectuate substantial consummation of a confirmed plan, and,

(N)     [most importantly here] *material default by the Debtor with respect to a confirmed plan.*

11 U.S.C. § 1112(b)(4)(A), (E), (M), and (O) (emphasis added).

a.     **SECTION 1129(b)(4)(A) – SUBSTANTIAL OR CONTINUING LOSS TO OR DIMINUTION OF THE ESTATE AND THE ABSENCE OF A REASONABLE LIKELIHOOD OF REHABILITATION.**

Here, both elements for finding cause for dismissal under Section 1112(b)(4) are satisfied.  The first element of Section 1129(b)(4)(A) is that there be a substantial or continuing loss to or diminution of the estate.   11 U.S.C. § 1112(b)(4)(A).  "'[T]here need not be a significant diminution in the estate'" for good cause to exist.  *In re Mense*, 509 B.R. 269, 284–85 (Bankr. C.D. Cal. 2014) (*citing* and *quoting In re East Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr. E.D.N.Y. 1992)).  Rather, "'[a]ll that need[s] to be found is that the estate has suffered some diminution in value.'" *Mense*, 509 B.R. at 284-58 (*citing* and *quoting East Coast Airways*, 146 B.R. 325); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988).

In this case, the element of substantial or continuing loss to or diminution of the estate is satisfied.  As discussed above, the Debtor's conduct resulted in the Trustee having to heavily police enforcement of the Plan, including numerous email exchanges to obtain information from the Debtor, turnover of the 2015 Tax Refund, and the preparation and filing of the Motion to Compel, which was granted by the Court.  Seeking to enforce the Plan based on the foregoing and other actions has come at considerable to cost to the estate in the form of professional fees and expenses, which has caused a substantial and continuing loss to and diminution of the estate – *i.e.*, the fees and expenses are reducing estate funds available to pay other allowed claims with a lower priority.

The second element of Section 1112(b)(4)(A) is that there is an "absence of a reasonable likelihood of **rehabilitation.**" 11 U.S.C. § 1112(b)(4)(A) (emphasis added).  The use of the term "rehabilitation" as opposed to the more familiar term of "reorganization" used throughout the Bankruptcy Code is meaningful and material to the instant case.  "As used in § 1112(b)(4)(A), rehabilitation does not necessarily denote reorganization, which could involve liquidation.  *In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (internal cites and quotes omitted).  "Rehabilitation is a different and … much more demanding standard than reorganization." *Id.* (internal cites and quotes omitted, alteration in original).  "The issue of rehabilitation for purposes of § 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re Hassen Imports P'ship*, 2013 WL 4428508, at *12–15 (B.A.P. 9th Cir. Aug. 19, 2013) (internal cites and quotes omitted); *In re Red Door Lounge, Inc.*, 559 B.R. 728, 735 (Bankr. D. Mont. 2016) (same).

In this case, as discussed herein above and below, despite confirmation of the Plan, there is not a reasonable likelihood of rehabilitation, because the Debtor's numerous defaults in performing under the Plan, the substantial and growing Plan Deficiency, and the Debtor's reluctance to even turnover the New Tax Refund to pay the defaulted New Value Payment or to try to reduce the Plan Deficiency.

Since both elements of Section 1112(b)(4)(A) are satisfied, "cause" has been established under Section 1112(b)(4)(A).

  **b.**  <u>**SECTION 1129(B)(4)(E), (M) AND (N) - FAILURE TO COMPLY WITH AN ORDER OF THE COURT, INABILITY TO EFFECTUATE SUBSTANTIAL CONSUMMATION OF A CONFIRMED PLAN, OR *MATERIAL DEFAULT BY THE DEBTOR WITH RESPECT TO A CONFIRMED PLAN.***</u>

As discussed, the Debtor failed to comply with the Motion to Compel Order multiple times by (1) not timely delivering to the Trustee payments made to the P.C. and (2) never providing monthly P.C. Budgets to the Trustee.

Further, there is an inability to effectuate substantial consummation of the Plan and numerous material defaults by the Debtor with respect to the Plan. The Debtor failed to turn over the 2015 Tax Refund until he was forced to do so by the Motion to Compel and the order granting such motion. The Debtor failed to make the New Value Payment in the amount of $9,500 that was due on January 18, 2019 to purchase non-exempt equity in vehicles, and which still has not been paid. As discussed in the Motion to Compel, the Debtor made numerous Improper Payments. As a result of the foregoing, and the general failure of the Debtor to meet the requirements of the Plan projections (*i.e.*, the P.C. Projections and Debtor Projections), there was a Plan Deficiency of approximately $104,000 as of December 2017, which grew to approximately $130,000 as of June 2018, and which is estimated to currently total approximately $177,000.

Given that the Debtor has not stopped making improper disbursements, not improved performance according to Plan projections, and refused to voluntarily turnover at least half of the New Tax Refund to reduce Plan Deficiency, which has resulted in certain creditors calling Plan defaults, there is no reasonable hope that it will be eliminated or that the Plan can be consummated.

Based on the foregoing, "cause" has been established under Section 1112(b)(4)(E), (M), and (N).

### c.    THERE IS GENERAL CAUSE FOR DISMISSAL UNDER SECTION 1112(b).

As noted above, the specific bases establishing "cause" that are enumerated in Section 1112(b)(4) are not exclusive, and "'[a] court may consider other factors as they arise and may 'use its equitable powers to reach an appropriate result in individual cases.'" *Mechanical Maintenance, Inc.*, 128 B.R. at 386 (internal cites and quotes omitted). Here, in addition to the independent bases for finding cause under Section 1112(b)(4), any one of which independently forms a basis for mandatory dismissal or conversion, there also exist more generalized bases for finding cause.

Specifically, from the start of the Case, the Debtor engaged in misconduct resulting in the appointment of the Trustee.  The Debtor's misconduct only continued after that.  For example, the Debtor refused to voluntarily turn over the 2015 Tax Refund to the Trustee and forced the Trustee to file the Motion to Compel at considerable cost, which reduced the net benefit of the 2015 Tax Refund.  Most recently, despite the Plan Deficiency and failure to make the New Value Payment, the Debtor retained the New Tax Refund and asserts that half of it belongs to his purported former spouse, M. Swenning, despite the disparity in income and income taxes, and the lack of any apparent basis under the Temporary Support Agreement to pay half to her.  Consistent with the 2015 Tax Refund, it appears that the Debtor intends to force the Trustee to seek turnover of the New Tax Refund.  Further, under the Debtor's misguided theory, he can simply overpay income taxes and then obtain a refund and pay 50% of his overpayment to M. Swenning further draining funds out of the estate and increasing the Plan Deficiency.

Based on the foregoing, there are numerous bases for finding "cause" for dismissal under Section 1112(b), which, barring unusual circumstances, make dismissal mandatory.

**B.        DISMISSAL IS IN THE BEST INTEREST OF CREDITORS AND THE ESTATE.**

Once it is determined that "cause" exists, the Court must determine whether to convert or dismiss the case based on what is in the best interests of creditors and the estate.  11 U.S.C. § 1112(b)(1); *Mense*, 509 B.R. 269, 284–85 (Bankr. C.D. Cal. 2014).  This determination is committed to the Court's discretion.  *In re Warren*, No. BAP EC-14-1390, 2015 WL 3407244, at *4 (B.A.P. 9th Cir. May 28, 2015) (citing and quoting *Nelson v. Meyer (In re Nelson)*, 343 B.R. 671, 675 (B.A.P. 9th Cir. 2006)); *Pioneer Liquidating Corp. v. United States Trustee (In re Consolidated Pioneer Mortgage Entities)*, 248 B.R. 368, 375 (B.A.P. 9th Cir. 2000).

In the present case, dismissal would best serve the interests of creditors and the estate.  The Debtor has made it clear that he does not intend to act in good faith, to comply with the Motion to Compel Order, or to perform under the Plan.  Instead, the Debtor has demonstrated

that he has no interest in reigning in expenses and trying to meet the Plan projections and to otherwise perform under the Plan. Under these circumstances, the Debtor is not an "honest but unfortunate debtor" who should be entitled to obtain a discharge. In consideration of the foregoing, this case should be dismissed, and creditors should be allowed to pursue their claims and remedies against the Debtor.

In addition to the foregoing, it is likely that this case cannot even be converted to Chapter 7. Section 1112 provides that "[n]ot withstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." 11 U.S.C. §1112(f). Here, given the Debtor's relatively high monthly income, the Trustee asserts that the Debtor would not be able to meet the means test for a Chapter 7 conversion. *See* 11 U.S.C. §707(b). Additionally, adding another layer of administrative costs that will result if this case is converted to Chapter 7 will not benefit any creditors.

## IV.

## THE COURT SHOULD ORDER TURNOVER OF THE NEW TAX REFUND

Pursuant to Section 541, property of the estate includes (1) "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is … under the sole, equal, or joint management and control of the debtor, (2) the " [p]roceeds, product, … or profits of or from property of the estate,"[9] and (3) "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(2), (6) and (7). In addition, in Chapter 11 cases filed by individuals, such as the instant case, property of the estate also includes "(1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case

---

[9] Section 541(a)(6) provides that property of the estate includes "[p]roceeds, product, … or profits of or from property of the estate, <u>except such as are earnings from services performed by an individual debtor after the commencement of the case.</u> 11 U.S.C. § 541(a)(6). As discussed below, the underlined portion of Section 541(a)(6) is inapplicable in individual Chapter 11 cases pursuant to Section 1115

under chapter 7, 12, or 13, whichever occurs first; and (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first."

Here, the New Tax Refund is property of the estate. The New Tax Refund is believed to have been generated entirely (or almost entirely) from the overpayment of income taxes by the Debtor – *i.e.*, the New Tax Refund is essentially the Debtor's wages or other earnings being returned to the Debtor. Thus, the New Tax Refund is, at minimum, (1) the proceeds, product, or profit from property of the estate, (2) property acquired after the commencement of the case, and/or (3) earnings from services performed by the Debtor after the commencement of the case.

The Trustee is entitled to turnover of the New Tax Refund. Section 542 provides, *inter alia*, that "an entity, [which includes an individual such as the Debtor pursuant to 11 U.S.C. §101(15)] … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title … **shall** deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a) (emphasis added).

Pursuant to Fed. R. Bankr. P. 7001(1), the Trustee can seek and obtain an order requiring turnover of the New Tax Refund, or the value thereof, by motion and without having to file an adversary proceeding.

Based on the foregoing, the Trustee submits that the Court should enter an order or judgment compelling the Debtor to turn over the New Tax Refund or the value thereof to the Trustee.

## V.

## THE COURT SHOULD APPROVE THE METHOD FOR MAKING FINAL DISTRIBUTIONS OF REMAINING FUNDS

As discussed above, the Trustee expects to have approximately $100,000 of Remaining Funds on the date of dismissal, assuming it happens by early June 2019. The foregoing amount may increase to the extent the Trustee receives a turnover of the New Tax Refund or other funds.

Since there are no secured claims, administrative claims are the highest priority claims in the case.   Based on the foregoing, the Trustee requests that the Court approve a method for making distributions of final funds whereby (1) the Trustee would first pay any outstanding UST quarterly fees and then (2) make a *pro rata* distribution on allowed administrative claims, with LNBYB's administrative claim including the fees and expenses it incurred after the Effective Date.   For example, assuming Remaining Funds totaled $100,000 after the payment of outstanding UST quarterly fees, such Remaining Funds would be distributed as follows:

| ADMINISTRATIVE CREDITOR | ORIGINAL CLAIM AMOUNT | LESS PAYMENTS MADE | PLUS ADDITIONAL FEES AND EXPENSES | CURRENT CLAIM AMOUNT | % OF TOTAL ADMIN. CLAIMS | FINAL DISTRIBUTION FROM REMAINING FUNDS |
|---|---|---|---|---|---|---|
| LNBYB (Trustee Counsel) | $ 100,621.43 | $ (26,028.53) | $ 72,516.26 | $ 147,109.16 | 32.44% | $ 32,438.70 |
| Trustee | $ 3,718.00 | $ (961.77) | | $ 2,756.23 | 1.20% | $ 1,198.62 |
| Hahn Fife (Trustee Accountants) | $ 20,128.50 | $ (5,206.80) | | $ 14,921.70 | 6.49% | $ 6,489.10 |
| Doerner Saunders (Debtor's Counsel) | $ 74,856.56 | $ (19,363.72) | | $ 55,492.84 | 24.13% | $ 24,132.53 |
| Feamster & Carroll (Debtor's Divorce Counsel) | $ 865.00 | $ (223.76) | | $ 641.24 | 0.28% | $ 278.86 |
| Desert Regional Medical Center | $ 110,000.00 | $ (28,454.55) | | $ 81,545.45 | 35.46% | $ 35,462.19 |
| TOTAL | $ 310,189.49 | $ (80,239.13) | $ 72,516.26 | $ 302,466.62 | 100% | $ 100,000.00 |

Further similar *pro rata* distributions would be made to the extent the New Tax Refund is recovered in one or more payments after dismissal.

/ / /

/ / /

/ / /

# VI.

## CONCLUSION

**WHEREFORE**, the Trustee respectfully requests that the Court to enter an order: (1) granting the motion, (2) dismissing the Debtor's Chapter 11 case, with a reasonable bar to refiling, (3) requiring the Debtor to turn over the entire New Tax Refund (or entering judgment against the Debtor for the amount thereof), (4) approving the method for making final distributions of the Remaining Funds, and (5) granting such further and other relief as the Court deems just and proper under the circumstances.

Dated: May 3, 2019

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.

*/s/ Todd M. Arnold*
MARTIN J. BRILL
Cal. Bar No. 53220
(*Pro Hac Vice* Application Approved)
TODD M. ARNOLD
Cal. Bar No. 221868
(*Pro Hac Vice* Application Approved)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com, tma@lnbyb.com

Counsel for Chapter 11 Trustee, Todd A. Frealy

## DECLARATION OF TODD A. FREALY

I, Todd A. Frealy, hereby declare as follows:

1. I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2. I am a partner in the law firm of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB").

3. In the ordinary course of LNBYB's business, LNBYB creates business books and records (the "Books and Records") regarding, among other things, time recorded by LNBYB performing particular tasks for clients. LNBYB's Books and Records are made at or near the time by, or from information transmitted by, a person with knowledge, in the ordinary course of LNBYB's business and as a regular practice of LNBYB's business. The fee and expense amounts for LNBYB referenced herein are based on LNBYB's Books and Records.

4. I am duly licensed to practice law in the state of California and in the United States District Court and Bankruptcy Court for the Central District of California.

5. I am the duly appointed Chapter 11 Trustee herein.

6. I make this declaration in support of the Motion to Dismiss to which this declaration is attached. Unless otherwise stated, all capitalized terms herein have the same meanings as in the Motion to Dismiss.

7. On July 28, 2015 (the "Petition Date"), the Debtor commenced this bankruptcy case by the filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

8. On April 22, 2016, the United States Trustee (the "UST") filed a *Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint Chapter 11 Trustee* [Dkt. 77] (the "Trustee Motion"). A true and correct copy of the Trustee Motion is attached hereto as **Exhibit "1."**

27

9.      On May 25, 2016, the Court entered its order [Dkt. 101] that, among other things, (a) granted the Trustee Motion to the extent it sought the appointment of a Chapter 11 Trustee and (b) directed the UST to appoint a Chapter 11 trustee and file an application for the approval of such trustee.

10.     On May 31, 2016, the UST filed its *Application for Order Approving Appointment of Chapter 11 Trustee* [Dkt. 109] (the "Trustee Application").

11.     On June 1, 2016, the Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Dkt. 110] pursuant to which the Court (a) granted the Trustee Application and (b) appointed me as the Chapter 11 Trustee.

12.     On November 11, 2016, I filed solicitation versions of the (a) *Second Amended Disclosure Statement for Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016* [Dkt. 161] (the "Disclosure Statement") and (b) *Second Amended Plan of Reorganization Dated November 10, 2016* [Dkt. 160] (the "Plan").  A true and correct copy of the Plan is attached hereto as **Exhibit "2."**

13.     On January 3, 2017, the Court entered an order confirming the Plan [Dkt. 180] (the "Confirmation Order").  A true and correct copy of the Confirmation Order is attached hereto as **Exhibit "3."**

14.     The Plan went effective on January 18, 2017 (the "Effective Date").

15.     The projected cash flow for the P.C. (the "P.C. Projections") and the Debtor (the "Debtor Projections") for the term of the Plan were attached to the Disclosure Statement as Exhibits "2" and "3," respectively, and are separately attached hereto as **Exhibits "5" and "6,"** respectively, for the Court's convenience.

16.     In February 2018, I filed a Motion to Compel [Dkt. 226].  A true and correct copy of the Motion to Compel, without attachments, many of which are duplicated here, is attached hereto as **Exhibit "7."**

17.     The Motion to Compel was brought based on arguments that:

a.      The Debtor had failed to pay his salary over to me on a number of occasions, most recently (at the time the Dismissal Motion was filed) in January 2018.

b.      The chart (the "Plan Performance Chart") attached to the Motion to Compel as Exhibit "6" and attached hereto as **Exhibit "8,"** showed, *inter alia*, (1) payments required under the Plan through January 2018, (2) payments actually made under the Plan through December 2017, and (3) the deficiency in Plan payments through December 2017, reflecting that at that time the Debtor had underperformed and was deficient on Plan contributions required to make Plan payments by at least $104,945.12. The amount was actually larger at that time, as it did not include thousands of dollars in professional fees incurred by my counsel, LNBYB, in seeking to enforce the Plan, which has been made more costly due to the Debtor's inability to provide timely, reliable financial information and to timely perform under the Plan (the "Plan Deficiency").

c.      The Plan and Debtor Projections provided for an estimated 2015 Tax Refund of $59,000 for the 2015 tax year, which ended up totaling $54,266.04. The projected 2015 Tax Refund was based on information from the Debtor. The initial 2015 Federal Income 2015 Tax Return (the "2015 Return") provided for the 2015 Tax Refund to be applied to 2016 federal income taxes. I directed the Debtor prepare and file an amended 2015 Return (the "2015 Amended Return") to provide for the 2015 Tax Refund to be paid to the Debtor, and then to pay the 2015 Tax Refund over to the Trustee. After the Effective Date, and after months of delay in preparing, purportedly executing, and purportedly filing the 2015 Amended Return, the Debtor's accountants[10] provided me with a copy of the Debtor's 2015 Amended Return that would generate the 2015 Tax Refund in the amount of $64,266.04 and payment thereof to the Debtor. I ultimately

---

[10] The Debtor's accountants are Healey & Associates, P.C. ("Healey"), which are also accountants for the P.C. Although Healy was employed in the bankruptcy case, Healey never filed a fee application and never had any of its fees or expenses approved, yet the P.C. has paid many thousands of dollars to Healey.

recovered the 2015 Tax Refund from the IRS, but only after having to issue an intercept letter to the IRS and after the Debtor's counsel requested, without any basis to do so, that the estate share a portion of the 2015 Tax Refund with the Debtor's alleged former spouse based on the assertion that she had an interest in the 2015 Tax Refund.

        d.      The Debtor made numerous unauthorized transfers of funds that should have been paid to me to pay for, among other things, extravagant travel, over $11,500 in personal veterinary bills, fine dining, and cash withdrawals for other personal expenses (the "Improper Payments").  Attached to the Motion to Compel as Exhibit "13" and attached hereto as **Exhibit "9"** is a chart (the "Improper Payment Summary") summarizing a material number, but not all, of what I asserted, at the time the Motion to Compel was filed, were unauthorized payments of personal and other unnecessary and/or non-business expenses for the Debtor and likely others from the P.C. Account.  As noted in the Motion to Compel, the Improper Payments by the P.C. that were not provided for by the Plan budget and projections totaled approximately $186,000, which amount, in and of itself and certainly together with the 2015 Tax Refund, would be sufficient to cure all or nearly all of the Plan Deficiency existing as of December 2017.

      18.      On March 3, 2018, the Court entered its order granting the Motion to Compel (the "Motion to Compel Order") [Dkt. 230].  A true and correct copy of the Motion to Compel Order is attached hereto as **Exhibit "16."**

      19.      The Debtor breached the Motion to Compel Order multiple times by (a) not timely delivering to me payments made to the P.C. and (b) never providing monthly P.C. Budgets to me.

      20.      Given the Plan Deficiency as of December 2017 and the need to eliminate it and any further deficiencies under the Plan in order to obtain a discharge, one would think that the Debtor would have strictly adhered to the terms of the Plan after the Motion to Compel was granted, but that has not been the case.  The Debtor has continued to disregard the terms of the Plan and to make the Plan as costly as possible to enforce, all at great cost to the estate and,

therefore, its creditors.  The Plan has also gone further into deficiency due to the Debtor's failure to perform.  In regard to the foregoing, I provides the information below.

21.      On March 4, 2019, I emailed the Debtor and his counsel inquiring as to $41,399.98 in funds deposited into the Debtor's trust account.  A true and correct copy of the March 4, 2019 email is attached hereto as **Exhibit "10."**

22.      On March 6, 2019, the Debtor responded that the foregoing deposits were tax refunds (the "New Tax Refund") from joint tax returns filed by him and M. Swenning and that he gave half of the amount, or $20,699.99, to M. Swenning.  A true and correct copy of the March 6, 2019 email is attached hereto as **Exhibit "11."**

23.      On March 7, 2019, my counsel emailed the Debtor and his counsel requesting the following documents and information and turnover of the New Tax Refund.  A true and correct copy of the March 7, 2019 email is attached hereto as **Exhibit "12"** and provides as follows:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – *i.e.*, IRS, FTB, etc.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds.  As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

- Please let us know who initially deposited the refund checks.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr. Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

- Please advise as to the status of Dr. Swenning paying the hospital his ~$60k portion of the cure amount to the hospital.  Please be advised that, under the plan, such cure amount is to be paid from non-estate / non-plan funds.  Therefore, Dr. Swenning is prohibited from making the payment by having the hospital offset against amounts otherwise owed to Dr. Swenning or the P.C.

24.     On March 18, 2019, I sent an email to the Debtor and his counsel inquiring as to the status of responding to the foregoing requests.  *See* Exhibit 11.

25.     On March 26, 2019, my counsel emailed the Debtor and his counsel (i) again inquiring as to the status of responding to the foregoing requests and (ii) indicating that without a response and better plan performance there was a likelihood of a motion to dismiss the case being filed and the loss of any discharge.  A true and correct copy of the March 26, 2019 email is attached hereto as **Exhibit "13."**

26.     On April 11, 2019, I emailed the Debtor and his counsel (i) ***yet again*** inquiring as to the status of responding to the foregoing requests, (ii) inquiring about continued spending out of the P.C. with no corresponding return, and (iii) and again (ii) indicating that without a response and better plan performance there was a likelihood of a motion to dismiss the case being filed and the loss of any discharge.  A true and correct copy of the April 11, 2019 email is attached hereto as **Exhibit "14."**

27.     On April 11, 2019, over a month after the requests were initially made, after numerous follow-ups on the requests, and only after threats of a motion to dismiss the bankruptcy case, the Debtor's counsel responded to the requests as follows:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – i.e., IRS, FTB, etc.

  **[RESPONSE]** Bill Healey [the Debtor's accountant] has this information. Dr. Swenning has requested it to be forwarded to you. I don't know the status, but I suspect that Healey's tax season has slowed down his response time.

  Dr. Swenning, please contact Bill and either have the documents sent immediately or advise the Trustee what Bill says.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

Same as above. Bill Healey has the returns and can get them to the Trustee. Dr. Swenning, include this in your call to Healey.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

  **[RESPONSE]** Bill Healey should also have this documentation, although Dr. Swenning or his bank should have copies of the refund checks. Dr. Swenning, when you call Healey confirm how the refunds were processed. He will know what documentation the trustee needs.

  Dr. Swenning is glad to work with Healey to get any and all information to the trustee and will continue to do so, but we also have no objection if the trustee desires to contact Healey directly by letter, call or otherwise to discuss any aspect or request any financial information, at any time, without notice to Dr. Swenning or me.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds.  As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

  **[RESPONSE]** I have the divorce case documents and will send them to you tomorrow. [Ultimately, the Debtor's counsel sent a copy of the Temporary Support Agreement as the purported basis for the split of the New Tax Refund]

- Please let us know who initially deposited the refund checks.

  **[RESPONSE]** I believe Dr. Swenning deposited his half and gave Mrs. Swenning her half. Dr. Swenning please confirm to the Trustee or let the Trustee know how the refund checks were otherwise processed.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr. Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

  Presently Dr. Swenning has no money to transfer to the trustee, which he has reported to you. We are working in earnest to secure private funding to make a proposal to the trustee to pay a lump sum to satisfy all plan payments. The tax refund would figure into that solution.  I can commit to you to have a proposal by the end of this month.

*See* Exhibit "14."

28.     Prior to April 23, 2019, I emailed the Debtor and requested bank statements for his DIP account.  On April 23, 2019, the Debtor responded and provided the bank statements. On the same date, I emailed the Debtor and his counsel and inquired about large transfers totaling over $24,000 made from the Debtor's DIP account, ostensibly from the New Tax Refund.  A true and correct copy of the April 23, 2019 email exchange is email is attached hereto as **Exhibit "15."**  The Debtor never responded to that inquiry.

29.     As discussed above, pursuant to the Plan the Debtor was required by make the New Value Payment to me in the amount of $9,500 from non-Estate assets by no later than January 18, 2019 to purchase the non-exempt equity in the Honda Cross Tour and Toyota Land Cruiser listed in the Debtor's Schedules.  Despite my demand for such payment and despite having received the New Tax Refund, the Debtor failed to make the payment, timely or otherwise.

30.     As the result of, among other things, the Debtor's failure to perform according to the terms of the Plan, the P.C. Projections, and the Debtor Projections, the Plan Deficiency of at least $104,945.12 as of December 2017 had grown to at least $130,342.41 just six months later, as of June 2018.  Included in the Plan Performance Chart, Exhibit "8" hereto, are (a) payments required under the Plan through June 2018, the date of the last disbursement under the Plan, (b) payments actually made under the Plan through June 2018, and (c) the deficiency in Plan payments through June 2018 in the amount of at least $130,342.41.

31.     There have been no plan disbursements since June 2018, other than to M. Swenning, who appears to be the only creditor receiving full, timely payments under the Plan thus far.   As a result, I estimate that the Plan Deficiency has grown to at least $177,000 as of May 1, 2019, which amount is actually larger, because it does not include thousands of dollars in professional fees incurred by my counsel in seeking to enforce the Plan, which has been made more costly due to the Debtor's refusal to provide timely, reliable financial information and to timely perform under the Plan.

32.     Due to the large Plan Deficiency and my inability to make timely Plan payments, creditors have started sending letters demanding that I make payments required by the Plan. True and correct copies of the demand letters/emails from the IRS and Desert Regional Hospital (aka Tenet Healthcare) are attached hereto as **Exhibits "17" and "18,"** respectively.  However, I simply do not have funds to make such payments, because of the Debtor's failure to perform under the plan and his active efforts to place funds beyond my reach.

33.     I paid all taxes and payroll due on May 1, 2019.  As of the filing of this Dismissal Motion the estate currently has $33,843.62 in the estate account and $74,701.50 in the payroll account.  Provided I receive regular deposits from the Debtor during May 2019, I will pay taxes and payroll due on June 1, 2019.  After accounting for the foregoing payments and expected additional deposits, I estimate that there will be approximately $100,000 in funds on hand if the case is dismissed soon after June 1, 2019, which amount may increase to the extent I receive the New Tax Refund or other funds (the "Remaining Funds").

34.     As of the date of the filing of this Dismissal Motion, in addition to LNBYB's allowed administrative claim in the amount of $100,621.43, LNBYB incurred $72,516.26 in unpaid legal fees and expenses since the Effective Date for a total claim of $173,137.69, which amount will increase as a result of preparing for and appearing at the hearing on this Dismissal Motion and preparing any order on this Dismissal Motion.  Attached hereto as **Exhibit "19"** is a summary of fees and expenses incurred by LNBYB from the Effective Date to the date hereof.

35.     In consideration of the foregoing, the Plan, and related fee application orders, and after accounting for prior distributions pursuant to the Plan, the Administrative Claims are projected to total approximately $302,466.62, as follows:

| ADMINISTRATIVE CREDITOR | ORIGINAL CLAIM AMOUNT | LESS PAYMENTS MADE | PLUS ADDITIONAL FEES AND EXPENSES | CURRENT CLAIM AMOUNT |
|---|---|---|---|---|
| LNBYB (Trustee Counsel) | $   100,621.43 | $   (26,028.53) | $     72,516.26 | $   147,109.16 |
| Trustee | $       3,718.00 | $        (961.77) | | $       2,756.23 |
| Hahn Fife (Trustee Accountants) | $     20,128.50 | $     (5,206.80) | | $     14,921.70 |
| Doerner Saunders (Debtor's Counsel) | $     74,856.56 | $   (19,363.72) | | $     55,492.84 |

35

| ADMINISTRATIVE CREDITOR | ORIGINAL CLAIM AMOUNT | LESS PAYMENTS MADE | PLUS ADDITIONAL FEES AND EXPENSES | CURRENT CLAIM AMOUNT |
|---|---|---|---|---|
| Feamster & Carroll (Debtor's Divorce Counsel) | $      865.00 | $       (223.76) | | $         641.24 |
| Desert Regional Medical Center | $   110,000.00 | $   (28,454.55) | | $      81,545.45 |
| **TOTAL** | **$ 310,189.49** | **$ (80,239.13)** | **$   72,516.26** | **$ 302,466.62** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of May 2019, at Los Angeles, California.

TODD A. FREALY

EXHIBIT "1"

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: | ) | |
| | ) | |
| TODD A. SWENNING, | ) | Case No. 15-11408-R |
| | ) | Chapter 11 |
| Debtor. | ) | |

## UNITED STATES TRUSTEE'S MOTION TO DISMISS CHAPTER 11 CASE, OR IN THE ALTERNATIVE, APPOINT CHAPTER 11 TRUSTEE

Samuel K. Crocker, United States Trustee for Region 20, (the "U.S. Trustee"), by and through the undersigned counsel, respectfully requests that this Court enter an Order, pursuant to 11 U.S.C. §§ 1112(b) and 1104(a), dismissing the above-referenced case, or in the alternative, appointing a Chapter 11 trustee. In support hereof, the U.S. Trustee represents as follows:

### JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 28 U.S.C. § 157(b).

### STATEMENT OF RELEVANT FACTUAL AND PROCUEDRAL BACKGROUND

**Employment/Assets**

2. Debtor Todd A. Swenning (the "Debtor") filed the above-styled bankruptcy case on July 28, 2015 (the "Petition Date"). The Debtor is employed as an orthopedic trauma surgeon in Palm Springs, California. The Debtor has resided in Palm Springs since April of 2015. Prior to that time, the Debtor worked as an orthopedic trauma surgeon in Tulsa, Oklahoma.

3. The Debtor owns one hundred percent (100%) of the stock in a professional corporation known as Todd D. Swenning, MD, PC (the "PC"). The PC was formed by the Debtor in early 2015, before the Debtor relocated to Palm Springs.

4.      The PC and the Debtor have numerous contracts with the employer of the Debtor, Desert Regional Medical Center, Inc. ("Desert Regional").[1]  Pursuant to these contracts, the PC is paid monies and then the PC distributes those monies to the Debtor in the form of a salary. The Debtor has stated that the PC has few expenses, identifying only medical malpractice insurance and book-keeping expenses.

5.      The PC has separate bank accounts at Chase Bank, N.A ("Chase").  These consist of a savings account [ending in nos. 1389] and a checking account [ending in nos. 2037].  The Debtor also holds at least one personal bank account at Chase – a checking account [ending in nos. 9750].

6.      Since the Petition Date, the PC's bank statements reflect that it has collected over $650,000.00.[2]  Of that amount, the Debtor's monthly operating reports and the Debtor's Form W-2 Tax and Wage Statement reflect only $233,000.00 has been distributed by the PC to the Debtor.  *See* attachments to *Supplement to Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Todd A. Swenning Holds a Substantial or Controlling Interest* (the "Reporting Supplement"), Dkt. No. 68.

7.      The Debtor has few exempt assets, and no homestead.  One large asset the Debtor claims as exempt is a retirement account with a scheduled value of $200,000.00.  *See* Debtor's Schedules B and C,  Dkt. No. 1.

---

[1]      Only one contract, that certain *Relocation Agreement* dated April 20, 2105, appears to be in the name of the Debtor personally. Pursuant to this agreement, the Debtor is guaranteed to receive the sum of $75,260.68 a month for 17 months – beginning in April of 2015. The Debtor advised that this agreement was transferred to the PC.

[2]      The source of that $650,000.00 is unclear.  The U.S. Trustee assumes it came from the Debtor's employer, Desert Regional.

**Liabilities**

8.      The Debtor pays a domestic support obligation ("DSO") to his estranged spouse, Narayani (Melissa) Swenning (the "Spouse"), in the amount of $20,000.00 per month.[3]

9.      The Debtor has scheduled more than $400,000.00 in unpaid personal income taxes owed to the Internal Revenue Service.[4]  In addition, the Debtor has a mortgage foreclosure deficiency owed to Commerce Bank in the amount of $1,209,165.96.  *See* Debtor's Schedules E and F, Dkt. No. 1.

**Reporting/Disclosures**

10.      The Debtor's case has been pending with the Court for more almost nine (9) months.  During that time, the Debtor has failed to open a debtor in possession ("DIP") bank account.  The U.S. Trustee has communicated to the Debtor's counsel repeatedly that this needed to be resolved.  Further, the Court held a status hearing on February 17, 2016, at which it was made clear by the Court that opening a DIP account was to be a priority for the Debtor.

11.      During the pendency of the Debtor's case, the Debtor has failed to properly report personal expenditures on the Debtor's monthly operating reports.  The Debtor appears to be using the PC bank accounts for personal use.  The Debtor did not disclose these transactions, but rather they were flagged by the U.S. Trustee (and now the Court) upon a review of the PC bank statements.  The U.S. Trustee has raised this issue with the Debtor's counsel on more than one

---

[3]      While the divorce case has been pending for some time, the custody and support order was not entered by the District Court until January of 2016 – more than 5 months after the bankruptcy filing.
[4]      The Internal Revenue Service has filed a claim in the Debtor's case in the amount of $443,897.87.

occasion, but received no response or explanation and the personal spending out of the PC account continued.

12. The Debtor, via counsel, has failed to respond to inquiries from the U.S. Trustee regarding the Debtor's taxes and in particular, whether the Debtor is withholding post-Petition Date for 2016.[5] The Debtor has also failed to confirm whether DSO notices have been properly sent, despite repeated requests from the U.S. Trustee.

13. Additionally, during the 341 meeting of creditors, numerous items of personal property were mentioned that were not included in the schedules. The Debtor advised amendments would be made. To date, none have been filed.

14. Finally, despite having the benefit of the automatic stay, the Debtor has failed to save any funds to fund a plan of reorganization. As of the end of February, the Debtor is holding cash in the amount of $19,406.12. *See* Debtor's MOR dated March 21, 2016, Dkt. No. 55. As of the end of February, the PC is holding cash in the amount of $45,440.81. *See* attachments to Reporting Supplement, Dkt. No. 68.

## ARGUMENT AND AUTHORITY

**Dismissal under Section 1112(b) of the Bankruptcy Code**

15. Section 1112 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") provides for conversion of a Chapter 11 case to one under Chapter 7, or dismissal of a Chapter 11 case, if a party in interest establishes "cause." *See* 11 U.S.C. § 1112(b)(1). In the instant case, the U.S. Trustee seeks dismissal of the Debtor's case rather than

---

[5] In the Reporting Supplement required by the Court, the Debtor did submit a statement from Paychex setting forth tax withholding information for 2016.

conversion as the Debtor's income and the nature of his liabilities make it unlikely he would remain in a Chapter 7. *See* 11 U.S.C. § 707(b).

16.      Specifically, Section 1112(b) provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of the creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of the creditors and the estate.

11 U.S.C. § 1112(b).  Courts have wide discretion in determining whether or not cause exists under Section 1112(b).  *See In re MF Global Holdings Ltd.*, 465 B.R. 736, 742 (Bankr. S.D.N.Y. 2012).  The Court may also consider special circumstances and order the appointment of either a Chapter 11 trustee or examiner if said appointment would be in the best interests of creditors of the estate.  *See* 11 U.S.C. §§ 1112(b)(1) and 1112(b)(2).  *See also In re Spencerport Dev., LLC*, No. 14-21154 (PRW), 2014 Bankr. LEXIS 4909, at *3-4 (Bankr. W.D.N.Y. Dec. 4, 2014).

17.      The Bankruptcy Code provides numerous examples of "cause," including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and "gross mismanagement of the estate."   11 U.S.C. §§ 1112(b)(4)(A) and (b)(4)(B).  The list contained in Section 1112 of the Bankruptcy Code, however, is non-exhaustive and thus, various non-identified acts or failure to act may also constitute cause.  Courts look at the totality of the circumstances in evaluating cause under Section 1112(b).  *See, e.g., Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir. 1989); *In re Colon Martinez,* 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012); *In re Landmark A. Hess Farm, LLC,* 448 B.R. 707, 711 (Bankr. D. Md. 2011); *In re Van Eck,* 425 B.R. 54, 59 (Bankr. D. Conn. 2010); *In re Orbit Petroleum, Inc.,* 395 B.R. 145, 147 (Bankr. D. N.M. 2008).

18.     The Debtor, as a debtor in possession, is a fiduciary for the estate and its creditors. *In re United Healthcare Sys., Inc.*, 200 F.3d 170 (3d Cir. 1999), *cert. denied*, 530 U.S. 1204, 120 S. Ct. 2199 (2000).  The Debtor is required by the Bankruptcy Code to be accountable for all property received and to furnish information concerning the estate and the estate's administration as requested by a party in interest.  *See* 11 U.S.C. §704(a)(2) and 704(a)(7), *incorporated by reference in* 11 U.S.C. §§ 1106(a)(1) and 1107(a).  *See also In re Modern Office Supply, Inc.*, 28 B.R. 943, 944 (Bankr. W.D. Okla. 1983) (stating that an important fiduciary obligation of a debtor in possession is to keep creditors and the bankruptcy court informed).

19.     The Debtor's actions indicate that he is either unable or unwilling to act as fiduciary in this case.  The Debtor has failed and refused to open a DIP account, as requested by the U.S. Trustee on numerous occasions and as directed by the Court.  In addition, the Debtor has failed to satisfactorily report his income and expenses to the U.S. Trustee and this Court. The Debtor has also failed to perform other required reporting of a DIP by refusing to confirm the sending of DSO notices.  Finally, the Debtor has failed to generate sufficient monies to fund a Chapter 11 plan of reorganization.  As such, the U.S. Trustee seeks dismissal of the Debtor's case.

**Appointment of a Trustee**

20.     Alternatively, pursuant to Section 1104(a) of the Bankruptcy Code, the U.S. Trustee seeks the appointment of a Chapter 11 trustee to manage the financial affairs of the Debtor.

21.     In pertinent part, Section 1104(a) provides as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

       (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

       (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets and liabilities of the debtor.

11 U.S.C. § 1104(a).

     22.    The Bankruptcy Code does not attempt to give an all-inclusive definition of what constitutes "cause" for the appointment of a Chapter 11 trustee.  Rather, the Code recognizes that what constitutes sufficient cause for the appointment of a Chapter 11 trustee is a question of fact. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989), *7 Collier on Bankruptcy* ¶ 1104.02[3][a] (16th Ed. Rev.).  Once the court determines that the facts as presented establish cause, the statute mandates that the court "shall" appoint a trustee.  *In re Oklahoma Refining Company,* 838 F.2d 1133, 1136 (10th Cir. 1988).  *See also Escoe v. Zerbst*, 295 U.S. 490, 493 (1935) (stating that "shall" is the language of command and its use in a statute indicates intent that the statute should be mandatory).

     23.    The Court may order the appointment a Chapter 11 trustee without a finding of fraud, dishonesty, incompetence or gross mismanagement. *Oklahoma Refining,* 838 F.2d at 1136.  Among the factors a court may consider in determining whether to appoint a Chapter 11 trustee under Section 1104(a)(2) are: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment.  *See In re*

*Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D.Colo. 1990).

24.     As noted above, the debtor in possession is a fiduciary for the estate and its creditors.  As such, the Debtor is required by the Bankruptcy Code to be accountable for all property received, including post-petition income, and to disclose the same to the Court, the U.S. Trustee and creditors.  The Debtor's failure to do so leads the U.S. Trustee to conclude the creditors are better served by the appointment of a Chapter 11 trustee to manage the financial affairs of the Debtor.

## CONCLUSION

In light of the above, the U.S. Trustee seeks an Order from this Court either dismissing the Debtor's case or appointing a Chapter 11 Trustee. The U.S. Trustee submits that cause exists under the relevant Code sections

Dated this 22nd day of April, 2016.

SAMUEL K. CROCKER,
UNITED STATES TRUSTEE

*/s/ Bonnie N. Hackler*
Katherine Vance, OBA #9175
Paul R. Thomas OBA #11546
Bonnie N. Hackler, OBA #18392
224 South Boulder, Room 225
Tulsa, Oklahoma 74103
(918) 581-6671- Telephone
(918) 581-6674 - Facsimile
bonnie.hackler@usdoj.gov – Email

# EXHIBIT "2"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re                                          Case No. 15-11408-R
TODD A. SWENNING,                              Chapter 11

                    Debtor

                                    **Plan Confirmation Hearing:**
                                    DATE:       December 16, 2016
                                    TIME:       10:30 a.m. (CST)
                                    PLACE:      Courtroom 1
                                                224 S. Boulder Ave. Suite 105
                                                Tulsa, OK 74103

## CHAPTER 11 TRUSTEE'S SECOND AMENDED PLAN OF REORGANIZATION DATED NOVEMBER 10, 2016

## I.

## INTRODUCTION

On July 28, 2015 (the "Petition Date"), Todd A. Swenning, the Chapter 11 debtor herein (the "Debtor"), commenced this Chapter 11 bankruptcy case (the "Case") by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[1] Upon the fling of the Case, a bankruptcy estate (the "Estate") was created that contains the assets described in Sections 541 and 1115.  On June 1, 2016, this Court (the "Court") entered an order appointing Todd A. Frealy as the Chapter 11 Trustee (the "Trustee") of the Debtor's Estate.

Chapter 11 allows the Debtor, the Trustee, and/or others parties in interest to propose a plan of reorganization.  A plan of reorganization may provide for the Debtor to reorganize by continuing to generate income from the operation of a business and/or employment, to liquidate by selling assets of the Estate, or a combination of both.  The Trustee is the party

---

[1] Unless otherwise stated, all section references herein are to the Bankruptcy Code.

proposing the Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 (the "Plan") described in the concurrently filed Second Amended Disclosure Statement Describing Chapter 11 Trustee's Plan of Reorganization Dated November 10, 2016 (the "Disclosure Statement"). Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement.

The Plan is a reorganization plan. In other words, the Trustee will make payments to creditors as described in this Disclosure Statement and the accompanying Plan through the use of (1) the Debtor's cash on hand on the Effective Date (as defined below) and disposable income over a 60 month period from the Effective Date, (2) a Tax Refund, and (3) net Avoidance Claim Recoveries (as defined below), and New Value Funds to purchase the Debtor's non-exempt equity in assets of the Estate.

The effective date of the Plan (the "Effective Date") will be the later of (1) the fifteenth (15th) calendar day after the entry of the order of the Court confirming the Plan (the "Confirmation Order") (unless such day is a Saturday, Sunday or a legal holiday, in which case the Effective Date shall be the next calendar day), assuming there has been no order staying the effectiveness of the Confirmation Order, and (2) if an appeal of the Confirmation Order has been filed before such date and there has been an order staying the effectiveness of the Confirmation Order entered before such date, on the date an order denying the appeal becomes final and non-appealable. The Trustee is currently projecting an Effective Date of January 1, 2017. The Debtor, following the Effective Date, will be referred to herein as the "Reorganized Debtor." Where necessary, the term Debtor and Reorganized Debtor shall be interchanged.

## II.

## FUNDING OF THE PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS

**A.**    **FUNDING OF THE PLAN.**

The Plan will be funded from the following sources (collectively the "Plan Funds"):

(1)    Funds on hand on the Effective Date comprised of (a) the Net P.C. Income as of the Effective Date, less a $10,000 retention to fund operations and (b) the Debtor's accumulated Salary as of the Effective Date, net of necessary and reasonable expenses, with (1)(a) and (b) projected to total $57,615 of funds on hand on the Effective Date (the "Initial Funds").

(2)    An expected federal tax refund in the amount of $59,000 for the 2015 tax year (the "Tax Refund")

(3)    The Debtor's projected disposable income over five years from the Effective Date, which is comprised of (a) the Net P.C. Income less a $10,000 retention to fund operations, and (b) the Debtor's Salary, less necessary and reasonable expenses, which are collectively projected to total $2,092,320 (the "Additional Funds"). In order for the Debtor to avoid a default under the Plan, he must provide no less than $1,883,088 in Additional Funds (the "Guaranteed Additional Funds"), which is 90% of the Additional Funds.

(4)    The net Avoidance Claim Recoveries, which are projected to total $125,000.

(5)    A new value contribution in the amount of $9,500 to be paid by the Debtor to the Trustee from non-Estate assets within 2 years of the Effective Date to purchase the non-exempt equity in the Honda Cross Tour and Toyota Land Cruiser listed in the Debtor's Schedules, as amended (the "New Value Funds").

B.    **WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN.**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

1.    **Unclassified Claims.**

Certain types of claims are not placed into voting classes. Instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Trustee has ***not*** placed the following claims in a class.

a.    **Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Case that are allowed under Section 507(a)(2). The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

The following chart lists ***all*** of the Debtor's Section 507(a)(2) administrative claims (the "Administrative Claims") and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 (estimated amount owed as of the Effective Date) | Any outstanding amount to be paid in full on the Effective Date from the Initial Funds. |
| UST Quarterly Fees | $0 (estimated amount owed as of the Effective Date) | Any outstanding amount to be paid in full on the Effective Date from the Initial Funds. |
| Chapter 11 Trustee | $35,000 (estimated amount owed for hourly fees as of the Effective Date) | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected |

4

| Name | Amount Owed | Treatment |
|---|---|---|
| | | allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims.<br><br>In addition to the foregoing, the Chapter 11 Trustee will serve as the disbursing agent under the Plan and will receive a fee of 3% of Plan Disbursements for serving as the disbursing agent and managing implementation and consummation of the Plan. |
| Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), the Trustee's bankruptcy counsel | $85,000 (estimated amount owed as of the Effective Date) | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09.  As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis. |

| Name | Amount Owed | Treatment |
|---|---|---|
| | | The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| Hahn Fife & Company, LLP ("HF & Co."), the Trustee's accountants | $27,500 (estimated amount owed as of the Effective Date) | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| Doerner, Saunders, Daniel & Anderson, L.L.P. ("DSDA"), the Debtor's bankruptcy counsel (prior to the appointment of the Trustee) | $117,462 (estimated amount as of the Effective Date) | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims |

| Name | Amount Owed | Treatment |
|---|---|---|
| | | from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| Gretchen K. Archer, CPA, the Debtor's accountant (prior to the appointment of the Trustee) | $0 | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| Feamster &Carroll, PLLC, the Debtor's special litigation counsel (prior to the appointment of the Trustee) | $865.09 | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims |

7

| Name | Amount Owed | Treatment |
|---|---|---|
|  |  | in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| Desert Regional for Repayment Claim | $110,000 (estimated) | Initial Funds on hand on the Effective Date are projected to total $57,615 and projected allowed Administrative Claims as of the Effective Date total $375,827.09. As a result, the Estate will not have sufficient funds to pay all projected allowed Administrative Claims in full on the Effective Date.<br><br>Based on the foregoing, the Plan provides for the payment of allowed Administrative Claims from the Plan Funds in full over a three year period from the Effective Date, with payments to be made on a quarterly basis.<br><br>The Trustee will seek the written consent of each professional or other entity to the treatment set forth herein for Administrative Claims. |
| **TOTAL** | **$375,827.09(estimated) Administrative Claims** | |

8

<u>Court Approval of Fees Required</u>:

Except for Clerk's Office fees and UST Quarterly Fees, the Court must rule on all fees listed in the foregoing chart before the fees will be owed. For all fees except Clerk's Office fees and UST Quarterly Fees, the professional in question must file and serve a properly noticed fee application, and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan.

The Administrative Claim amounts set forth above simply represent the Trustee's best estimate as to the amount of allowed Administrative Claims estimated to be incurred by professionals prior to the Effective Date and that will be paid under the Plan to the extent allowed by the Bankruptcy Court. The actual Administrative Claims may be higher or lower. The Trustee expressly reserves his right to object to any of the foregoing Administrative Claims. Similarly, by voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these Administrative Claim, and creditors are not waiving any of their rights to object to the allowance of any of these Administrative Claim. By voting to accept the Plan, creditors also understand that the final amount of allowed fees and expenses of the professionals employed in this Case may be higher or lower than the figures set forth above, which again are just estimates.

**b.      Priority Tax Claims.**

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for under the Plan.

The following charts list <u>all</u> of the Debtor's Section 507(a)(8) priority tax claims (the "<u>Priority Tax Claims</u>") and their treatment under the Plan: [2]

| Description | Amount Owed | Treatment |
|---|---|---|
| Internal Revenue Service (POC # 1 – as Amended) | <u>Alleged:</u> $302,912.70 (priority portion of claim only)<br><br><u>Estimated:</u> $250,770.95 ($302,912.70, less $52,141.75) (priority portion of claim only) | While the priority portion of the IRS's claim is asserted in the amount of $302,912.70, there may be one or more bases for objecting to the IRS's POC. For example, the POC indicates that the priority portion of the IRS's POC is for 2010, 2012, 2013 and 2014 Income Taxes. However, the POC also asserts a secured claim in the amount of $28,299.07 for 2010 Income Taxes. Thus, the priority portion of the POC may be duplicative of the secured portion of the POC.<br><br>In addition to the foregoing, since (a) $52,141.75 of the priority portion of the POC is for 2010 Income Taxes, the return for which was last due on April 18, 2011, (b) Section 507(a)(8) only allows priority for, *inter alia*, "a tax measured by income … for a taxable year ending on or before the date of the filing of the petition (i) for which a return … is last due, including extensions, after three years before the date of the filing of the petition, and (c) the Petition Date was July 28, 2015, which is more than three years after the return for the 2010 Income Taxes was last due, the Trustee or other parties in interest may be able to object seeking to reclassify the portion of the POC for 2010 Income Taxes as a general unsecured claim.<br><br>Any portion of the POC that is reclassified and allowed as a general unsecured claim will be treated in the same manner as other Class 4 Other Unsecured Claims. (*See*, infra) |

---

[2] The chart below is for informational purposes and is not an admission as to the validity of any particular claim.

| Description | Amount Owed | Treatment |
|---|---|---|
| | | Upon being allowed as a priority claim after any objection, the claim will be paid from the Plan Funds (1) in regular quarterly installment payments starting no later than 120 days after the Effective Date (a) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of the claim, plus statutory interest thereon at the rate of 4% compounded annually (b) over a period ending not later than five (5) years after the Petition Date. |
| TOTAL | $250,770.95 (estimated) Priority Tax Claims | |

2.      **Classified Claims and Interests**

      a.      **Classes of Secured Claims**

Secured claims are claims secured by liens on property of the Estate. The following chart lists the classes containing the Debtor's secured pre-petition claims and their treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of: IRS<br><br>Collateral description = All collateral<br><br>Lien Priority = First<br><br>Collateral value = Approximately, $33,668 in non-exempt assets as of the Petition Date, plus approximately $57,615 in Initial Funds and | N | Y<br><br>(Creditor in this class is entitled to vote on the Plan) | There may be one or more bases for objecting to the secured portion of the IRS's POC in the amount of $28,299.07. For example, the, IRS's POC indicates that the Notice of Tax Lien allegedly creating the lien securing a portion of the POC was recorded on July 28, 2015, which is the Petition Date.<br><br>If the Notice of Tax Lien was recorded **before** the time the bankruptcy petition |

11

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | Additional Funds for a total of approximately $91,283, plus any net Avoidance Claim Recoveries.<br><br>Amount of Claim = POC # 1, as amended<br><br>Alleged: $28,299.07(secured portion of claim only)<br><br>Estimated: $0 (secured portion of claim only, estimated at $0 for the reasons in "Treatment" column to the right.)<br><br>Monthly Payment = $0 | | | was filed on July 28, 2015, the lien may be avoided as a preferential transfer under Section 547 or as a fraudulent transfer under Sections 544 and 548.<br><br>If the Notice of Tax Lien was recorded *after* the time the bankruptcy petition was filed on July 28, 2015, the lien may be a void because the recording thereof would constitute a violation of the automatic stay of Section 362 and/or may be avoided as an unauthorized post-Petition Date transfer under Section 549.<br><br>In addition to the foregoing, since (a) $52,141.75 of the priority portion of the POC is for 2010 Income Taxes, the return for which was last due on April 18, 2011, (b) Section 507(a)(8) only allows priority for, *inter alia*, "a tax measured by income … for a taxable year ending on or before the date of the filing of the petition (i) for which a return … is last due, including extensions, after three years before the date of the filing of the petition, and (c) the Petition Date was July 28, 2015, which is more than three years after the return for the 2010 Income Taxes was last due, the Trustee or other parties in interest may be able to object seeking to |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | | | | reclassify the portion of the POC for 2010 Income Taxes as a general unsecured claim.<br><br>Based on the foregoing issues, which the Trustee has been discussing with the IRS, the secured portion of the foregoing claim is being treated as a Class 4 Other Unsecured Claim for the purposes of this Disclosure Statement and the Plan based on the presumption that the claim will be successfully objected to and reclassified as a general unsecured claim.<br><br>In the event the foregoing claim is allowed after any objection, at the Trustee's option, the claim will be paid from the Plan Funds (1) in regular quarterly installment payments starting no later than 120 days after the Effective Date (a) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of the claim, plus statutory interest thereon at the rate of 4% compounded annually (b) over a period ending not later than five (5) years after the Petition Date. |
| NA | Secured claim of: Capital One Auto Finance, a Division of Capital One, N.A. | NA | NA | NA |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | Collateral description = 2010 Honda Cross Tour<br><br>Claim Priority = First<br><br>Collateral value = $15,000 (approx.)<br><br>Amount of Claim = POC # 10 – $8,450.93 at time POC #10 was filed, claim now paid in full.<br><br>Monthly Payment = $0 – paid in full | | | |

### b.    Classes of Priority Unsecured Claims.

Certain allowed priority claims (the "Non-Tax Priority Claims") that are referred to in Bankruptcy Code Sections 507(a) (1), (4), (5), (6) and (7) are required to be placed in classes. Non-Tax Priority Claims are entitled to priority treatment as follows:  The Bankruptcy Code requires that each holder of a Non-Tax Priority Claims receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured Non-Tax Priority Claims holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists *all* of the Debtor's Non-Tax Priority Claims and their treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 2 | Section 507(a)(1)<br><br>Alleged Claim of: M. Swenning, the | Y | N<br><br>(Creditor in this class is | As discussed above, the Trustee is informed and believes that, in addition to the domestic support |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | Debtor's former spouse, for a domestic support obligation.<br><br>Amount of Claim = Scheduled Amount - $0<br><br>POC - $0 (no POC filed); however, $20,000.00 per month per Agreed Temporary Joint Child Custody Plan and the order thereon entered on December 15, 2015<br><br>Monthly Payment = $20,000.00 per month | | not entitled to vote on the Plan) | obligation payments she may have been entitled to, (1) within four years before the Petition Date, the P.C. and/or the Debtor paid over $200,000 to or for the benefit of M. Swenning, which may be recoverable as preferential and/or actual or constructively fraudulent transfers and (2) after the Petition Date, the P.C. and/or the Debtor paid at least $8,810.39 to or for the benefit of M. Swenning, which may be recoverable as actual or constructively fraudulent transfers and/or improper post-Petition Date transfers.<br><br>To the extent allowable under applicable law, if and when the Trustee initiates an action against M. Swenning to avoid and recover the foregoing transfers, the Trustee will escrow funds payable to M. Swenning pending a resolution of the action.<br><br>Prior to initiating any such action, the Trustee will pay $20,000 per month to M. Swenning.<br><br>M. Swenning's claim for a domestic support obligation is non-dischargeable. Therefore, M. Swenning's claim for a domestic support obligation, and the Debtor's obligation to pay |

15

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | | | | on such claim, will not be discharged by the entry of a discharge of other debts and final decree closing the case and will constitute a continuing obligation of the Debtor. |
| | Sections 507(a) (4), (5), (6) and (7) | | None | N/A |
| TOTAL | | **$1,200,000 ($20,000 per month for the 5 year term of Plan payments) (estimated) Non-Tax Priority Claims.** | | |

### c.      Classes of General Unsecured Claims.

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).   The following chart identifies the Plan's treatment of the classes containing *all* of the Debtor's non-priority general unsecured claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | General unsecured claims against the Debtor **under** the amount of $3,000 (the "<u>Convenience Class Unsecured Claims</u>"). <br><br>The following general unsecured claims are included in this class: <br><br>Byrd Pool Services: $575.00 <br><br>Capitol One Bank (USA), N.A. by American InfoSource LP as Agent: $238.60 <br><br>Hibdon Tire aka Credit First NA: $648.50 | N | Y <br><br>(Creditors in this class are entitled to vote on the Plan) | As soon as practicable within 90 days after the Effective Date and after (1) paying or reserving for amounts then currently owed under the Plan for allowed Administrative Claims, (2) paying or reserving for amounts then currently owed under the Plan for the Class 1 secured claim of the IRS, (3) paying or reserving for amounts then currently owed under the Plan for the Class 2 Non-Tax Priority claim of M. Swenning, (4) paying or reserving for amounts then currently owed for the Priority Tax Claims, and (5) reserving amounts then accrued and owing and/or projected for in the projected cash flow for the |

| | | | | |
|---|---|---|---|---|
| | RMS (on behalf of Chubb & Son): $2,775.00 _____ TOTAL    $4,237.10 | | | Debtor for the term of the Plan attached to the Disclosure Statement as Exhibit "3" for the payment of post-Effective Date fees and expenses incurred by the Trustee and his professionals to implement the Plan and administer the Estate, including UST quarterly fees, the Trustee shall pay an amount equal to 75% of each of the allowed Class 3 Convenience Class Unsecured Claims in full and final satisfaction of each of the allowed Convenience Class Unsecured Claims, with the total amount of such payments estimated to be $3,177.83. |
| 4 | General unsecured claims against the Debtor *over* the amount of $3,000 (the "Other Unsecured Claims"). The Trustee estimates that the Other Unsecured Claims will total **approximately $1,686,634.26** (assuming approximately $52,141.75 of the Priority Tax Claim of the IRS for 2010 Income Taxes and the alleged $28,299.07 Class 1 IRS Secured Claim **are** reclassified as Class 4 Other Unsecured Claims) | N (except that Ila Swenning is an "insider." Therefore, her vote will not be counted for the purposes of determining whether Class 4 has accepted the Plan. | Y (Creditors in this class are entitled to vote on the Plan) | To the extent there is at least $10,000 in Plan Funds available for making distributions on allowed Class 4 Other Unsecured Claims after (1) paying or reserving for amounts then currently owed under the Plan for allowed Administrative Claims, (2) paying or reserving for amounts then currently owed under the Plan for the Class 1 secured claim of the IRS, (3) paying or reserving for amounts then currently owed under the Plan for the Class 2 Non-Tax Priority claim of M. Swenning, (4) paying or reserving for amounts then currently owed for the Priority Tax Claims, (5) reserving amounts then accrued and owing and/or projected for in the projected cash flow for the Debtor for the term of the Plan attached to the Disclosure Statement as Exhibit "3" for the payment of post-Effective Date fees and expenses incurred by |

|  |  |  |  | the Trustee and his professionals to implement the Plan and administer the Estate, including UST quarterly fees, and (6) paying or reserving for an amount equal to 75% of each of the allowed Class 3 Convenience Class Unsecured Claims, the Trustee, on a quarterly basis, shall make *pro rata* distributions to the holders of Class 4 Other Unsecured Claims in full and final satisfaction of each of the allowed Class 4 Other Unsecured Claims.<br><br>As can be seen from projected cash flow for the P.C. and the Debtor attached to the Disclosure Statement as **Exhibits "2" and "3,"** the Trustee estimates that, after paying senior claims, the Estate will distribute approximately $351,983 to the holders of Class 4 Other Unsecured Claims, which amounts to an estimated distribution of **21%** on account of such claims.<br><br>To the extent any of the Class 4 Other Unsecured Claims constitute non-dischargeable claims for student loans or otherwise, payment pursuant to the Plan will reduce such claims, but the claims will not be discharged by the entry of a discharge of other debts and final decree closing the case and will constitute continuing obligations of the Debtor. |
|---|---|---|---|---|

### d.    Class of Interest Holders.

Interest holders are the parties who hold an ownership interest (*i.e.,* equity interest) in the Debtor.  The Debtor is an individual and therefore the only interest holder.  The following chart identifies this Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 5 | Interest Holders (*i.e.,* the Debtor). | Y | Y<br><br>(Interest Holders in this class are entitled to vote on the Plan) | Provided that the Plan has been fully consummated and the Debtor has satisfied all of his obligations to perform or assist the Trustee in the performance of the Plan, including, but not limited to paying the Estate (1) the Additional Funds of between the current projected amount of $2,092,320 and the Guaranteed Additional Funds amount of $1,883,088 and (2) the New Value Funds of $9,500, upon entry of both the Debtor's discharge and a final decree closing the Case, the property of the Estate shall be deemed to have revested in the Debtor. |

## C.    MEANS OF EFFECTUATING THE PLAN.

### 1.    Funding for the Plan.

As discussed, the Plan will be funded from the Plan Funds: (1) the Initial Funds (*i.e.,* Funds on hand on the Effective Date comprised of (a) the Net P.C. Income as of the Effective Date, less a $10,000 retention to fund operations and (b) the Debtor's accumulated Salary as of the Effective Date, net of necessary and reasonable expenses, with (1)(a) and (b) projected to total $57,615 of funds on hand on the Effective Date, (2) the Tax Refund in the amount of $59,000, (3) the Additional Funds (*i.e.,* the Debtor's projected disposable income over five years from the Effective Date, which is comprised of (a) the Net P.C. Income less a $10,000 retention

19

to fund operations, and (b) the Debtor's Salary, less necessary and reasonable expenses, which are collectively projected to total $2,092,320, (4) the net Avoidance Claim Recoveries, which are projected to total $125,000, and (5) the New Value Funds in the amount of $9,500 to be paid by the Debtor to the Trustee from non-Estate assets within 2 years of the Effective Date to purchase the non-exempt equity in the Honda Cross Tour listed in the Debtor's Schedules, as amended.

**2.    Post-Confirmation Management of the Estate.**

On the Effective Date, the Trustee will continue to serve as the Trustee for the purposes of, among other things, making distributions required by the Plan and otherwise implementing and consummating the Plan, prosecuting any Avoidance Action Claims and claim objections, and performing such other duties required under Section 1106.

The Trustee will be deemed to have authority to act as the representative of the Estate and to take actions on behalf of the Estate that are not inconsistent with the terms of the Plan.

**a.    Rights and Responsibilities.**

In addition to the rights and responsibilities set forth in Section 1106, the Trustee shall have the following rights and responsibilities:

- **Employing and Paying Counsel.**

After the Effective Date, (1) LNBYB will continue to serve as the Trustee's bankruptcy counsel and HF & Co. will continue to serve as the Trustee's accountants for the purposes of, among other things, implementing and consummating the Plan, prosecuting any Avoidance Action Claims and claim objections, and performing such other professional services as required by the Trustee to perform his duties and (2) the Trustee will have the authority to employ such other professionals as the Trustee deems necessary for the purposes of, among other things, implementing and consummating the Plan, prosecuting any Avoidance Action Claims and claim objections, and performing such other professional services as required by the Trustee to perform his duties.

20

The post-Effective Date employment of professionals and the payment of the fees and expenses incurred by them after the Effective Date shall not require any further Court approval and shall be paid from the Plan Funds.

- **Analyzing, Prosecuting, and Resolving Avoidance Action Claims and Objections to Claims.**

As provided by Section 502(c), the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan.

The Trustee, pursuant to Section 1106 and as the representative of the Debtor's Estate under Section 1123(b)(3)(B) or otherwise, shall have the full power and authority, in his sole discretion, in the reasonable exercise of his business judgment, and without the need for any further Court authority or orders of the Court, to prosecute, settle, compromise, adjust, retain, enforce, dismiss, assign, and/or abandon any objections to claims and any Avoidance Action Claims or other litigation claims, regardless of whether such objections to claims or actions on Avoidance Action Claims or other litigation claims were commenced prior or subsequent to the Effective Date.

To the extent not accomplished before the Effective Date, the Trustee shall analyze and prosecute objections to claims or actions on Avoidance Action Claims or other litigation claims that the Trustee, in his sole discretion, deems necessary and appropriate. As allowed by the Bankruptcy Code, any other party in interest may also object to claims.

Nothing contained herein or in the Plan shall constitute a waiver or release by the Estate, the Debtor, the Reorganized Debtor, the Trustee, or any other party in interest of any rights of setoff or recoupment, or of any defense, the Debtor, the Reorganized Debtor, or any other party in interest may have with respect to any claim.

- **Receiving and Holding the Plan Funds**

Prior to and after the Effective Date, the Debtor shall pay his Salary and the Net P.C. Income to the Trustee to hold for the benefit of creditors pursuant to the terms of the Plan. Additionally, the Trustee shall hold any Avoidance Claim Recoveries and New Value Funds for

the benefit of creditors pursuant to the terms of the Plan.

- **Making Distributions from the Plan Funds.**

The Trustee shall make distributions as required by the Plan, which distributions, include, but are not limited to, (1) distributions of Plan Funds to pay the necessary and reasonable post-Effective Date expenses of the Debtor and the Estate and (2) distributions on allowed Administrative Claims, allowed Class 1 claims, allowed Class 2 claims, allowed Priority Tax Claims, allowed Class 3 claims, and allowed Class 4 claims.

Except as otherwise agreed to in writing by the Trustee, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's Schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1009, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

Checks issued by the Trustee for distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof (the "Claiming Period"). Requests for reissuance of any check shall be made in writing to the Trustee by the holder of the allowed claim to whom such check originally was issued, prior to the expiration of the Claiming Period. After such date, the claim shall be deemed disallowed and the funds otherwise available for distribution on the subject claim shall be redistributed to the remaining holders of allowed claims in accordance with the Plan.

The Trustee shall not be required to make any single distribution of less than $10.00 to the holder of an allowed claim otherwise entitled to a distribution.

If and when Plan Funds total less than $1,000 after (1) all claims objections, Avoidance Action Claims, and any other litigation claims have been fully resolved, (2) all amounts owed to the Trustee and any of his professionals have been paid, and (3) all other distributions required by the Plan have been made, the balance of Plan Funds shall be deposited into the Court.

- **Other Actions.**

In addition to the foregoing, the Trustee shall have the authority to take such other actions as he deems necessary and appropriate to assure the Debtor's performance of the terms of the Plan and the full administration of the Debtor's Estate, provided that such actions are not inconsistent with the terms of the Plan.

Without limiting in any way the foregoing general grant of authority to the Trustee to act to effectuate the terms of the Plan, except as otherwise set forth herein or in the Plan, after the Effective Date, the Trustee may use, acquire, sell or otherwise dispose of the Estate Property without the supervision of, or approval by, the Court or the UST and free of any restrictions in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or Local Bankruptcy Rules.

b.     **Compensation.**

As consideration for the services provided by the Trustee after the Effective Date, the Trustee shall be entitled to a fee calculated as 5% of distributions made pursuant to the Plan.

3.     **Exemption from Transfer Taxes.**

Pursuant to Section 1146(a), the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under Section 1129 of may not be taxed under any law imposing a stamp tax or similar tax.

4.     **Exculpations and Releases.**

To the maximum extent permitted by law, neither the Trustee, the Estate, nor any of the Trustee's employees, agents, and representatives, or the professionals employed or retained by any of them, whether or not by Bankruptcy Court order (each, a "Released Person"), shall have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the formulation of the Disclosure Statement, the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein. Each Released Person

23

shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.

**5.     Injunctions.**

**As of the Effective Date, the Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, treated in the Plan, discharged or to be discharged or terminated or to be terminated pursuant to the Plan (each an "Enjoined Claim").  Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities and individuals that have held, currently hold, or may hold an Enjoined Claim are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Estate, property of the Estate, and any property that revests in the Debtor on account of any Enjoined Claim: (1) commencing or continuing, in any manner or in any place, any action or other proceeding; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance; (4) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (5) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

By accepting distribution(s) pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this section.

**D.     OTHER PROVISIONS OF THE PLAN.**

**1.     Executory Contracts and Unexpired Leases.**

**a.     Assumptions and Rejections.**

In the ordinary course of business, the Debtor is a party to a number of executory contracts and unexpired leases (collectively, the "Contracts and Leases").  The Contracts and Leases were listed in Schedule "G" of the Debtor's Schedules, a true and correct copy of which

24

is attached to the Disclosure Statement as **Exhibit "4."**  On the Effective Date, the Trustee, on behalf of the Estate, intends to assume and will be deemed to have (1) ***assumed*** (a) the unexpired lease with Carol M. Tallichet for the property located at 655 E. Vereda Sur, Palm Springs, CA, (b) the unexpired lease with Elevation Property Management for the property located at 140 W. Via Lola #113, Palm Springs, CA, and (c) the executory Medical Directorship Agreement with Desert Regional (collectively the "Assumed Contracts and Leases") and (2) ***rejected*** (a) the services contract with Byrd Pool Services and (b) the lease with Paul and Cynthia Coury for the property located at 2470 E. 29th Street (collectively the "Rejected Contracts and Leases")

The Trustee is informed and believes, based on the Debtor's books and records and other information provided by the Debtor, that the Debtor is pre- and post-Petition Date current on obligations under the Assumed Contracts and Leases to be assumed on the Effective Date, and, therefore, no cure payments are due and owing to parties to such Contracts and Leases.  Therefore, upon confirmation of the Plan the cure amounts for the Assumed Contracts and Leases will be deemed to be $0.

**THE DEADLINE FOR ANY PARTY TO THE REJECTED CONTRACTS AND LEASES TO FILE A CLAIM BASED ON DAMAGES ARISING FROM THE REJECTION SHALL BE 30 DAYS AFTER THE EFFECTIVE DATE.**

**2.        Effect of Claim Bar Date**

Any creditor filing a POC after the Claim Bar Date, which is not otherwise an allowed claim, shall have no right to participate with other claimants or receive any distributions under the Plan by virtue of such late-filed POC, unless treatment for the specifically identified creditor is expressly provided for in the Plan.

**3.        Deadline for Filing Administrative Claims.**

**EXCEPT AS OTHERWISE PROVIDED BY THE PLAN, THE DEADLINE ("Admin. Claim Bar Date") BY WHICH PARTIES, OTHER THAN PROFESSIONALS EMPLOYED AT THE EXPENSE OF THE ESTATE HEREIN, MUST FILE AND SERVE REQUESTS FOR THE PAYMENT OF ADMINISTRATIVE EXPENSE**

PRIORITY CLAIMS OF THE KIND DESCRIBED IN 11 U.S.C. § 503(B) AND ENTITLED TO PRIORITY UNDER 11 U.S.C. § 507(A)(2) ("**Admin. Claim Requests**") IS 30 DAYS AFTER THE EFFECTIVE DATE.  Admin. Claim Requests filed after the Admin. Claim Bar Date shall be deemed disallowed and the holder of such claim will not be entitled to any payment or distribution on account of such late-filed Admin. Claim Request.

   **4.**  **Deadline for Filing Objections to Claims and Admin. Claim Requests.**

  As soon as practicable after the Effective Date, but in no event later than 120 days after the Effective Date, unless otherwise ordered or extended by the Court, any objections to claims and Admin. Claim Requests and/or complaints or motions to subordinate or estimate claims and Admin. Claim Requests shall be filed with the Court.  Notwithstanding any other provision in the Plan, no payment or distribution shall be made with respect to any claim if any portion of the claim is a disputed claim. Upon allowance or partial allowance of a disputed claim, such allowed claim shall be paid as otherwise provided by the Plan.

   **5.**  **Changes in Rates Subject to Regulatory Commission Approval.**

  To the best of the Trustee's knowledge, the Debtor is not subject to governmental regulatory commission approval of his rates.

   **6.**  **Retention of Jurisdiction.**

  After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

    a.  To resolve any and all disputes regarding the operation, implementation, and interpretation of the Plan and the Confirmation Order;

    b.  To determine any motions to approve the settlement of any adversary proceedings;

    c.  To determine the allowability, classification, and/or priority of claims and interests upon objection by the Trustee, the Debtor, the Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

26

d.      To determine the extent, validity and priority of any lien asserted against property of the Debtor, the Reorganized Debtor, or property of the Estate;

e.      To construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto;

f.      To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

g.      To determine any request for payment of administrative expenses;

h.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this Case whether before, on, or after the Effective Date;

i.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

j.      To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

k.      Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Confirmation Order;

l.      To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with

27

respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules;

       m.    To make determinations and issue any orders regarding the Debtor's discharge; and

       n.    To enter a final decree closing this Case.

## E.    **RISK FACTORS.**

The primary risk factors are that the total amount of allowed claims is materially higher than projected and/or that the Initial Funds, Tax Refund, Additional Funds, and/or net Avoidance Claim Recoveries, and New Value Funds used to make distributions under the Plan are materially lower than projected.  To a lesser extent, another risk factor is that the Trustee is not able to disallow the alleged secured portion of the IRS's claim or to reclassify a portion of the alleged priority portion of the IRS's claim, which claims the Trustee is discussing with the IRS.

## F.    **TAX CONSEQUENCES OF THE PLAN.**

The Trustee makes no representation concerning the tax consequences of the Plan to the Debtor and creditors.  The Debtor and each creditor should consult their own tax advisors to determine the tax consequences of the Plan on them.  The Trustee does not anticipate any adverse tax consequence to the Estate by virtue of confirmation of the Plan.

## III.

## EFFECT OF CONFIRMATION OF PLAN

## A.    **DISCHARGE.**

Upon completion of Plan payments as set forth herein, the Trustee will file an application for the entry of an order granting a discharge of liabilities for debts incurred before confirmation of the Plan to the extent provided in Section U.S.C. § 1141.

Confirmation shall bind the Debtor, all creditors, and all other parties in interest to the provisions of the Plan whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

**B.      CONTINUING STAY/INJUNCTION**

The automatic stay shall continue to prohibit collection or enforcement of pre-petition claims and other Enjoined Claims against the Debtor, the Reorganized Debtor, the Revested Assets (as defined below), the Estate, or property of the Estate until the earlier of the date: (1) the Case is closed or (2) the Case is dismissed. Therefore, all parties bound by the Plan shall take no action with respect to, and are enjoined from, collecting or enforcing their pre-petition claims or other Enjoined Claims as set forth herein, and as otherwise provided by operation of law, until the earlier of the date: (1) the Case is closed, or (2) the Case is dismissed.

**C.      THE VESTING OF PROPERTY OF THE ESTATE IN THE TRUSTEE UPON CONFIRMATION AND REVESTING OF PROPERTY IN THE REORGANIZED DEBTOR THEREAFTER.**

Notwithstanding Section 1141(a)(1), upon entry of the Confirmation Order, the property of the Estate shall vest in the Trustee, for the benefit of creditors pursuant to the terms of the Plan.

Provided that the Plan has been fully consummated and the Debtor has satisfied all of his obligations to perform under, or assist the Trustee in the performance of, the Plan, upon entry of both the Debtor's discharge and a final decree closing the Case, the remaining property of the Estate shall be deemed to have revested in the Debtor (the "Revested Assets").

**D.      MODIFICATION OF PLAN.**

The Trustee may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or re-voting on the Plan, unless the modification is non-material or relates only to the extension of the Effective Date, which modification shall not require a new disclosure statement and/or re-voting on the Plan.

The Trustee may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

Upon the Effective Date, the Trustee, the Debtor, all creditors, and all other parties in interest shall be deemed to have mutually waived the right to modify the Plan pursuant to Section § 1127(e).

## E.    POST-CONFIRMATION STATUS REPORT.

Within 120 days of the entry of the Confirmation Order or such other date established by the Court, the Trustee shall file a status report with the Court explaining what progress has been made toward consummation of the Plan.  The status report shall be served on the Debtor, the UST, and those parties who have requested special notice.  Further status reports shall be filed every 120 days, or such other interval established by the Court.

## F.    POST-CONFIRMATION CONVERSION/DISMISSAL.

A creditor or party in interest may bring a motion to convert or dismiss the Case under Section 1112 after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate.

The Confirmation Order may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

## G.    POST-CONFIRMATION U.S. TRUSTEE FEES

All fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6) shall be paid by the Trustee from the Plan Funds.

/ / /

/ / /

30

## H.   FINAL DECREE

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the

Trustee shall file a motion with the Court to obtain a final decree to close the Case.

Dated: November 10, 2016                    By:_____
                                                    TODD A. FREALY,
                                                    Solely in His Capacity as the Chapter 11 Trustee

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

*/s/ Todd M. Arnold*
MARTIN J. BRILL
Cal. Bar No. 53220
(*Pro Hac Vice* Application Approved)
TODD M. ARNOLD
Cal. Bar No. 221868
(*Pro Hac Vice* Application Approved)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com, tma@lnbyb.com

Counsel for Chapter 11 Trustee, Todd A. Frealy

## H.    **FINAL DECREE**

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the Trustee shall file a motion with the Court to obtain a final decree to close the Case.

Dated: November 10, 2016                    By: _Todd A Frealy_

                                   TODD A. FREALY,
                                   Solely in His Capacity as the Chapter 11 Trustee

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

*/s/ Todd M. Arnold*
MARTIN J. BRILL
Cal. Bar No. 53220
(*Pro Hac Vice* Application Approved)
TODD M. ARNOLD
Cal. Bar No. 221868
(*Pro Hac Vice* Application Approved)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com, tma@lnbyb.com

Counsel for Chapter 11 Trustee, Todd A. Frealy

# EXHIBIT "3"

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OKLAHOMA



Filed/Docketed
Jan 03, 2017

In re

**TODD A. SWENNING,**

**Case No. 15-11408-R**

**Chapter 11**

Debtor

**Hearing on Plan Confirmation:**

DATE:    December 16, 2016

TIME:     10:30 a.m.

PLACE:   Courtroom 1

             224 S. Boulder Ave. Suite 105

             Tulsa, OK 74103

## ORDER CONFIRMING CHAPTER 11 TRUSTEE'S SECOND AMENDED PLAN OF REORGANIZATION DATED NOVEMBER 10, 2016

On December 16, 2016, a confirmation hearing was held on the Second Amended Plan Of Reorganization Dated November 10, 2016 (the "Plan") [Dkt 160] filed by Todd A. Frealy, Chapter 11 Trustee (the "Trustee") for the bankruptcy estate of Todd A. Swenning, the Chapter 11 debtor herein (the "Debtor"). Appearances were made as set forth on the record of the Court.

Upon review of (A) the Plan, (B) the Stipulation Among Administrative Creditors Agreeing To Treatment Under Trustee's Second Amended Plan Of Reorganization Dated November 10, 2016; Order Thereon (the "Admin. Claim Stipulation") [Dkt. 176], (C) the Stipulation Resolving Commerce Bank's Limited Objection To Confirmation Of Chapter 11 Trustee's Second Amended Plan Of Reorganization Dated November 10, 2016 (the "Bank Stipulation") [Dkt. 174], (D) the Stipulation In Connection With Confirmation Of Chapter 11 Trustee's Second Amended Plan Of Reorganization Dated November 10, 2016 Re: (1) Assumption Of Relocation Agreement Between The Debtor And Desert Regional Medical Center And (2) Administrative Claim And Cure Amount Related Thereto (the "Hospital Stipulation") [Dkt. 177], (E) the Stipulation Resolving The United States' Objection To Confirmation Of

1

Chapter 11 Trustee's Second Amended Plan Of Reorganization Dated November 10, 2016 (the "IRS Stipulation" and, together with the Admin. Claim stipulation, Bank Stipulation, and Hospital Stipulation, the "Stipulations") [Dkt. 178], (F) the United States' Objection to Confirmation of Chapter 11 Plan of Reorganization with Combined Brief in Support (the "IRS Objection"), which was resolved and withdrawn pursuant to the IRS Stipulation, (G) Commerce Bank's Limited Objection to Confirmation of the Second Amended Chapter 11 Plan of Reorganization Proposed by the Chapter 11 Trustee (the "Bank Objection"), which was resolved and withdrawn pursuant to the Bank Stipulation, (H) the Chapter 11 Trustee's Witness And Exhibit Lists Re: Confirmation Hearing On Trustee's Second Amended Plan Of Reorganization Dated November 10, 2016 (the "Witness and Exhibit List"), the entirety of which was accepted into evidence, (I) the entire record in this case, and (J) the arguments and comments of counsel at the confirmation hearing,

**THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES THAT:**

1.       In accordance with Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court makes the following findings of fact and conclusions of law that support confirmation of the Plan. To the extent any finding of fact is later determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law contained herein is later determined to be a finding of fact, it shall be so deemed.

2.       Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

3.       On July 28, 2015 (the "Petition Date"), the Debtor commenced this Chapter 11 bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[1]

4.       On June 1, 2016, this Court entered an order appointing Todd A. Frealy as the Chapter 11 Trustee of the Debtor's estate.

---

[1] Unless otherwise stated, all section references herein are to the Bankruptcy Code.

5.      The Trustee filed his (A) Second Amended Disclosure Statement for Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 (the "<u>Disclosure Statement</u>") [Dkt. 161] and (B) Plan [Dkt. 160]

6.      On November 10, 2016, the Court entered its Order (1) Approving Disclosure Statement, (2) Fixing Time For Submitting Ballots And Objecting To Plan, And (3) Setting Confirmation Hearing [Dkt. 159] (the "<u>Disclosure Statement Order</u>") pursuant to which the Court (A) set November 12, 2016 as the deadline for the Trustee to serve the Disclosure Statement, Plan, ballots for voting on the Plan, and a copy of the Disclosure Statement Order on parties in interest, (B) set December 14, 2016, as the deadline for parties in interest to submit ballots and file objections to the Plan and for the Trustee to file his Witness and Exhibit List, including a tabulation of ballots, and (C) set a confirmation hearing for December 16, 2016 at 10:30 a.m.

7.      On November 15, 2016, the Trustee fled a Certificate Of Service (the "<u>Certificate of Service</u>") [Dkt. 164] indicating that the Trustee had served the Disclosure Statement, Plan, ballots for voting on the Plan, and a copy of the Disclosure Statement Order on parties in interest as required by the Disclosure Statement Order and within the deadline set by the Disclosure Statement Order.

8.      Per the Certificate of Service, the Plan, Disclosure Statement, the Disclosure Statement Order and appropriate ballots (A) were served on all parties required by the Bankruptcy Code and the Bankruptcy Rules; (B) were reasonably calculated, under the circumstances, to provide adequate notice to all creditors and other parties in interest of the hearing on confirmation of the Plan, the last date for filing objections to confirmation of the Plan, the voting deadline on the Plan and all other material information; and (C) fully complied with and satisfied all applicable requirements of due process. No additional notices or disclosures are required.

9.      The Disclosure Statement Order adequately and appropriately described and gave notice of the relief requested by the Trustee, including (without limitation) the filing of the Plan with the Court and the ability of parties in interest to review the contents of the Plan.

3

10.    There were two objections to confirmation of the plan, the IRS Objection and the Bank Objection, which were resolved and withdrawn pursuant to the IRS Stipulation and the Bank Stipulation, respectively.

11.    Other potential objections to the Plan were resolved by the Admin. Claim Stipulation and the Hospital Stipulation.

12.    All of the Stipulations are hereby approved.

13.    As set forth in Exhibit "3" to the Trustee's Witness and Exhibit List, which collectively includes the ballots, the tally of plan ballots, and a declaration regarding the tally of Plan ballots (collectively the "Ballot Tally"), Class 4 (general unsecured claims) and Class 5 (interest holder) voted to accept the Plan. Additionally, (A) Class 1 (IRS secured claim) and (B) Class 3 (convenience class general unsecured claims) did not vote on the Plan and, therefore, are deemed to have accepted the Plan and (B) Class 2 is unimpaired under the Plan and, therefore, is deemed to have accepted the Plan. Therefore, all classes accepted the Plan.

14.    Based on the foregoing and the other findings of fact and conclusions of law set forth on the record of the Court at the Plan confirmation hearing, which are incorporated herein by this reference, the Court finds that all requirements for confirmation of the Plan under Section 1129(a) are satisfied.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

A.    **Confirmation of Plan.**  The Plan is hereby confirmed, subject to the following conditions and amendments pursuant to the Stipulations approved by the Court and an agreement between the Trustee and UST stated on the record at the confirmation hearing and approved by the Court, which the Court finds to be non-material:

- Per the Bank Stipulation –

  - Notwithstanding any provision or term of the Plan, the Plan is not intended to, and shall not result, in (1) a discharge of any claims the Bank has against M. Swenning or (2) a stay of the Bank's ability to assert and

4

pursue its rights and remedies related to the enforcement of any claims the Bank has against M. Swenning. On and after the Effective Date of the Plan, the Bank shall be deemed to have (1) retained any claims the Bank has against M. Swenning and (2) the right to assert and pursue its rights and remedies related to the enforcement of any claims the Bank has against M. Swenning.

- Per the Hospital Stipulation –
  - o The Estate is deemed to have assumed the Relocation Agreement.
  - o The cure amount required to assume the Relocation Agreement is the Reconciliation Claim amount of $171,314.39 (the "Cure Amount").
  - o The Estate will be responsible for $110,000 of the Cure Amount (the "Estate Cure Amount"), which shall be paid by the Estate in accordance with the terms of the Plan.
  - o The Debtor will be responsible for and shall pay the balance of $61,314.39 of the Cure Amount (the "Debtor Cure Amount"), which shall be paid by the Debtor within two years of the effective date of the Plan, provided, however that (i) the Debtor shall retain and can pursue any rights as set forth in the Relocation Agreement to challenge the Reconciliation Claim and any reductions in the Reconciliation Claim shall be deducted from the Debtor Cure Amount, (ii) payments on the Debtor Cure Amount can only be paid from any surplus funds remaining with the Debtor after making all payments then currently due and owing under the Plan, (iii) payment of the Debtor Cure Amount shall not create any claims by the Debtor against the Estate, (iv) failure by the Debtor to pay the Debtor Cure Amount, or any other breach of the terms of the Relocation Agreement, shall not create or entitle the Hospital to any additional claims against the Estate in excess of the Estate Cure Amount.

5

- o The Hospital consents to the assumption of the Relocation Agreement on the terms set forth above and waives any rights the Hospital may have under Section 365 to seek additional showings of adequate assurance of cure or future performance.

- Per the IRS Stipulation –

    - o Notwithstanding any language to the contrary in the Disclosure Statement, Plan, and this Confirmation Order, the IRS' proof of claim (Claim 1-2) (the "IRS Claim") shall be deemed to be allowed in the amounts and priorities set forth in the IRS Claim and shall be paid in accordance with Plan terms—more specifically, the IRS Claim shall be paid from the Plan Funds (1) in regular quarterly installment payments starting no later than 120 days after the Effective Date (a) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of the claim, plus statutory interest thereon at the rate of 4% compounded annually (b) over a period ending not later than five (5) years after the Petition Date, or at an earlier date at the Trustee's option—unless and until there is an objection to the IRS Claim that is sustained by the Court.

    - o The "Injunction" language set forth in Section II.C.5 of the Plan is hereby amended to add the following language to the end of Section II.C.5:

        Notwithstanding any other provision of the Disclosure Statement, Plan, or Confirmation Order, (1) the IRS's Priority Tax Claim arising under Section 507(a)(8) and treated under Section II.B.1.b of the Plan shall not be discharged or satisfied unless and until such Priority Tax Claim is paid in full pursuant to the terms of the Plan and (2) in the event the IRS's Priority Tax Claim, or any other non-dischargeable tax obligation owed to the IRS, is not paid in full pursuant to the

6

terms of the Plan, the injunctions set forth in Section II.C.5 shall not apply to the IRS.

- <u>Per Agreement with the UST</u> –
  - o Section III.H. of the Plan titled "FINAL DECREE" is hereby replaced with the following language:

    H.      FINAL DECREE AND CLOSING OF THE CASE

    The Trustee shall seek the closing of this Case before entry of discharge.  The Trustee anticipates seeking closure of this Case after payments have begun to creditors, resolution of claims objections, and allowance of professional fees – at which time the Trustee believes the Case shall be full administered under Bankruptcy Rule 3022.  Furthermore, the Trustee shall seek to have this Case re-opened (after paying the appropriate fee to re-open) approximately 60 months after the first payment is made under the Plan for purposes of this Court entering a discharge of debt.

B.      **Implementation of Plan.** The entry of this Order shall constitute a direction and authorization to the Trustee to take or cause to be taken any and all action necessary or appropriate to consummate the provisions of the Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by this Court.

C.      **Binding Effect.** Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code, upon the Effective Date, the provisions of the Plan will bind any holder of a claim against, or interest in, the Debtor, whether or not the claim or interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan, and will also bind any person with actual notice of the Plan and an opportunity to object.

D.      **Retention of Jurisdiction.** The Court shall retain jurisdiction to the maximum extent permitted by the Bankruptcy Code or other applicable law for, among other things, the nonexclusive purposes described in the Plan.

7

**SO ORDERED** this 3rd day of January, 2017.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

**AGREED TO AS TO FORM AND CONTENT BY:**

**SAMUEL K. CROCKER,**
**UNITED STATES TRUSTEE**

*/s/ Bonnie N. Hackler*
Katherine Vance, OBA #9175
Paul R. Thomas OBA #11546
Bonnie N. Hackler, OBA #18392
224 South Boulder, Room 225
Tulsa, Oklahoma 74103
(918) 581-6671- Telephone
(918) 581-6674 - Facsimile

bonnie.hackler@usdoj.gov – Email

8

# EXHIBIT "4"



IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA

IN RE THE MARRIAGE OF )
)
TODD SWENNING, )
     Petitioner, )
  and )
)
MELISSA SWENNING, )
     Respondent. )

Case No. **FD-2014-320**
**ATTORNEY LIEN CLAIMED**

DISTRICT COURT
**FILED**

JAN 0 5 2016

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

### AGREED TEMPORARY JOINT CHILD CUSTODY PLAN

Come now the Petitioner, Todd Swenning, and the Respondent, Melissa Swenning,, jointly, and submit this Agreed Temporary Joint Child Custody Plan agreed upon by them for the Court's consideration concerning the custody, visitation and support of the parties' minor children. More particularly, the parties agree and show the Court that:

1. The parties are the parents of the following minor children: E.S. born July 2, 2005 and H.S. born October 7, 2003.

2. Both parties are fit and proper parents to receive the legal and physical care, custody and control of said minor children, and both parties consider that the best interests of the minor children will be served by the Court's approval and implementation of this Temporary Joint Child Custody Plan, in accordance with 43 O.S. §109. Our Temporary Joint Child Custody Plan is the following:

3. Custody of the children shall be awarded to the parties jointly. Visitation with the minor children is awarded to the parties equally according to a "nesting" visitation schedule wherein the children will remain at the marital residence and the Petitioner and Respondent will exercise their visitation separately according to a week on week off visitation schedule at the residence or as agreed to by the parties.

4. Both parties shall reasonably confer with the other by the most reasonable means and appropriate method and shall share decision making authority as to important decisions affecting the physical, mental and moral welfare and upbringing of the minor children to arrive at decisions promoting their best interests. More particularly, decisions concerning the children shall be made as follows:

A. The parent having physical custody of the children shall have the discretion to decide all routine matters concerning the children during their time with that parent and the provisions hereinafter set forth concerning resolution of disputes shall not apply to such matters. Even so, the parties will work together to provide consistency and common routines where possible, and the parent having physical custody will insure that the children's

involvement and participation in preexisting activities in which they may be involved are maintained.

B.   Both parties shall confer and jointly decide the following matters, to wit: (1) the fashion and manner in which the children shall be disciplined; (2) schools (such as which public or private, special courses, etc.) the children shall attend; (3) health care (medical, dental, mental, etc.) the children should receive; (4) religious instruction the children should receive; (5) summer camps, church schools and special event trips the children should attend; (6) travel of the children away from home, including extent, purpose, duration, mode, chaperon(s), etc.; and (7) any other area requiring decisions which affect the growth and development of the children.

C.   After conferring with each other concerning the foregoing matters, if the parties do not reach an agreement upon any such matter, the provisions hereinafter set forth concerning arbitration and/or mediation shall be followed to resolve any such disagreement.

5.   To insure each party's continuing association with the children, each party shall have visitation with the children as follows:

A.   The parties shall alternate weeks from Sunday at 6:00 p.m. until the following Sunday at 6:00 p.m.

The Parties shall alternate physical custody of the minor children on the holidays as set forth in the Holiday Visitation Schedule.   See Exhibit "B." This schedule may be modified by mutual agreement of the Parties.   All Holiday Visitation shall superceded normal visitation custody periods.

B.   The parties shall be mindful and considerate of the children's school activities, sports activities, peer activities and associations and the wishes of the children and, in the event of a time conflict respecting a parent's entitlement to the physical custody of the children, as above provided, both parties shall work together reasonably in advance for alternative times for physical custody, if necessary.

C.   The party having the right to receive the children's physical custody shall have the responsibility of picking up the children and of paying for any transportation expense associated with the same.   The parties may vary this routine by agreement from time to time as they mutually see fit.

D.   If the parent entitled to physical custody of the children is to be out-of-town for business, that parent shall provide to the other the first opportunity to assume physical custody of the children during the time of such trip.

2

E.  Additionally, each party shall be entitled to telephone the children at all reasonable times and the children shall be entitled to telephone their parents at any time. Each party shall be entitled to participate in all birthday, school or extracurricular activities of the children and each party shall keep the other informed of all such events on a regular basis.

6.  Additionally, each party shall comply with the following provisions of this plan, to wit:

A.  Each party shall be equally entitled to access and have all medical, hospital, school and all other records of the children and neither party shall inhibit or interfere with such access and, in the event that any doctor, hospital, teacher or other person does not freely grant such access, each party shall take such action as is necessary to cause such access to occur.

B.  Each party shall keep the other informed of all changes in his/her residence and work addresses and telephone numbers before changes occur.

C.  Each party shall affirm the other to the children and neither party shall demean the other to the children or within their presence or hearing.

D.  If the parent having physical custody of the children plans to take the children on an out-of-state trip, that parent shall notify the other reasonably in advance of the trip. If the trip will exceed ten (10) days, the consent of the other parent shall be necessary before such trip shall occur.

E.  Neither party shall permit an adult person of the opposite sex to stay overnight, but to whom he/she is not married, to spend the night in his/her dwelling or other sleeping location while the children are present, unless they are related by blood or marriage.

7.  The parties' Child Support Computation form has been completed, has been approved by the Court, is on file herein, and all of the information, findings and orders contained in said Child Support Computation form are hereby adopted and incorporated herein by reference. As is more specifically set forth therein, for purposes of Oklahoma's Child Support Guidelines, 43 O.S. §§118 and 119, Petitioner's monthly gross income will be set at $48,000.00, which is 89.3% of combined parental income, and Respondent's monthly gross income will be set at $3,000.00, which is 10.7% of combined parental income. Work related day care expense for the minor children presently exists and is paid by Petitioner in the amount set forth in said Child Support Computation form. Health insurance for the minor children is maintained by Petitioner at the cost set forth in said Child Support Computation form.

3

A. The Child Support Guidelines shall not be followed for the following cause, to wit: Petitioner's income exceeds the monthly maximum amount of monthly income set forth in the Oklahoma Child Support Guidelines. Both parties are represented by counsel, have been respectfully advised as to their rights regarding this issue. The parties agree that Petitioner will pay Respondent child support in the amount of $20,000.00 per month on the first day of each month beginning September 1, 2015, until the minor children are eighteen years of age or through such portion of the youngest child's twentieth birth year that such child be enrolled in and attending high school (whichever is later), or until the further order of the Court. The parties agree that this amount of monthly child support is in the best interests of the minor children.

B. Each parent will pay his/her proportionate share of work related child care expense, which is to say, Petitioner's share is 94.1% and Respondent's share is 5.9% of such expense. At present, in addition to said base monthly child support, Respondent will pay Petitioner 5.9% of the current work related child care expense set forth in said Child Support Computation Form on the first day of each month hereafter, until such time as Petitioner give Respondent documentation from the child care provider that the cost of such expense has changed, at which time Respondent will pay Petitioner 94.1% of such new monthly cost.

D. Health insurance for the children shall be maintained by Petitioner for each child who is under eighteen years of age or who is eighteen years of age but is still regularly enrolled in and attending high school (whichever is later), or until the further order of the Court.

E. Petitioner shall provide Respondent with all such insurance cards, provider lists and/or other documents as are needed concerning the use of such insurance and each party shall cooperate with the other in all respects concerning the filing and processing of health expense claims with the all insurers and/or health care providers of and for the minor children.

F. All other reasonable and necessary medical, dental, orthodontic, optometrical, psychological or any other physical or mental health expenses of the children shall be handled and paid in the following manner: Except for medical emergencies, the parties shall obtain health care services for the children in accordance with the requirements associated with the said health insurance being maintained for the children. All said health care expense should be submitted to all insurers as may exist. After being notified of the action taken by such insurers, each party shall pay the following portions of such expense which was not paid by insurance, including all co-payments and/or deductibles which may be applicable, to wit: Respondent shall pay 5.9% and Petitioner shall pay 94.1% thereof. If

4

one parent has overpaid his or her share of such expense, he/she shall provide notice and documentation to the other parent within forty-five (45) days of the expense, and the other parent shall reimburse that parent not later than forty-five (45) days after presentation of documentation concerning the same.

G.   In the event that a party does not satisfy his/her foregoing duties associated with the foregoing obligations concerning health insurance for the children or does not notify the other parent of an employer canceling an insurance policy relating to the minor children, including but not limited to the maintenance of said insurance, the supplying of documents associated with such insurance, the utilization of health care providers authorized by the health care insurers (other than for medical emergencies), and the processing of claims with said insurers, and/or any of the other foregoing obligations concerning the health care expenses of the children, that party may be liable to the other for any loss which may be occasioned by such failure based upon all equitable and legal considerations, and the provisions hereinafter set forth concerning arbitration and/or mediation shall be followed to resolve any dispute concerning such matters.

H.   The Respondent shall be responsible for 100% of any additional expenses of the children.  Such additional expenses may include school, camp, travel, equipment (such as computers, etc.) and any other expense the parties agree to incur for the benefit of the children.

I.   The state and federal income tax dependent exemptions for the minor children shall be awarded to each of the parties, as follows: Petitioner shall receive the federal and state exemptions the minor children. Respondent shall execute and deliver to the Petitioner on or before January 31 following a particular tax year such federal and/or state income tax form(s) as are then utilized by such taxing authorities which authorize such exemptions to be received by non-custodial parents. Unless and except the Petitioner has not paid his portion of the health insurance costs, uninsured health expenses, or day care. The failure of a party to comply with the obligations contained herein may result in that party being liable to the other party for any loss resulting from such failure based upon all legal and equitable considerations, and the provisions hereinafter set forth concerning mediation shall be followed to resolve any dispute concerning such matters.

J.   Upon the written request of a party to exchange current income information, each party shall promptly provide to the other all documents necessary to objectively determine his and her gross income during the prior calendar year and year to date gross income as of the date of such request.  In the event that child support computed for such data reflects a different

5

obligation of child support and/or percentage of income than is contained herein, parties shall agreeably modify this Plan in such regards. In the event that either parent refuses comply with the terms of this paragraph, the provisions hereinafter set forth concerning arbitration and/or mediation shall be followed to resolve any dispute concerning such matters. If a parent has unreasonably refused to comply with the terms of this paragraph, that party shall pay all costs of arbitration and/or mediation and/or litigation expense, including the other party's reasonable and necessary attorney fees.

K.   If a party makes a written request to the other that child support be modified by agreement effective on the date that a child becomes eighteen years old or is nineteen years of age but is no longer attending high school, and if the requesting party has provided to the other the documentation provided for in the preceding paragraph, the other party shall promptly provide the same documentation and the parties shall agree to child support modification based upon current income amounts and other statutory factors effective as of the latter said date. If such written request is made but the other party declines such request, the provisions hereinafter set forth concerning arbitration and/or mediation shall be followed to resolve any dispute concerning such matters. If a parent has unreasonably refused to comply with the terms of this paragraph, that party shall pay all costs of arbitration and/or mediation and/or litigation expense, including the other party's reasonable and necessary attorney fees, and, further, the requesting party shall have no liability to the other party for child support based upon a greater number of minor children than existed at the date of such request.

8.   If either party remarries, he/she shall provide a copy of this Plan to his/her spouse and shall exert every reasonable effort to insure that his/her spouse honors and respects the terms and provisions hereof.

9.   In the event of the death, incapacitation or serious illness of either party, legal and physical custody of the children shall vest wholly and exclusively in the other party.

10.   In the event a dispute arises between the parties concerning any matter pertaining to the children which is not within the discretionary province of only one of the parties as above set forth, the following shall occur:

A.   The parties shall submit the matter to a mediator, for resolution. If the parties do not agree and/or the identity of who will perform such mediation, upon the motion of either party, the Court will appoint a mediator to resolve the dispute.

B.   The parties shall cooperate and participate in such mediation in all respects in an attempt to resolve their disagreement outside judicial proceedings.

C.  If the dispute be submitted to mediation and the parties fail to reach agreement, all matters in dispute shall be submitted to the Court for resolution, including the assessment of attorney fees and expenses associated with the attempted mediation.

WHEREFORE, the parties jointly move the Court for its order confirming and adopting the above Temporary Joint Child Custody Plan as the Court's final Plan and for such other relief as may be appropriate to the same.

_____          _____
Todd Swenning, Petitioner           Melissa Swenning, Respondent

STATE OF OKLAHOMA, COUNTY OF TULSA, SS: Todd Swenning, Petitioner, of lawful age and being first duly sworn, states: I am the Petitioner above named. I have read all of the terms of the foregoing Temporary Joint Child Custody Plan and I agree with all the terms thereof. I will comply with the same.

_____
Todd Swenning, Petitioner

Subscribed and sworn to before me by Todd Swenning on this 6th day of Nov., 2015.

My Commission Expires:          _____
MAY 31 2017                     Notary Public
Commission # 2023 14

STATE OF OKLAHOMA, COUNTY OF TULSA, SS: Melissa Swenning, Pro Se, Respondent, of lawful age and being first duly sworn, states: I am the Respondent above named. I have read all of the terms of the foregoing Temporary Joint Child Custody Plan and I agree with all the terms thereof. I will comply with the same.

_____
Melissa Swenning, Pro Se, Respondent

Subscribed and sworn to before me by Melissa Swenning on this 6 day of Nov., 2015.

My Commission Expires:          _____
MAY 31 2017.                    Notary Public
Commission # 2023142

*** SEE ATTACHED CURRENT
JURAT FOAM.

7

**California Jurat as of 01/01/2015**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California          )

County of _RIVERSIDE_

Subscribed and sworn to (or affirmed) before me on this _6th_ day of _Nov_ 20 _15_ by
_TODD SWENNING and MELISSA SWENNING_
proved to me the basis of satisfactory evidence to be the person (s) who appeared before me.

_____
Notary Signature

(Area for Notary Seal)

OFFICIAL SEAL,
ERNEST I. SUSSMAN
COMM. #2023446
NOTARY PUBLIC • CALIFORNIA
RIVERSIDE COUNTY
My Comm. Exp. May 31, 2017

## ORDER

Now, on this __15__ day of __Dec.__, 2014, each of the parties requesting the same and with the same appearances and evidence set forth in this Court's Decree of Divorce entered on this date, the Court found that the parties' foregoing Temporary Joint Child Custody Plan is in the best interests of the minor children, that said Plan conforms to the requirements of 43 O.S. §109, and that each party fully understood the same and agreed to be bound by the terms thereof.  The Court further found that it should adopt said Temporary Joint Child Custody Plan as the order of the Court.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the foregoing Temporary Joint Child Custody Plan is adopted as the order of this Court and that custody of E.S., born July 2, 2005 and H.S., born October 7, 2003, is awarded to the parties jointly in accordance with the terms of the same.  Each party is ordered to comply with each and all of the terms and provisions set forth therein, even as the same were here fully set forth.

Signed on September __15__, 2015.

_____
JUDGE OF THE DISTRICT COURT

Approved For Entry:

_____
James W. Feamster, III   OBA #2848
Adam P. Carroll, OBA#19970
35 East 18th St.
Tulsa, Oklahoma 74119
Telephone (918) 712-2686
Fax (918) 712-9222
Attorney for Petitioner

_____
Megan Beck, OBA
320 South Boston Ave., Suite 200
Tulsa, OK 74103
Telephone 918-594-0809
Fax (918) 594-0505
Attorney for Respondent

8

## CERTIFICATE OF SERVICE

I hereby certify that on this ___5___ day of ___Jan_____, 2016 a copy of the above and foregoing document entitled was hand delivered to the following:

Megan Beck,
320 South Boston Ave., Suite 200
Tulsa, OK 74103

James W. Feamster, III
Adam P. Carroll

9

**"EXHIBIT B"**
**STANDARD HOLIDAY VISITATION SCHEDULE**

The Petitioner shall have visitation as follows:

1.   Holidays.  In even numbered years such as 2012, 2014, etc.:

   **Easter:** 6:00 p.m. Friday preceding Easter until 6:00 p.m. Sunday;
   **July 4th :** 6:00 p.m. evening of July 3rd until 8:00 a.m. July 5th;
   **Fall Break:** From the time schools let out until 7:30 the day before school reconvenes.
   **Thanksgiving:** 6:00 p.m. Wednesday preceding Thanksgiving until 6:00 p.m. Sunday;

   Respondent shall have these in odd years.

   In odd numbered years such as 2011, 2013, etc.:

   **News Years Day:** 12:00 p.m. to 9:00 p.m.;
   **Spring Break:** 6:00 p.m. the day school is out until 6:00 p.m. Wednesday
   **Memorial Day:** 6:00 p.m. Friday preceding Memorial Day until 6:00 p.m. Monday;
   **Labor Day:** 6:00 p.m. Friday preceding Labor Day until 6:00 p.m. Monday;

   Respondent shall have these in even years.

5.   **Christmas Vacation:** In odd numbered years, such as 2011, etc., the Petitioner shall have extended Christmas vacation from 6:00 p.m. on the day day-care or school (whichever is applicable) recesses until 6:00 p.m. on Christmas Eve.

   In even numbered years, such as 2012, etc., the Petitioner shall have extended Christmas vacation from Christmas Day at 6:00 p.m. until 6:00 p.m. on January 1.

   Respondent shall have the reverse of this schedule (i.e. odd years she shall have second half of Christmas and in even years she shall have the first half.)

6.   **Father's Day and Mother's Day.** The children's Father and Mother shall have the children on Father's Day and Mother Day respectively from 9:00 a.m. to 9:00 p.m. Father's Day and Mother's Day shall take precedence over any conflict with any regularly scheduled week-end.

7.   **Child's Birthday.** The Petitioner shall have visitation with the child on that child's birthday, according to the following schedule.

a)   On odd numbered years, the Petitioner shall have visitation with the child the evening immediately prior to said child's birthday from the time day-care or school recesses for the day until 9:00 p.m.; if the day prior to said child's birthday falls on

a weekend then the Petitioner shall have visitation with the child from 9:00 a.m. until 9:00 p.m. on that day.  Respondent shall have this in even numbered years.

b)   On even numbered years, the Petitioner shall have visitation with the child the evening of said child's birthday from the time day-care or school recesses for the day until 9:00 p.m.; If the child's birthday fall on a weekend then Petitioner shall have visitation with that child from 9:00 a.m. until 9:00 p.m. on that day. Respondent shall have this in odd numbered years.

8.   **Parent's Birthday.**  The child will celebrate each parent's birthday with that parent. If the Petitioner's birthday falls during a school day, then the Petitioner shall have visitation with the child from the time school recesses until 9:00 that evening.

If the Petitioner's birthday falls on a weekend, then Petitioner shall have visitation from 9:00 a.m. until 9:00 p.m. that day.  Petitioner's birthday visitation shall preempt any previously allocated visitation of the Respondent.

Likewise, if the Respondent's birthday falls on a day when the Petitioner would normally have visitation, then the Respondent's birthday shall preempt the Petitioner's normal visitation, and should the child be in Petitioner's Possession at that time the Petitioner shall return the child to the Respondent no later than 9:00 a.m. that day.

***The parties may deviate from this schedule as they agree.

IN THE DISTRICT COURT OF _____ COUNTY
STATE OF OKLAHOMA

| TODD SWENNING | ) | Dist. Ct. Case No. | FD-14-320 |
| | ) | | |
| Petitioner, | ) | OAH Case No. | |
| | ) | | |
| vs. | ) | FGN: | |
| | ) | | |
| MELISSA SWENNING | ) | | |
| | ) | | |
| Respondent. | ) | | |

**CHILD SUPPORT COMPUTATION**

| | Calculation for number of children in this case | | 2 | | | |
|---|---|---|---|---|---|---|
| | Obligor (person who pays) is (Enter "Father" or "Mother") | | Father | Combined income on Line 4 exceeds Child Support Guideline Schedule. See 43 O.S. § 119 (B). | | |
| **A** | **Base monthly obligation** | | | **Father** | **Mother** | **Combined** |
| 1 | **Gross monthly income** All sources, except income specifically excluded by 43 O.S. Section 118B(B) | | | $48,000.00 | $3,000.00 | $51,000.00 |
| | a. Amount of self-employment income included in Line 1 | | | $0.00 | $0.00 | |
| | b. Deduction for self-employment tax Multiply Line 1a by 7.65% | | | $0.00 | $0.00 | |
| 2 | **Total gross monthly income** Line 1 minus Line 1b | | | $48,000.00 | $3,000.00 | |
| | a. Amount of SSA Title II benefits paid for the benefit of the children. Do NOT include SSI benefits. (Enter in the column for the disabled or retired parent.) | | | $0.00 | $0.00 | |
| | b. Court ordered support alimony actually paid in a prior case | | | $0.00 | $0.00 | |
| | c. Court ordered monthly adjustment for marital debt | | | $0.00 | $0.00 | |
| | d. Court ordered monthly child support actually paid for out-of-home children | | | $0.00 | $0.00 | |

| | In-home Children Deduction Worksheet | | | |
|---|---|---|---|---|
| | e. Number of qualified in-home children excluding children on this case | 0 | 0 | |
| | f. Amount for qualified in-home children. Apply Line 2 for each parent to Child Support Guideline Schedule amount using the number of children in Line 2e, and multiply guideline amount by 75% | $0.00 | $0.00 | |
| 3 | **Adjusted gross monthly income (AGI)** Amount in Line 2 plus 2a, minus Lines 2b, 2c, 2d, and 2f | $48,000.00 | $3,000.00 | $51,000.00 |
| 4 | **Percentage share of income** AGI for each parent divided by the combined AGI | 94.1% | 5.9% | 100% |
| 5 | **Base monthly obligation** Apply combined AGI to Child Support Guideline Schedule and put total in combined base monthly obligation. Multiply the combined total by the percentage share of income for each parent. | $1,845.65 | $115.35 | $1,961.00 |
| **B** | **Parenting time adjustment, if used** | **Father** | **Mother** | **Combined** |
| 6 | **Number of overnights with each parent** If less than 121 for either parent, skip to C. | 182 | 183 | 365 |
| | a. Percentage of overnights with each parent Number of overnights for each parent divided by 365 | 50.0% | 50.0% | 100% |
| | b. Adjusted combined child support obligation Adjustment factor is based on the parent with the fewest overnights. The result in the combined column is the combined monthly obligation in Line 5 multiplied by the adjustment factor. | 1.5 | <=== **Adjustment Factor** less than 121 = no factor 121-131 = 2 132-143 = 1.75 144-183 = 1.5 | $2,941.50 |
| | c. Share of adjusted combined child support obligation Combined Line 6b multiplied by the percentage share of income in Line 4 | $2,768.47 | $173.03 | |
| | d. Respective adjusted base child support obligation Amount for each parent in Line 6c multiplied by the percentage of the other parent in Line 6a | $1,384.24 | $86.52 | |
| 7 | **Adjusted base monthly obligation** Line 6d larger amount minus Line 6d smaller amount and the result is for the parent with the positive amount. If parent has more than 205 in Line 6, use $0 for that parent. If either parent has less than 121 in Line 6, use the Line 5 amount for both parents. | $1,297.72 | $0.00 | |
| **C** | **Obligor (person who pays) is** (Enter "Father" or "Mother") | Father | | |

| D | Work and education-related child care expenses | Father | Mother | Other Custodian |
|---|---|---|---|---|
| 8 | **Monthly child care expenses for children in this case** Do not include any co-payments being paid by a parent receiving OKDHS child care subsidy. | $0.00 | $0.00 | $0.00 |
| 9 | **Child care expense percentage share of the total** Total child care expenses multiplied by percentage share of income for each parent Multiply Line 8 by Line 4 | $0.00 | $0.00 | |
| 10 | **OKDHS Child Care Subsidy Worksheet** a. Total children in each parent's household receiving child care subsidy | | | |
| | b. Number of children from Line 10a included in this order | | | |
| | c. Parent's actual gross monthly income less self-employment tax from Line 2 | | | |
| | d. Base monthly obligation of the obligor Enter Line 7 for obligor into obligee's column, $0 for the obligor indicated in Section C | $0.00 | $0.00 | |
| | e. Amount treated as OKDHS household income Line 10c plus Line 10d | | | |
| | f. Amount treated as each parent's family share co-payment from OKDHS Appendix C-4, page 2 Use Lines 10e & 10a | | | |
| | g. OKDHS child care co-payment amount Multiply Line 10f by Line 10b, and divide by Line 10a | $0.00 | $0.00 | |
| 11 | **Child care subsidy co-pay adjustment to child support obligation** Child care expense percentage share total Multiply total of Line 10g for both parents by Line 4 | $0.00 | $0.00 | |
| 12 | **Total child care adjustment to base monthly obligation** Line 9 plus Line 11, minus Line 8 and Line 10g (amount may be negative) | $0.00 | $0.00 | |
| E | Health Insurance premium | Father | Mother | Other Custodian |
| 13 | **Monthly health insurance premium costs** This premium represents the actual premium cost for any child(ren) in this case only.  Insurance Premium Worksheet is available if needed. **Use Cash Medical Support if any child is not covered by insurance.** | $0.00 | $0.00 | $0.00 |
| 14 | **Monthly health insurance share for each parent** Percentage share of income in Line 4 multiplied by total current insurance cost for all persons in Line 13 | $0.00 | $0.00 | |
| 15 | **Total premium cost adjustment to base monthly obligation** Line 14 minus Line 13  (amount may be negative) | $0.00 | $0.00 | |

| F | Other contributions, if agreed or ordered | Father | Mother | Other Custodian |
|---|---|---|---|---|
| 16 | **Ongoing medical costs** <br> Cash medical support for fixed periodic payments for ongoing medical costs | $0.00 | $0.00 | $0.00 |
| | a. Adjusted medical costs share <br> Multiply total of Line 16 for all persons by Line 4 | $0.00 | $0.00 | |
| | b. Total ongoing medical costs adjustment to base monthly obligation <br> Line 16a minus Line 16 (amount may be negative) | $0.00 | $0.00 | |
| 17 | **Visitation transportation costs** | $0.00 | $0.00 | $0.00 |
| | a. Adjusted visitation costs share <br> Multiply total of Line 17 for all persons by Line 4 | $0.00 | $0.00 | |
| | b. Total ongoing visitation costs adjustment to base monthly obligation <br> Line 17a minus Line 17 (amount may be negative) | $0.00 | $0.00 | |
| G | **Child Support obligation subtotal** | **Father** | **Mother** | |
| 18 | **Base monthly child support obligation less adjustments for child care and other contributions** <br> Add obligor Line 7 to Lines 12, 15 and 17b if positive amounts. Subtract Lines 12, 15 or 17b if negative amounts. | $1,297.72 | $0.00 | |
| 19 | **SSA Title II benefits paid for the benefit of the child** <br> Line 2a for obligor | $0.00 | | |
| 20 | **Total monthly child support obligation less any SSA Title II benefits paid for the benefit of the child** <br> Line 18 minus Line 19 (amount may be negative) | $1,297.72 | $0.00 | |
| H | **Cash Medical Support** | **Father** | **Mother** | **Combined** |
| 21 | Enter number of children from Line 13 not covered by health insurance. If none, skip to Line 26. | | | |
| 22 | Enter the Soonercare or other health care government assistance applicant for the child(ren) in this case. Enter "Father", "Mother", or "other". | | | |

| | | Father | Mother | |
|---|---|---|---|---|
| 23 | **Cash medical amount for obligor**<br>If Line 21 is zero or the obligor is the person on Line 22, enter $0 in Line 25. If Line 21 is greater than zero and the obligor is not the person on Line 22, refer to the Cash Medical Income Guidelines Table. If the combined income is less than or equal to the amount on the table, enter $0. If greater, multiply $115 per number of children in Line 21. Multiply the combined total by percentage shares from Line 4. | $0.00 | $0.00 | $0.00 |
| 24 | **5% of Gross Monthly Income for Obligor**<br>Line 2 multiplied by 0.05<br>This represents the maximum amount of total medical allowed. | $2,400.00 | | |
| 25 | **Cash medical support in lieu of insurance**<br>If Line 23 plus Line 15 is greater than Line 24, use Line 24 minus Line 15. If Line 23 plus Line 15 is less than or equal to Line 24, enter Line 23. Enter $0 if negative | $0.00 | $0.00 | |

| I | **Current Monthly Support Obligation** | Father | Mother |
|---|---|---|---|
| 26 | **a. Child support portion**<br>If Line 16b is positive, Line 20 for obligor<br>If Line 16b is negative, reduce Line 20 by Line 16b<br>Enter $0 if negative | $1,297.72 | |
| | **b. Cash medical portion**<br>If Line 20 minus 16b is positive, Line 25 for obligor<br>If Line 20 minus 16b is negative, reduce Line 25 by Line 20 minus 16b. Enter $0 if negative | $0.00 | |
| | **c. Ongoing medical costs portion**<br>If Line 20 is positive, Line 16b for obligor<br>If Line 20 is negative, reduce 16b by Line 20<br>Enter $0 if negative | $0.00 | |
| 27 | **Total obligation to be paid by the obligor**<br>Line 26a plus 26b plus 26c | $1,297.72 | |

_Petitioner_ shall begin payments on _Sept. 1, 2015_ and continue on the same date of each month until further order of the court.

___ Guidelines were followed.

_X_ Deviation from child support guidelines by Court-Specific findings of Court supporting each deviation:

_____

_____

_____

Dated: _12-15-15_ 

_[signature]_ JUDGE

**APPROVED AS TO FORM:**

_____          _____
Father printed name                          Father signature

_____          _____
Attorney for father printed name            Attorney for father signature and OBA Number

_____          _____
Mother printed name                          Mother signature

_Megan M. Beck_____          _Myra M Beck___ OBA #36962___
Attorney for mother printed name            Attorney for mother signature & OBA Number

_____          _____
Other Custodian printed name                Other Custodian signature

_____          _____
Attorney for Other Custodian printed name   Attorney for Other Custodian signature and
                                            OBA Number

_____          _____
State's Attorney, OCSS printed name         State's Attorney, OCSS signature and OBA Number

OKDHS 07/01/2009                  **03EN025E**                    6 of 6

# EXHIBIT "5"

TODD SWENNING MD PC
Projected Cash Flow

| | 2017 Jan | 2017 Feb | 2017 Mar | 2017 Apr | 2017 May | 2017 Jun | 2017 Jul | 2017 Aug | 2017 Sep | 2017 Oct |
|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | | | |
| Patient Collections | 70,000 | 70,000 | 70,000 | 60,000 | 60,000 | 40,000 | 30,000 | 30,000 | 40,000 | 40,000 |
| Non-Patient Related | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 | 23,500 |
| Medical Directorships | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 |
| Other | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Gross Income | 108,600 | 108,600 | 108,600 | 98,600 | 98,600 | 78,600 | 68,600 | 68,600 | 78,600 | 78,600 |
| | | | | | | | | | | |
| **EXPENSES:** | | | | | | | | | | |
| TS Salary | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 |
| Office Manager | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 |
| Assistant | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Payroll Taxes (Employer) | 5,451 | 4,920 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 | 1,239 |
| Billing | 5,600 | 5,600 | 5,600 | 4,800 | 4,800 | 3,200 | 2,400 | 2,400 | 3,200 | 3,200 |
| Malpractice Insurance | 0 | 40,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Health Insurance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Office Support | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 |
| CPA | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| Phone/Fax/Internet | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Travel/Entertainment | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Secured Lease Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cell Phone | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Total Expenses | 80,576 | 120,045 | 76,364 | 75,564 | 75,564 | 73,964 | 73,164 | 73,164 | 73,964 | 73,964 |
| | | | | | | | | | | |
| Net Income | 28,024 | (11,445) | 32,237 | 23,037 | 23,037 | 4,637 | (4,564) | (4,564) | 4,637 | 4,637 |
| | | | | | | | | | | |
| Beginning Cash | 10,000 | 30,000 | 18,555 | 10,000 | 10,000 | 15,000 | 19,637 | 15,073 | 10,510 | 10,000 |
| Net Income (Loss) | 28,024 | (11,445) | 32,237 | 23,037 | 23,037 | 4,637 | (4,564) | (4,564) | 4,637 | 4,637 |
| Distribution | (8,024) | 0 | (40,791) | (23,037) | (18,036) | 0 | 0 | 0 | (5,146) | (4,637) |
| Ending Cash | 30,000 | 18,555 | 10,000 | 10,000 | 15,000 | 19,637 | 15,073 | 10,510 | 10,000 | 10,000 |

TODD SWENNING MD PC
Projected Cash Flow

| | 2017 Nov | 2017 Dec | 2017 TOTAL | 2018 TOTAL | 2019 TOTAL | 2020 TOTAL | 2021 TOTAL | PLAN TOTAL |
|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | |
| Patient Collections | 40,000 | 50,000 | 600,000 | 660,000 | 721,500 | 721,500 | 721,500 | 3,424,500 |
| Non-Patient Related | 23,500 | 23,500 | 282,000 | 310,200 | 341,220 | 341,220 | 341,220 | 1,615,860 |
| Medical Directorships | 14,600 | 14,600 | 175,200 | 175,200 | 175,200 | 175,200 | 175,200 | 876,000 |
| Other | 500 | 500 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| Gross Income | 78,600 | 88,600 | 1,063,200 | 1,151,400 | 1,243,920 | 1,243,920 | 1,243,920 | 5,946,360 |
| | | | | | | | | |
| **EXPENSES:** | | | | | | | | |
| TS Salary | 57,000 | 57,000 | 684,000 | 684,000 | 684,000 | 684,000 | 684,000 | 3,420,000 |
| Office Manager | 4,500 | 4,500 | 54,000 | 54,000 | 54,000 | 54,000 | 54,000 | 270,000 |
| Assistant | 500 | 500 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| Payroll Taxes (Employer) | 1,239 | 1,239 | 22,756 | 22,756 | 22,756 | 22,756 | 22,756 | 113,780 |
| Billing | 3,200 | 4,000 | 48,000 | 52,800 | 57,720 | 57,720 | 57,720 | 273,960 |
| Malpractice Insurance | 0 | 0 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 200,000 |
| Health Insurance | 3,000 | 3,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 180,000 |
| Office Support | 225 | 225 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 13,500 |
| CPA | 900 | 900 | 10,800 | 10,800 | 10,800 | 10,800 | 10,800 | 54,000 |
| Phone/Fax/Internet | 600 | 600 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 36,000 |
| Travel/Entertainment | 2,500 | 2,500 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 150,000 |
| Secured Lease Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cell Phone | 300 | 300 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 18,000 |
| Total Expenses | 73,964 | 74,764 | 945,056 | 949,856 | 954,776 | 954,776 | 954,776 | 4,759,240 |
| | | | | | | | | |
| Net Income | 4,637 | 13,837 | 118,144 | 201,544 | 289,144 | 289,144 | 289,144 | 1,187,120 |
| | | | | | | | | |
| Beginning Cash | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Net Income (Loss) | 4,637 | 13,837 | 118,144 | 201,544 | 289,144 | 289,144 | 289,144 | 1,187,120 |
| Distribution | (4,636) | (13,837) | (118,144) | (201,544) | (289,144) | (289,144) | (289,144) | (1,187,120) |
| Ending Cash | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |

11/10/201610:04 AM

# EXHIBIT "6"

TODD SWENNING INDIVIDUAL
Projected Cash Flow

|  | 2017 Jan | 2017 Feb | 2017 Mar | 2017 Apr | 2017 May | 2017 Jun |
|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | |
| Salary | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 |
| Distribution from PC | 8,024 | 0 | 40,791 | 23,037 | 18,036 | 0 |
| New Value Contribution | | | | | | |
| Tax Refund | 59,000 | | | | | |
| Preference Recovery | | | | | | |
| Gross Income | 124,024 | 57,000 | 97,791 | 80,037 | 75,036 | 57,000 |
| | | | | | | |
| **PAYROLL&INCOME TAXES:** | | | | | | |
| Payroll Taxes | 4,874 | 4,874 | 1,106 | 1,079 | 1,340 | 1,340 |
| Federal Taxes - Wages | 17,762 | 17,762 | 17,762 | 17,762 | 17,762 | 17,762 |
| State Taxes - Wages | 6,422 | 6,422 | 6,422 | 6,422 | 6,422 | 6,422 |
| Federal Taxes - K-1 Income | 0 | 0 | 0 | 11,696 | 0 | 11,696 |
| State Taxes - K-1 Income | 0 | 0 | 0 | 3,633 | 0 | 3,633 |
| Tax Saving - Hospital Payment | (8,962) | 0 | (4,011) | 0 | 0 | (4,011) |
| Total Taxes | 20,095 | 29,058 | 21,279 | 40,592 | 25,524 | 36,842 |
| Net Income after Taxes | 103,929 | 27,943 | 76,512 | 39,445 | 49,513 | 20,158 |
| | | | | | | |
| **EXPENSES:** | | | | | | |
| Household Expenses | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Rent | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 |
| Medical/Dental | 130 | 130 | 130 | 130 | 130 | 130 |
| Travel & Entertainment | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Total Expenses | 6,525 | 6,525 | 6,525 | 6,525 | 6,525 | 6,525 |
| | | | | | | |
| Net Income | 97,404 | 21,418 | 69,987 | 32,920 | 42,988 | 13,633 |
| | | | | | | |
| Payment to Creditors: | | | | | | |
| Administrative (Pre) | 59,000 | 0 | 26,402 | 0 | 0 | 26,402 |
| Administrative (Post) | 4,370 | 2,600 | 4,004 | 2,695 | 2,600 | 4,004 |
| United States Trustee Fees | 0 | 0 | 0 | 975 | 0 | 0 |
| Internal Revenue Service | 0 | 0 | 20,388 | 0 | 0 | 20,388 |
| Class 1 (*estimated at $0*) | | | | | | |
| Class 2 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Class 3 | 0 | 0 | 0 | 3,179 | 0 | 0 |
| Class 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Payments to Creditors | 83,370 | 22,600 | 70,794 | 26,849 | 22,600 | 70,794 |
| | | | | | | |
| Net Cash Flow after | 14,034 | (1,183) | (807) | 6,071 | 20,388 | (57,161) |
| Payments to Creditors | | | | | | |
| | | | | | | |
| Beginning Cash | 57,615 | 71,648 | 70,466 | 69,659 | 75,731 | 96,118 |
| Net Income (Loss) | 14,034 | (1,183) | (807) | 6,071 | 20,388 | (57,161) |
| Ending Cash | 71,648 | 70,466 | 69,659 | 75,731 | 96,118 | 38,958 |

11/10/2016 10:13 AM

TODD SWENNING INDIVIDUAL
Projected Cash Flow

| | 2017 Jul | 2017 Aug | 2017 Sep | 2017 Oct | 2017 Nov | 2017 Dec |
|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | |
| Salary | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 |
| Distribution from PC | 0 | 0 | 5,146 | 4,637 | 4,636 | 13,837 |
| New Value Contribution | | | | | | |
| Tax Refund | | | | | | |
| Preference Recovery | 125,000 | | | | | |
| Gross Income | 182,000 | 57,000 | 62,146 | 61,637 | 61,636 | 70,837 |
| | | | | | | |
| **PAYROLL&INCOME TAXES:** | | | | | | |
| Payroll Taxes | 1,340 | 1,340 | 1,340 | 1,340 | 1,340 | 1,340 |
| Federal Taxes - Wages | 17,762 | 17,762 | 17,762 | 17,762 | 17,762 | 17,762 |
| State Taxes - Wages | 6,422 | 6,422 | 6,422 | 6,422 | 6,422 | 6,422 |
| Federal Taxes - K-1 Income | 0 | 0 | 11,696 | 0 | 0 | 11,696 |
| State Taxes - K-1 Income | 0 | 0 | 3,633 | 0 | 0 | 3,633 |
| Tax Saving - Hospital Payment | 0 | 0 | (4,011) | 0 | 0 | (4,011) |
| Total Taxes | 25,524 | 25,524 | 36,842 | 25,524 | 25,524 | 36,842 |
| Net Income after Taxes | 156,477 | 31,477 | 25,304 | 36,114 | 36,113 | 33,995 |
| | | | | | | |
| **EXPENSES:** | | | | | | |
| Household Expenses | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Rent | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 |
| Medical/Dental | 130 | 130 | 130 | 130 | 130 | 130 |
| Travel & Entertainment | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Total Expenses | 6,525 | 6,525 | 6,525 | 6,525 | 6,525 | 6,525 |
| | | | | | | |
| Net Income | 149,952 | 24,952 | 18,779 | 29,589 | 29,588 | 27,470 |
| | | | | | | |
| Payment to Creditors: | | | | | | |
| Administrative (Pre) | 0 | 0 | 26,402 | 0 | 0 | 26,402 |
| Administrative (Post) | 2,600 | 2,600 | 4,004 | 2,600 | 2,600 | 4,004 |
| United States Trustee Fees | 975 | 0 | 0 | 975 | 0 | 0 |
| Internal Revenue Service | 0 | 0 | 20,388 | 0 | 0 | 20,388 |
| Class 1 (*estimated at $0*) | | | | | | |
| Class 2 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Class 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Class 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Payments to Creditors | 23,575 | 22,600 | 70,794 | 23,575 | 22,600 | 70,794 |
| | | | | | | |
| Net Cash Flow after Payments to Creditors | 126,377 | 2,352 | (52,015) | 6,014 | 6,988 | (43,324) |
| | | | | | | |
| Beginning Cash | 38,958 | 165,334 | 167,686 | 115,671 | 121,684 | 128,672 |
| Net Income (Loss) | 126,377 | 2,352 | (52,015) | 6,014 | 6,988 | (43,324) |
| Ending Cash | 165,334 | 167,686 | 115,671 | 121,684 | 128,672 | 85,348 |

TODD SWENNING INDIVIDUAL
Projected Cash Flow

| | 2017 TOTAL | 2018 TOTAL | 2019 TOTAL | 2020 TOTAL | 2021 TOTAL | Plan TOTAL |
|---|---|---|---|---|---|---|
| INCOME: | | | | | | |
| Salary | 684,000 | 684,000 | 684,000 | 684,000 | 684,000 | 3,420,000 |
| Distribution from PC | 118,144 | 201,544 | 289,144 | 289,144 | 289,144 | 1,187,120 |
| New Value Contribution | 0 | 9,500 | 0 | 0 | 0 | 9,500 |
| Tax Refund | 59,000 | 0 | 0 | 0 | 0 | 59,000 |
| Preference Recovery | 125,000 | 0 | 0 | 0 | 0 | 125,000 |
| Gross Income | 986,144 | 895,044 | 973,144 | 973,144 | 973,144 | 4,800,620 |
| | | | | | | |
| PAYROLL&INCOME TAXES: | | | | | | |
| Payroll Taxes | 22,647 | 22,647 | 22,647 | 22,647 | 22,647 | 113,235 |
| Federal Taxes - Wages | 213,144 | 213,144 | 213,144 | 213,144 | 213,144 | 1,065,720 |
| State Taxes - Wages | 77,064 | 77,064 | 77,064 | 77,064 | 77,064 | 385,320 |
| Federal Taxes - K-1 Income | 46,785 | 79,811 | 114,501 | 114,501 | 114,501 | 470,100 |
| State Taxes - K-1 Income | 14,532 | 24,790 | 35,565 | 35,565 | 35,565 | 146,016 |
| Tax Saving - Hospital Payment | (25,005) | (16,043) | (16,043) | 0 | 0 | (57,090) |
| Total Taxes | 349,167 | 401,414 | 446,878 | 462,921 | 462,921 | 2,123,300 |
| Net Income after Taxes | 636,977 | 493,630 | 526,266 | 510,223 | 510,223 | 2,677,320 |
| | | | | | | |
| EXPENSES: | | | | | | |
| Household Expenses | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 210,000 |
| Rent | 16,740 | 16,740 | 16,740 | 16,740 | 16,740 | 83,700 |
| Medical/Dental | 1,560 | 1,560 | 1,560 | 1,560 | 1,560 | 7,800 |
| Travel & Entertainment | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 90,000 |
| Total Expenses | 78,300 | 78,300 | 78,300 | 78,300 | 78,300 | 391,500 |
| | | | | | | |
| Net Income | 558,677 | 415,330 | 447,966 | 431,923 | 431,923 | 2,285,820 |
| | | | | | | |
| Payment to Creditors: | | | | | | |
| Administrative (Pre) | 164,609 | 105,609 | 105,609 | 0 | 0 | 375,827 |
| Administrative (Post) | 38,680 | 24,815 | 14,015 | 12,023 | 18,959 | 108,493 |
| United States Trustee Fees | 2,925 | 3,900 | 3,900 | 3,900 | 3,900 | 18,525 |
| Internal Revenue Service | 81,551 | 81,551 | 81,551 | 40,776 | 0 | 285,429 |
| Class 1 (estimated at $0) | 0 | 0 | 0 | 0 | 0 | 0 |
| Class 2 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 1,200,000 |
| Class 3 | 3,179 | 0 | 0 | 0 | 0 | 3,179 |
| Class 4 | 0 | 0 | 40,000 | 120,000 | 191,983 | 351,983 |
| Total Payments to Creditors | 530,944 | 455,875 | 485,075 | 416,699 | 454,842 | 2,343,434 |
| | | | | | | |
| Net Cash Flow after Payments to Creditors | 27,733 | (40,545) | (37,109) | 15,224 | (22,919) | (57,615) |
| | | | | | | |
| Beginning Cash | 57,615 | 85,348 | 44,803 | 7,694 | 22,919 | 57,615 |
| Net Income (Loss) | 27,733 | (40,545) | (37,109) | 15,224 | (22,919) | (57,615) |
| Ending Cash | 85,348 | 44,803 | 7,694 | 22,919 | (0) | (0) |

11/10/2016 10:13 AM

# EXHIBIT "7"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

In re                                         Case No. 15-11408-R
TODD A. SWENNING,                             Chapter 11

                      **Debtor**

**CHAPTER 11 TRUSTEE'S NOTICE OF MOTION AND MOTION TO COMPEL
PERFORMANCE UNDER SECOND AMENDED PLAN OF REORGANIZATION
DATED NOVEMBER 10, 2016;  AND NOTICE OF OPPORTUNITY FOR HEARING**

### NOTICE OF MOTION

**PLEASE TAKE NOTICE THAT** Todd A. Frealy, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estate of Todd A. Swenning, the Chapter 11 debtor herein (the "Debtor"), hereby submits this Motion (the "Motion") to compel performance under the Trustee's confirmed *Second Amended Plan Of Reorganization Dated November 10, 2016* (the "Plan").

### NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 14 days from the date of filing of this request for relief (which is by **no later than February 16, 2018**. You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney and file a certificate of service with the Court.  If no response or objection is timely filed, the Court may

1

grant the requested relief without a hearing or further notice. **The 14 day period includes the three (3) days allowed for mailing provided for in Fed. R. Bankr. P. 9006(f).**

\* \* \*

## MOTION

### I.

### INTRODUCTION

The Debtor is woefully underperforming on his obligations to fund the Plan so that the Trustee can make distributions required by the Plan. As a result, at present, there is at least $104,945 in Plan payments that have come due that the Trustee has not been able to make. It appears that the Debtor's underperformance in funding the Plan is primarily the result of the Debtor's refusal to conform to the budget and projections attached to the disclosure statement describing the Plan. More specifically, the Debtor is utilizing income from the Debtor's solely owned professional corporation, Todd Swenning, M.D., P.C. (the "P.C."), which is the primary source of funding the Plan, to pay numerous personal expenses, for, among other things, extravagant travel, over $11,500 in personal veterinary bills, fine dining, and cash withdrawals for other personal expenses. Improper disbursements by the P.C. that were not provided for by the Plan budget and projections total approximately $186,000, which amount, in and of itself, would be sufficient to cure all or nearly all of the current Plan payment deficiencies.

In addition to the foregoing, the Plan provided for approximately $59,000 in Plan funding to be provided by a federal tax refund owed to the Debtor. At one point, an amended tax return was purportedly filed with the IRS directing the IRS to pay the refund to the Debtor, which the Debtor was to pay to the Trustee. Based on the foregoing, and after a long delay in receiving the refund, the Trustee sent an intercept letter to the IRS so that the refund would be paid directly to the Trustee. For reasons that are not altogether clear, the IRS has indicated that the refund will be applied to 2016 taxes, possibly including taxes owed by the Debtor's alleged

former spouse, thereby, prohibiting the estate from recovering the refund to make Plan payments. As further discussed below, there are only three ways the foregoing could have occurred, two of which would have been caused by the Debtor in an effort to prevent the estate from recovering the Tax Refund.

In consideration of the foregoing and other facts and arguments set forth below, the Trustee submits that good cause exists to (1) grant the Motion and compel Plan performance as set forth below and (2) require the Debtor to explain numerous P.C. disbursements described below and set forth in **Exhibit "13"** hereto and the redirection of the tax refund.

## II.

## STATEMENT OF FACTS

### A.    BACKGROUND.

1.      On July 28, 2015 (the "Petition Date"), the Debtor commenced this bankruptcy case by the filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

2.      On April 22, 2016, the United States Trustee (the "UST") filed a Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint Chapter 11 Trustee (the "Trustee Motion").

3.      On May 25, 2016, the Court entered its order that, among other things, (a) granted the Trustee Motion to the extent it sought the appointment of a Chapter 11 Trustee and (b) directed the UST to appoint a Chapter 11 Trustee and file an application for the approval of such trustee.

4.      On May 31, 2016, the UST filed its Application for Order Approving Appointment of Chapter 11 Trustee (the "Trustee Application").

5.      On June 1, 2016, the Court entered its Order Approving Appointment of Chapter 11 Trustee pursuant to which the Court (a) granted the Trustee Application and (b) appointed Todd A. Frealy as the Chapter 11 Trustee.

3

**B. THE PLAN, CONFIRMATION OF THE PLAN, AND THE COURT AND TRUSTEE'S AUTHORITY TO ENFORCE THE PLAN.**

6.      On November 11, 2016, the Trustee filed solicitation versions of his (a) Second Amended Disclosure Statement for Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 (the "Disclosure Statement") and (b) Second Amended Plan of Reorganization Dated November 10, 2016 (the "Plan").  True and correct copies of the Disclosure Statement and Plan are attached hereto as **Exhibits "1" and "2,"** respectively.[1]

7.      On January 3, 2017, the Court entered an order confirming the Plan (the "Confirmation Order").  A true and correct copy of the Confirmation Order is attached hereto as **Exhibit "3."**

8.      The Plan went effective on January 18, 2017 (the "Effective Date").

9.      Pursuant to the terms of the Plan and the Confirmation Order, the Trustee is authorized to all take necessary and appropriate action to consummate the provisions of the Plan. Plan, ¶¶ II.C.2; Confirmation Order, ¶ B.

10.      Pursuant to the terms of the Plan and the Confirmation Order, the Court retained jurisdiction to, among other things, (a) interpret and implement the Plan, (b) to "resolve any disputes regarding the operation, implementation, and interpretation of the Plan and the Confirmation Order, (c) to "construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan and the Confirmation Order, and all matters referred to in the Plan and the Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto, (d) "[e]xcept as otherwise provided in the Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Disclosure Statement and Plan.

Order, or the execution or implementation by any person or entity of the Plan or the Confirmation Order, and (e) to "issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules." Plan, ¶¶ II.D.6; Confirmation Order, ¶ D.

C.     **FUNDING FOR THE PLAN, PLAN PROJECTIONS, PLAN PAYMENTS, AND THE DEBTOR'S FAILURE TO PERFORM.**

11.     The Plan is to be funded from, among others, the following sources (the "Plan Funds"):

    a.     Funds on hand on the Effective Date comprised of the Net P.C. Income (*i.e.*, the net income from the Debtor's solely owned professional corporation, Todd Swenning, M.D., P.C. (the "P.C.")), as of the Effective Date, less a $10,000 retention to fund operations,

    b.     An expected federal tax refund in the amount of $59,000 for the 2015 tax year (the "Tax Refund"), and

    c.     The Debtor's projected disposable income over five years from the Effective Date, which is comprised of (a) the Net P.C. Income less a $10,000 retention to fund operations, and (b) the Debtor's Salary, less necessary and reasonable expenses, which are collectively projected to total $2,092,320 (the "Additional Funds").

*See* Plan, ¶¶ II.A and II.C.1.

12.     In order to control Plan Funds, the Plan provides that "after the Effective Date, the Debtor shall pay his Salary and the Net P.C. Income to the Trustee to hold for the benefit of creditors pursuant to the terms of the Plan." Plan, ¶¶ II.C.2.a (Receiving and Holding the Plan Funds). The Debtor has failed to pay his Salary over to the Trustee on a number of occasions, most recently in January 2018. To the extent the Debtor argues this ever occurred because of a shortfall in funds required to pay payroll for the P.C., the Trustee notes that, if the Debtor had not

caused the P.C. to utilize its funds to make well over $180,000 in Improper Payments (as discussed and defined below), the P.C. would have had sufficient funds to fund payroll.

13. The projected cash flow for the P.C. (the "P.C. Projections") and the Debtor (the "Debtor Projections") for the term of the Plan are attached to the Disclosure Statement as Exhibits "2" and "3," respectively, and are separately attached hereto as **Exhibits "4" and "5,"** respectively, for the Court's convenience.

14. Attached hereto as **Exhibit "6"** is a chart (the "Plan Performance Chart") showing, *inter alia*, (a) payments required under the Plan through January 2018, (b) payments actually made under the Plan through January 2018, and (c) the deficiency in Plan payments through January 2018.

15. As can be seen from the Plan Performance Chart, through January 2018, the Debtor has underperformed and is deficient on Plan contributions required to make Plan payments by at least $104,945.12, which amount is actually larger, because it does not include thousands of dollars in professional fees incurred by the Trustee's counsel in seeking to enforce the Plan, which has been made more costly due to the Debtor's inability to provide timely, reliable financial information and to timely perform under the Plan (the "Plan Deficiency").

16. Based on a review of financial information provided by the Debtor, the Trustee asserts that the Plan Deficiency results from, among others, the following factors:

  **a.**  **NON-PAYMENT OF THE TAX REFUND:**

The Plan and Debtor Projections provide for an estimated Tax Refund of $59,000 for the 2015 tax year. The projected Tax Refund was based on information from the Debtor. The initial 2015 Federal Income Tax Return (the "2015 Return") provided for the Tax Refund to be applied to 2016 federal income taxes. The Trustee directed the Debtor prepare and file an amended 2015 Return (the "2015 Amended Return") to provide for the Tax Refund to be paid to the Debtor, and then to pay the Tax Refund over to the Trustee. After the Effective Date, and after months of delay in preparing, purportedly executing, and purportedly filing the 2015 Amended Return, the

Debtor's accountants[2] provided the Trustee with a copy of the Debtor's 2015 Amended Return that would generate the Tax Refund in the amount of $59,654 and payment thereof to the Debtor. A true and correct copy of the 2015 Amended Return provided by the Debtor's accountants, with redactions to protect privacy, is attached hereto as **Exhibit "7."** As can be seen from the 2015 Amended Return provided to the Trustee, (1) the 2015 Amended Return provides for the Tax Refund to be paid to the Debtor, however, (2) (a) the 2015 Amended Return was marked "COPY," (b) the 2015 Amended Return was not signed or dated, and (c) there is no indication or evidence that the 2015 Amended Return was signed, dated, and filed with the IRS.

After receiving the 2015 Amended Return, the Trustee inquired with the Debtor and his counsel numerous times about the status of the payment of the Tax Refund to the Debtor and the Debtor's payment thereof to the Trustee as required by the Plan. At one point, the Debtor's counsel requested that the estate share a portion of the Tax Refund with the Debtor's alleged former spouse based on the assertion that she had an interest in the Tax Refund. In response, the Trustee's counsel provided ample authority for why the Tax Refund was estate property and was required to be turned over to the Trustee as a portion of the Plan Funds. *See* July 11, 2017 email from the Trustee's counsel to the Debtor and his counsel, a true and correct copy of which is attached hereto, without exhibits, as **Exhibit "8."**

After further delay in receiving the Tax Refund, the Trustee sent an intercept letter to the IRS so that the refund would be paid directly to the Trustee. Thereafter, based on the foregoing and the failure of the Debtor to be forthcoming regarding the status of the Tax Refund and payment thereof to the Debtor and then to the Trustee, the Trustee obtained a power of attorney from the Debtor and his alleged former spouse so that the Trustee could himself inquire with the IRS regarding the status of the payment of the Tax Refund. To the Trustee's amazement, the IRS indicated that the Tax Refund would not be paid to the Debtor and instead would be applied

---

[2] The Debtor's accountants are Healey & Associates, P.C. ("Healey"), which are also accountants for the P.C. Although Healy was employed in the bankruptcy case, Healey never filed a fee application and never had any of its fees or expenses approved, yet the P.C. has paid many thousands of dollars to Healey. The Trustee may seek to recover post-Petition Date payments to Healey from the Debtor and/or the P.C. pursuant to Section 549.

to 2016 income taxes. The Trustee asserts that there are only three ways this could have happened (1) the Debtor never actually filed the 2015 Amended Return, (2) after the Trustee refused to "share" the Tax Refund with the Debtor's alleged former spouse, despite the fact that she is not entitled to it, the Debtor and his alleged former spouse further amended the 2015 Amended Return to provide for the Tax Refund to be applied to 2016 income taxes, possibly including those owed by the Debtor's alleged former spouse, instead of being paid to the Debtor, and (3) the IRS unilaterally decided to disregard the 2015 Amended Return and to apply the Tax Refund to 2016 income taxes. If the Tax Refund has not been paid to the Debtor and then to the Trustee because of potential reasons (1) or (2) the Debtor and his alleged former spouse should be required to explain the reason for diverting estate assets to personal use in violation of the Plan.

      b.      **UNAUTHORIZED PAYMENTS OF PERSONAL AND OTHER UNNECESSARY AND/OR NON-BUSINESS EXPENSES FOR THE DEBTOR AND LIKELY OTHERS FROM THE P.C. ACCOUNT RESULTING IN A SUBSTANTIAL DERIVATION FROM PLAN PROJECTIONS REGARDING NET P.C. INCOME AND ACTUAL P.C. INCOME:**

A review of the post-Effective Date Quarterly Reports and the banking information attached thereto for the bank account of the P.C. (Chase Account No. XXXXX1389) (the "P.C. Account") provided by the Debtor (each a "Quarterly Report") demonstrate that he has been using P.C. funds (the net of which constitute estate property and Plan Funds) to pay exorbitant amounts of personal and other unnecessary, non-business expenses for the Debtor and likely others. True and correct copies of the post-Effective Date Quarterly Reports are attached hereto as **Exhibits "9," "10," "11," and "12."** Attached hereto as **Exhibit "13"** is a chart (the "Improper Payment Summary") summarizing a material number, but not all, of what the Trustee asserts are unauthorized payments of personal and other unnecessary and/or non-business expenses for the Debtor and likely others from the P.C. Account (the "Improper Payments").

The Improper Payments include disbursements of P.C. funds to pay for, among other things, extravagant travel, over $11,500 in personal veterinary bills, fine dining, and cash withdrawals for other personal expenses.  Improper disbursements by the P.C. that were not provided for by the Plan budget and projections total approximately $186,000, which amount, in and of itself and certainly together with the Tax Refund, would be sufficient to cure all or nearly all of the current Plan Deficiency.

## III.

## DISCUSSION

The facts set forth above demonstrate a clear need to get the Plan back on track by curing the Plan Deficiency and providing a means for avoiding any future Plan deficiencies.   Based on the foregoing facts, and pursuant to the rights and powers retained by the Court and the Trustee pursuant to the Plan and Confirmation Order, the Trustee submits that good cause exists to compel Plan performance by entering an order:

(1)     Requiring the Debtor to cause the P.C. to immediately transfer all funds in any P.C. accounts into a trust account maintained by the Trustee (the "Trustee Account"), less $10,000 for operating expenses;

(2)     Requiring the Debtor to cause the P.C. to (a) sign over and deposit all payments made to the P.C. into the Trustee Account within three (3) business days of receipt and/or (b) sign over to the Trustee and send to the Trustee within three (3) business days of receipt all payments made to the P.C., which the Trustee shall deposit into the Trustee Account;

(3)     Requiring the Debtor to (a) sign over and deposit all payments made to the Debtor into the Trustee Account within three (3) business days of receipt and/or (b) sign over to the Trustee and send to the Trustee within three (3) business days of receipt all payments made to the Debtor, which the Trustee shall deposit into the Trustee Account;

9

(4)     Authorizing the Trustee to direct entities and individuals regularly making payments to the P.C. and/or the Debtor to make such payments directly into the Trustee Account or by checks payable to the Trustee to be deposited into the Trustee Account;

(5)     Requiring the Trustee to provide the Debtor and P.C. with monthly bank statements showing payments to the P.C. and/or the Debtor received into the Trustee Account;

(6)     Requiring the Debtor and/or P.C. to provide a monthly budget (the "P.C. Budget") for the P.C. to the Trustee no later than one week before the following subject month, which P.C. Budget shall include (a) line items in the amounts set forth in the P.C. Projections, plus (b) any adjustments thereto and any additional line items and an explanation therefor;

(7)     Authorizing and requiring the Trustee to disburse to the P.C. (a) funds in the amounts set forth in the P.C. Projections, plus, (b) subject to the Trustee's discretion, any additional amounts the Trustee deems necessary to operate the P.C.;

(8)     Requiring the Debtor to pay the Tax Refund or an amount equal to the Tax Refund to the Debtor; and

(9)     Requiring the Debtor to explain, under oath, (a) the P.C. disbursements described above and set forth in **Exhibit "13"** hereto and (b) (i) whether the 2015 Amended Return was ever actually executed and filed with the IRS and (ii) if the 2015 Amended Return was actually filed with the IRS, whether, thereafter, a further amended 2015 Amended Return was filed with the IRS or the IRS was otherwise directed by the Debtor to apply the Tax Refund to 2016 income taxes instead of paying the Tax Refund to the Debtor.

/ / /

/ / /

/ / /

10

# IV.

## CONCLUSION

WHEREFORE, based on the foregoing, the Trustee respectfully requests that the Court

enter an order:

(1)     granting the Motion and compelling Plan performance as set forth in Section

III(1) – (9); and

(2)     affording such further and other relief as is warranted under the circumstances.

Dated: February 2, 2018         LEVENE, NEALE, BENDER, YOO
                           & BRILL L.L.P.

                         */s/ Todd M. Arnold*
                         MARTIN J. BRILL
                         Cal. Bar No. 53220
                         (*Pro Hac Vice* Application Approved)
                         TODD M. ARNOLD
                         Cal. Bar No. 221868
                         (*Pro Hac Vice* Application Approved)
                         10250 Constellation Boulevard, Suite 1700
                         Los Angeles, California 90067
                         Telephone:  (310) 229-1234
                         Facsimile:  (310) 229-1244
                         Email: mjb@lnbyb.com, tma@lnbyb.com

                         Counsel for Chapter 11 Trustee, Todd A. Frealy

## <u>DECLARATION OF TODD A. FREALY</u>

I, Todd A. Frealy, hereby declare as follows:

1.     I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.     I am a partner in the law firm of Levene, Neale, Bender, Yoo & Brill L.L.P.

3.     I am duly licensed to practice law in the state of California and in the United States District Court and Bankruptcy Court for the Central District of California.

4.     I am the duly appointed Chapter 11 Trustee herein.

5.     I make this declaration in support of the Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Motion.

6.     On July 28, 2015 (the "<u>Petition Date</u>"), the Debtor commenced this bankruptcy case by the filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

7.     On April 22, 2016, the United States Trustee (the "<u>UST</u>") filed a Motion to Dismiss Chapter 11 Case, or in the Alternative, Appoint Chapter 11 Trustee (the "<u>Trustee Motion</u>").

8.     On May 25, 2016, the Court entered its order that, among other things, (a) granted the Trustee Motion to the extent it sought the appointment of a Chapter 11 Trustee and (b) directed the UST to appoint a Chapter 11 Trustee and file an application for the approval of such trustee.

9.     On May 31, 2016, the UST filed its Application for Order Approving Appointment of Chapter 11 Trustee (the "<u>Trustee Application</u>").

10.     On June 1, 2016, the Court entered its Order Approving Appointment of Chapter 11 Trustee pursuant to which the Court (a) granted the Trustee Application and (b) appointed me as the Chapter 11 Trustee.

11.     On November 11, 2016, I filed solicitation versions of my (a) Second Amended Disclosure Statement for Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 (the "Disclosure Statement") and (b) Second Amended Plan of Reorganization Dated November 10, 2016 (the "Plan").   True and correct copies of the Disclosure Statement and Plan are attached hereto as **Exhibits "1" and "2,"** respectively.[3]

12.     On January 3, 2017, the Court entered an order confirming the Plan (the "Confirmation Order").  A true and correct copy of the Confirmation Order is attached hereto as **Exhibit "3."**

13.     The Plan went effective on January 18, 2017 (the "Effective Date").

14.     The Plan is to be funded from, among others, the following sources (the "Plan Funds"):

     a.     Funds on hand on the Effective Date comprised of the Net P.C. Income (*i.e.*, the net income from the Debtor's solely owned professional corporation, Todd Swenning, M.D., P.C. (the "P.C.")), as of the Effective Date, less a $10,000 retention to fund operations,

     b.     An expected federal tax refund in the amount of $59,000 for the 2015 tax year (the "Tax Refund"), and

     c.     The Debtor's projected disposable income over five years from the Effective Date, which is comprised of (a) the Net P.C. Income less a $10,000 retention to fund operations, and (b) the Debtor's Salary, less necessary and reasonable expenses, which are collectively projected to total $2,092,320 (the "Additional Funds").

*See* Plan, ¶¶ II.A and II.C.1.

---

[3] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Disclosure Statement and Plan.

15.     In order to control Plan Funds, the Plan provides that "after the Effective Date, the Debtor shall pay his Salary and the Net P.C. Income to the Trustee to hold for the benefit of creditors pursuant to the terms of the Plan."  Plan, ¶¶ II.C.2.a (Receiving and Holding the Plan Funds).  The Debtor has failed to may his Salary over to me on a number of occasions, most recently in January 2018.

16.     The projected cash flow for the P.C. (the "P.C. Projections") and the Debtor (the "Debtor Projections") for the term of the Plan are attached to the Disclosure Statement as Exhibits "2" and "3," respectively, and are separately attached hereto as **Exhibits "4" and "5,"** respectively, for the Court's convenience.

17.     Attached hereto as **Exhibit "6"** is a chart (the "Plan Performance Chart") showing, *inter alia*, (a) payments required under the Plan through January 2018, (b) payments actually made under the Plan through January 2018, and (c) the deficiency in Plan payments through January 2018.

18.     As can be seen from the Plan Performance Chart, through January 2018, the Debtor has underperformed and is deficient on Plan contributions required to make Plan payments by at least $104,945.12, which amount is actually larger, because it does not include thousands of dollars in professional fees incurred by my counsel in seeking to enforce the Plan, which has been made more costly due to the Debtor's inability to provide timely, reliable financial information and to timely perform under the Plan (the "Plan Deficiency").

19.     Based on a review of financial information provided by the Debtor, I am informed and believe, and assert, that the Plan Deficiency results from, among others, the following factors:

      a.     **NON-PAYMENT OF THE TAX REFUND:**

The Plan and Debtor Projections provide for an estimated Tax Refund of $59,000 for the 2015 tax year.  The projected Tax Refund was based on information from the Debtor.  I am informed and believe that the initial 2015 Federal Income Tax Return (the "2015 Return") provided for the Tax Refund to be applied to 2016 federal income taxes.  I, through my counsel

and accountants and otherwise, directed the Debtor prepare and file an amended 2015 Return (the "2015 Amended Return") to provide for the Tax Refund to be paid to the Debtor, and then to pay the Tax Refund over to the estate. After the Effective Date, and after months of delay in preparing, purportedly executing, and purportedly filing the 2015 Amended Return, the Debtor's accountants provided me and my counsel with a copy of the Debtor's 2015 Amended Return that would generate the Tax Refund in the amount of $59,654 and payment thereof to the Debtor. A true and correct copy of the 2015 Amended Return provided by the Debtor's accountants, with redactions to protect privacy, is attached hereto as **Exhibit "7."**

After receiving the 2015 Amended Return, I, through my counsel and accountants and otherwise, inquired with the Debtor and his counsel numerous times about the status of the payment of the Tax Refund to the Debtor and the Debtor's payment thereof to estate as required by the Plan. At one point, the Debtor's counsel requested that the estate share a portion of the Tax Refund with the Debtor's alleged former spouse based on the assertion that she had an interest in the Tax Refund. In response, my counsel provided ample authority for why the Tax Refund was estate property and was required to be turned over to the Trustee as a portion of the Plan Funds. *See* July 11, 2017 email from my counsel to the Debtor and his counsel, a true and correct copy of which is attached hereto, without exhibits, as **Exhibit "8."**

After further delay in receiving the Tax Refund, I caused an intercept letter to be sent to the IRS so that the refund would be paid directly to the estate. Thereafter, based on the foregoing and the failure of the Debtor to be forthcoming regarding the status of the Tax Refund and payment thereof to the Debtor and then to the estate, I obtained a power of attorney from the Debtor and his alleged former spouse so that my accountants could inquire with the IRS regarding the status of the payment of the Tax Refund. To my amazement, the IRS indicated that the Tax Refund would not be paid to the Debtor and instead would be applied to 2016 income taxes.

15

**b.**   **UNAUTHORIZED PAYMENTS OF PERSONAL AND OTHER UNNECESSARY AND/OR NON-BUSINESS EXPENSES FOR THE DEBTOR AND LIKELY OTHERS FROM THE P.C. ACCOUNT RESULTING IN A SUBSTANTIAL DERIVATION FROM PLAN PROJECTIONS REGARDING NET P.C. INCOME AND ACTUAL P.C. INCOME:**

I am informed and believe and based thereon assert that a review of the post-Effective Date Quarterly Reports and the banking information attached thereto for the bank account of the P.C. (Chase Account No. XXXXX1389) (the "P.C. Account") provided by the Debtor (each a "Quarterly Report") demonstrate that he has been using P.C. funds (the net of which constitute estate property and Plan Funds) to pay exorbitant amounts of personal and other unnecessary, non-business expenses for the Debtor and likely others.   True and correct copies of the post-Effective Date Quarterly Reports are attached hereto as **Exhibits "9," "10," "11," and "12."** Attached hereto as **Exhibit "13"** is a chart (the "Improper Payment Summary") summarizing a material number, but not all, of what I assert are unauthorized payments of personal and other unnecessary and/or non-business expenses for the Debtor and likely others from the P.C. Account (the "Improper Payments").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2nd day of February 2018, at Los Angeles, California.

*/s/ Todd A. Frealy*
TODD A. FREALY

16

# EXHIBIT "8"

| CLASS | ALLOWED CLAIM AMT. | 2/1/2017 | 3/1/2017 | 4/1/2017 | 5/1/2017 | 6/1/2017 | 7/1/2017 | 8/1/2017 | 9/1/2017 | 10/1/2017 | 11/1/2017 | 12/1/2017 | 1/1/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | YEAR 1 | | | | | |
| **Secured** | | | | | | | | | | | | | |
| Class 1 - IRS (disallowed per OE 6/23/) | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| **Administrative** (other than UST Fees Paid Current and Post Effective Date LNBYB Fees) [1] | | ADMIN CLAIM PMT START DATE | | | | | | | | | | | |
| Levene Neale | $  100,621.43 | | | | | | | | | | | | |
| Amt. Owed | | $  8,385.12 | $    - | $    - | $  8,385.12 | $    - | $    - | $  8,385.12 | $    - | $    - | $  8,385.12 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $ 12,705.84 | $    - |
| Chapter 11 Trustee | $   3,718.00 | | | | | | | | | | | | |
| Amt. Owed | | $   309.83 | $    - | $    - | $   309.83 | $    - | $    - | $   309.83 | $    - | $    - | $   309.83 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $   469.49 | $    - |
| Hahn Fife | $  20,128.50 | | | | | | | | | | | | |
| Amt. Owed | | $  1,677.38 | $    - | $    - | $  1,677.38 | $    - | $    - | $  1,677.38 | $    - | $    - | $  1,677.38 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $  2,541.70 | $    - |
| Doerner Saunders | $  74,856.56 | | | | | | | | | | | | |
| Amt. Owed | | $  6,238.05 | $    - | $    - | $  6,238.05 | $    - | $    - | $  6,238.05 | $    - | $    - | $  6,238.05 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $  9,452.41 | $    - |
| Gretchen Archer | $    - | | | | | | | | | | | | |
| Amt. Owed | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| Feamster & Carroll | $  865.00 | | | | | | | | | | | | |
| Amt. Owed | | $   72.08 | $    - | $    - | $   72.08 | $    - | $    - | $   72.08 | $    - | $    - | $   72.08 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $   109.23 | $    - |
| Desert Regional Medical Center | $  110,000.00 | | | | | | | | | | | | |
| Amt. Owed | | $  9,166.67 | $    - | $    - | $  9,166.67 | $    - | $    - | $  9,166.67 | $    - | $    - | $  9,166.67 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $ 13,890.10 | $    - |
| | $  310,189.49 | | | | | | | | | | | | |
| Total Amt. Owed | | $  25,849.12 | | | $ 25,849.12 | | | $ 25,849.12 | | | $ 25,849.12 | | |
| Total Amt. Paid | | $    - | | | $    - | | | $    - | | | $    - | $ 39,168.76 | |
| Total Amt. Delinquent | | $  25,849.12 | | | $ 25,849.12 | | | $ 25,849.12 | | | $ 25,849.12 | | |
| | | | | | | | | | | | | | |
| **Classified Priority** | | | | | | | | | | | | | |
| Class 2 [507(a)(1)]- M. Swenning | $ 1,200,000.00 | | | | | | | | | | | | |
| Amt. Owed | | $  20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| Amt. Paid | | $  20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| Amt. Delinquent | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| | | | | | | | | | | | | | |
| **Unclassified Priority** | | | | | | | | | | | | | |
| IRS (per OE 6/23/17 [Dkt. 216]) [2] | $  250,770.95 | | | | IRS PMT START DATE | | | | | | | | |
| Amt. Owed | | $    - | $    - | $    - | $ 21,849.52 | $    - | $    - | $ 21,849.52 | $    - | $    - | $ 21,849.52 | $    - | $    - |
| Amt. Paid | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $ 24,831.17 | $    - |
| Amt. Delinquent | | $    - | | | $ 21,849.52 | | | $ 21,849.52 | | | $ 21,849.52 | | |
| | | | | | | | | | | | | | |
| **Unsecured Claims** | | | | | | | | | | | | | |
| Class 3 (GUC's Under $3,000) | | | | | | | | | | | | | |
| Byrd Pool Services | $  575.00 | | | | | | | | | | | | |
| Capital One | $  238.60 | | | | | | | | | | | | |
| Hibdon Tire | $  648.50 | | | | | | | | | | | | |
| RMS | $  2,775.00 | | | | | | | | | | | | |
| **TOTAL CLASS 3** | $  4,237.10 | | | | PAID IN FULL PER PLAN TERMS | | | | | | | | |
| Amt. Owed | | $    - | $    - | $  3,179.00 | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| Amt. Paid | | $    - | $    - | $  3,179.00 | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| Amt. Delinquent | | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| | | | | | | | | | | | | | |
| Class 4 (GUC's Over $3,000) | | NO PAYMENTS DUE UNTIL THERE IS AT LEAST $10,000 ON HAND AFTER THE PAYMENT OF CURRENT AMOUNTS OWED ON ADMIN, PRIORITY CLAIMS | | | | | | | | | | | |
| Commerce Bank | $ 1,252,646.24 | | | | | | | | | | | | |
| Great Lakes | $  124,329.36 | | | | | | | | | | | | |
| Ila Swenning | $  75,000.00 | | | | | | | | | | | | |
| | $  164,827.85 | | | | | | | | | | | | |
| IRS (per OE 6/23/17 [Dkt. 216] AND Amended POC Filed 12/19/19) | | | | | | | | | | | | | |
| Wells Fargo | $  41,531.74 | | | | | | | | | | | | |
| | $ 1,658,335.19 | | | | | | | | | | | | |
| **TOTAL CLAIMS** | $ 3,423,532.73 | | | | | | | | | | | | |

| CLASS | ALLOWED CLAIM AMT. | YEAR 2 | | | | | TOTAL REQ PLAN PAYMENTS | TOTAL V. ACTUAL REQ PLAN PAYMENTS THRU 12/31/17 (First Dist) | TOTAL V. ACTUAL REQ PLAN PAYMENTS THRU 6/30/2018 (Second Dist) | DEFICIENCY THRU 12/31/17 (First Dist) | DEFICIENCY THRU 6/30/18 (Second Dist) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2/1/2018 | 3/1/2018 | 4/1/2018 | 5/1/2018 | 6/1/2018 | | | | | |
| **Secured** | | | | | | | | | | | |
| Class 1 - IRS (disallowed per OE 6/23/ | $ - | $ - | $ - | $ - | $ - | $ - | | $ - | $ - | $ - | |
| **Administrative** (other than UST Fees Paid Current and Post Effective Date LNBYB Fees) [1] | | | | | | | | | | | |
| Levene Neale | $ 100,621.43 | | | | | | | | | | |
| Amt. Owed | | $ 8,385.12 | $ - | $ - | $ 8,385.12 | $ - | $ 100,621.43 | $ 33,540.48 | $ 50,310.72 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 13,322.69 | $ 26,028.52 | $ 12,705.84 | $ 26,028.52 | $ 20,834.64 | $ 24,282.19 |
| Chapter 11 Trustee | $ 3,718.00 | | | | | | | | | | |
| Amt. Owed | | $ 309.83 | $ - | $ - | $ 309.83 | $ - | $ 3,718.00 | $ 1,239.33 | $ 1,859.00 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 492.28 | $ 961.76 | $ 469.49 | $ 961.76 | $ 769.85 | $ 897.24 |
| Hahn Fife | $ 20,128.50 | | | | | | | | | | |
| Amt. Owed | | $ 1,677.38 | $ - | $ - | $ 1,677.38 | $ - | $ 20,128.50 | $ 6,709.50 | $ 10,064.25 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 2,665.10 | $ 5,206.79 | $ 2,541.70 | $ 5,206.79 | $ 4,167.80 | $ 4,897.46 |
| Doerner Saunders | $ 74,856.56 | | | | | | | | | | |
| Amt. Owed | | $ 6,238.05 | $ - | $ - | $ 6,238.05 | $ - | $ 74,856.56 | $ 24,952.19 | $ 37,428.28 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 9,911.31 | $ 19,363.72 | $ 9,452.41 | $ 19,363.72 | $ 15,499.77 | $ 18,064.56 |
| Gretchen Archer | $ - | | | | | | | | | | |
| Amt. Owed | | $ - | $ - | $ - | $ - | $ - | | | | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ - | | | | | |
| Feamster & Carroll | $ 865.00 | | | | | | | | | | |
| Amt. Owed | | $ 72.08 | $ - | $ - | $ 72.08 | $ - | $ 865.00 | $ 288.33 | $ 432.50 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 114.53 | $ 223.76 | $ 109.23 | $ 223.76 | $ 179.11 | $ 208.74 |
| Desert Regional Medical Center | $ 110,000.00 | | | | | | | | | | |
| Amt. Owed | | $ 9,166.67 | $ - | $ - | $ 9,166.67 | $ - | $ 110,000.00 | $ 36,666.67 | $ 55,000.00 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 14,564.45 | $ 28,454.55 | $ 13,890.10 | $ 28,454.55 | $ 22,776.56 | $ 26,545.45 |
| | $ 310,189.49 | | | | | | | | | | |
| Total Amt. Owed | | $ 25,849.12 | | | $ 25,849.12 | | $ 310,189.49 | $ 103,396.50 | $ 155,094.75 | | |
| Total Amt. Paid | | $ - | | | $ - | $ 41,070.35 | $ 80,239.11 | $ 39,168.76 | $ 80,239.11 | | |
| Total Amt. Delinquent | | $ 25,849.12 | | | $ 25,849.12 | | $ 229,950.38 | | | $ 64,227.73 | $ 74,855.63 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Classified Priority** | | | | | | | | | | | |
| Class 2 (507(a)(1))- M. Swenning | $ 1,200,000.00 | | | | | | | | | | |
| Amt. Owed | | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 1,200,000.00 | $ 220,000.00 | $ 340,000.00 | | |
| Amt. Paid | | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 340,000.00 | $ 220,000.00 | $ 340,000.00 | | |
| Amt. Delinquent | | | | | | | $ 860,000.00 | | | $ - | |
| **Unclassified Priority** | | | | | | | | | | | |
| IRS (per OE 6/23/17 [Dkt. 216]) [2] | $ 250,770.95 | | | | | | | | | | |
| Amt. Owed | | $ 21,849.52 | $ - | $ - | $ 21,849.52 | $ - | $ 284,043.76 | $ 65,548.56 | $ 109,247.60 | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ 28,929.65 | $ 53,760.82 | $ 24,831.17 | $ 53,760.82 | | |
| Amt. Delinquent | | $ 21,849.52 | | | $ 21,849.52 | | $ 230,282.94 | | | $ 40,717.39 | $ 55,486.78 |
| **Unsecured Claims** | | | | | | | | | | | |
| **Class 3 (GUC's Under $3,000)** | | | | | | | | | | $ 104,945.12 | $ 130,342.41 |
| Byrd Pool Services | $ 575.00 | | | | | | | | | | |
| Capital One | $ 238.60 | | | | | | | | | | |
| Hibdon Tire | $ 648.50 | | | | | | | | | | |
| RMS | $ 2,775.00 | | | | | | | | | | |
| **TOTAL CLASS 3** | $ 4,237.10 | | | | | | | | | | |
| Amt. Owed | | $ - | $ - | $ - | $ - | $ - | $ 3,179.00 | $ 3,179.00 | | | |
| Amt. Paid | | $ - | $ - | $ - | $ - | $ - | $ 3,179.00 | $ 3,179.00 | | | |
| Amt. Delinquent | | $ - | $ - | $ - | $ - | $ - | | | | $ - | |
| | | | | | | | | | | | |
| **Class 4 (GUC's Over $3,000)** | | | | | | | | | | | |
| Commerce Bank | $ 1,252,646.24 | | | | | | | | | | |
| Great Lakes | $ 124,329.36 | | | | | | | | | | |
| Ila Swenning | $ 75,000.00 | | | | | | | | | | |
| | $ 164,827.85 | | | | | | | | | | |
| IRS (per OE 6/23/17 [Dkt. 216] AND Amended POC Filed 12/19/19) | | | | | | | | | | | |
| Wells Fargo | $ 41,531.74 | | | | | | | | | | |
| | $ 1,658,335.19 | | | | | | | | | | |
| **TOTAL CLAIMS** | $ 3,423,532.73 | | | | | | | | | | |

EXHIBIT "9"

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 5/11/2017 | Transfer to other biz account | Accont Transfer | $ 30,000.00 | | It appears that these funds were transferred back to the main PC business account; however, there was no reason for the transfers and the resulting need for inquiry and monitoring by the Trustee. |
| 6/22/2017 | Transfer to other biz account | Accont Transfer | $ 30,000.00 | | Same as above. |
| 8/2/2017 | Transfer to other biz account | Accont Transfer | $ 20,000.00 | $ 80,000.00 | Same as above. |
| 7/7/2017 | IMA Helps | Charity | $ 500.00 | $ 500.00 | The Trustee appreciates charity, but not at a time when the Trustee/PC are materially behind on Plan payments. |
| 2/2/2017 | Todd Swenning | Funds for living expenses | $ 6,830.17 | | This should not be paid from the PC account. The Debtor's income is to be paid to the Trustee with a portion paid over by the Trustee to the Debtor for personal use. |
| 4/18/2017 | Todd Swenning | Transfer to Savings account | $ 30,000.00 | | Same as above. |
| 6/1/2017 | Todd Swenning | Salary for living expenses | $ 6,500.00 | | Same as above. |
| 8/30/2017 | Todd Swenning | Salary | $ 31,168.41 | $ 74,498.58 | Same as above. |
| 1/4/2017 | Western Southern Pacific | insurance | $ 1,118.41 | | The Trustee does not know the basis for payments to Western Southern Pacific. |
| 1/10/2017 | Travel Insurance policy | Insurance | $ 55.08 | | |
| 1/10/2017 | Travel Insurance policy | Insurance | $ 45.00 | | |
| 1/17/2017 | Blue Shield | Insurance | $ 1,551.58 | | |
| 2/1/2017 | Western Southern Pac | Insurance | $ 1,118.41 | | The Trustee does not know the basis for payments to Nationwide, but believes the payments may be for automobile and/or real property insurance; however, the P.C. is not known to own any automobiles or real property. |
| 2/1/2017 | Western Southern Pac | Insurance | $ 318.82 | | |
| 2/2/2017 | Nationwide Insurance | Insurance | $ 672.72 | | |
| 2/8/2017 | Nationwide Insurance | Insurance | $ 126.00 | | |
| 2/8/2017 | Blueshield | Insurance | $ 1,551.58 | | |
| 3/8/2017 | Blue Shield CA | Insurance | $ 1,551.58 | | |
| 4/3/2017 | Western-Southern Pacific Ins | Insurance | $ 1,437.23 | | |
| 4/17/2017 | Nationwide | Insurance | $ 76.90 | | The Trustee believes that BlueShield is for health insurance, that Cal Physicians and CAP MPT are for professional liability insurance. |
| 4/26/2017 | Blue Shield | Insurance | $ 3,103.16 | | |
| 6/1/2017 | Western Southern Pac Ins | Insurance | $ 1,437.23 | | |
| 6/21/2017 | Blueshield CA | Insurance | $ 1,998.60 | | |
| 6/26/2017 | Nationwide | Insurance | $ 222.93 | | |
| 7/3/2017 | Western Southern Pac Ins | Insurance | $ 1,437.23 | | |
| 7/12/2017 | Cal Physicians | Insurance | $ 3,103.16 | | |
| 8/2/2017 | Western Souther Pac | Insurance | $ 1,437.23 | | |
| 8/9/2017 | CAP-MPT | Insurance | $ 4,682.00 | | |
| 8/22/2017 | Nationwide | Insurance | $ 57.50 | | |
| 8/22/2017 | Nationwide | Insurance | $ 339.57 | | |
| 8/24/2017 | Travel Insurance | Insurance | $ 53.85 | | |
| 9/7/2017 | Western Southern | Insurance | $ 126.20 | | |
| 9/11/2017 | Nationwide | Insurance | $ 22.57 | | |
| 9/26/2017 | Nationwide | Insurance | $ 337.81 | | |
| 9/26/2017 | Nationwide | Insurance | $ 57.50 | | |
| 10/3/2017 | Western Southern Pacific | Insurance | $ 1,437.23 | | |
| 10/11/2017 | CAP-Mpt | Insurance | $ 5,009.00 | | |
| 10/11/2017 | Blueshield | Insurance | $ 1,789.43 | | |
| 10/18/2017 | Nationwide | Insurance | $ 337.80 | | |
| 10/18/2017 | Nationwide | Insurance | $ 160.50 | | |
| 11/1/2017 | Western-Southern Pacific | Insurance | $ 1,563.43 | | |
| 11/2/2017 | Blue Shield CA | Insurance | $ 1,789.43 | | |
| 11/22/2017 | Nationwide | Insurance | $ 349.11 | | |
| 11/22/2017 | Nationwide | Insurance | $ 28.30 | | |
| 11/22/2017 | Blue Shield CA | Insurance | $ 1,789.43 | | |
| 12/1/2017 | Western Souther Pac | Insurance | $ 1,563.43 | | |
| 12/22/2017 | Nationwide | Insurance | $ 343.82 | | |
| 9/22/2017 | Cal Physicians | Insurance | $ 3,103.16 | $ 14,718.38 | |
| 1/11/2017 | Transfer to account 1695 | Payment of support | $ 4,000.00 | | This should not be paid from the PC account. The Debtor's income is to be paid to the Trustee with support payments to the Debtor's allege former spouse paid by the Trustee as a Plan payment. |
| 1/20/2017 | Transfer to account 1695 | Payment of support | $ 4,000.00 | | Same as above. |
| 1/10/2017 | Workshop Kitchen & Bath | Personal | $ 25.07 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 1/10/2017 | Workshop Kitchen & Bath | Personal | $ 289.80 | | |
| 1/30/2017 | Stater brothers | Personal | $ 55.03 | | |
| 3/14/2017 | Withdrawal | Personal | $ 5,000.00 | | |
| 4/17/2017 | Withdrawal | Personal | $ 200.00 | | |
| 5/9/2017 | Petco | Personal | $ 55.95 | | |
| 6/22/2017 | Withdrawal | Personal | $ 200.00 | | |
| 7/10/2017 | Safelite Auto Glass | Personal | $ 108.60 | | |
| 7/14/2017 | Rite Aid Store | Personal | $ 290.00 | | |
| 7/17/2017 | California Veterinary | Personal | $ 1,929.00 | | **Over $11,500 in personal veterinary bills.** |
| 7/17/2017 | California Veterinary | Personal | $ 1,924.00 | | Same as above. |
| 7/20/2017 | California Veterinary | Personal | $ 7,000.00 | | Same as above. |
| 7/20/2017 | California Veterinary | Personal | $ 696.24 | | Same as above. |
| 8/7/2017 | Mentorbox | Personal | $ 69.00 | | |
| 8/7/2017 | Mentorbox | Personal | $ 97.00 | | |
| 8/7/2017 | Mentorbox | Personal | $ 37.00 | | |
| 8/7/2017 | Walgreens | Personal | $ 29.30 | | |
| 9/7/2017 | Mentorbox | Personal | $ 69.00 | | |
| 9/7/2017 | Mentorbox | Personal | $ 37.00 | | |
| 9/12/2017 | Withdrawal | Personal | $ 100.00 | | |
| 9/14/2017 | Go daddy | Personal | $ 25.16 | | |
| 9/15/2017 | CVS Pharmacy | Personal | $ 202.35 | | |
| 9/18/2017 | Withdrawal | Personal | $ 100.00 | | |
| 8/10/2017 | Todd Swenning | Personal withdrawal | $ 140.00 | | |
| 8/18/2017 | Todd Swenning | Personal withdrawal | $ 200.00 | | |
| 8/24/2017 | Todd Swenning | Personal withdrawal | $ 200.00 | | |
| 8/28/2017 | Todd Swenning | Personal withdrawal | $ 200.00 | | |
| 4/3/2017 | Desert Premium Outlets | Personal | $ 1,163.64 | $ 20,443.14 | None of this is provided for in the Plan projections. |
| 1/17/2017 | ATM withdrawal | Petty cash | $ 200.00 | | Given the numerous other cash withdrawals and a lack of accounting for the use of alleged PC business petty cash, it is impossible to verify that any or all of the funds were used for PC business. |
| 1/31/2017 | Cash withdrawal | Petty cash | $ 300.00 | | Same as above. |
| 2/17/2017 | Cash Withdrawal | Petty cash | $ 300.00 | | Same as above. |
| 7/14/2017 | withdrawal | petty cash | $ 200.00 | $ 1,000.00 | Same as above. |
| 1/4/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 2/2/2017 | American Funds Investments | Retirement | $ 1,500.00 | | |
| 3/2/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 4/4/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 6/2/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 7/5/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 8/2/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 9/5/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 10/3/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 11/2/2017 | American Funds Investment | Retirement | $ 1,500.00 | | |
| 12/4/2017 | American Funds Investment | Retirement | $ 1,500.00 | $ 16,500.00 | None of this is provided for in the Plan projections. The Debtor should not be funding retirement while he is substantially behind on Plan performance. |
| 1/5/2017 | The Draughtsman | Travel & Entertainment | $ 177.90 | | |
| 1/9/2017 | NYPD Palm Springs | Travel & Entertainment | $ 202.00 | | |
| 1/10/2017 | American Airlines | Travel & Entertainment | $ 847.35 | | Who was on this flight and what was the purpose? |
| 1/12/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 18.08 | | |
| 1/13/2017 | American Airlines | Travel & Entertainment | $ 188.00 | | |
| 1/13/2017 | The Saguaro Palm Springs | Travel & Entertainment | $ 1,255.94 | | Who stayed at the hotel and what was the purpose of the trip? |
| 1/13/2017 | United Airlines | Travel & Entertainment | $ 2,867.46 | | Who was on this flight and what was the purpose? |
| 1/13/2017 | United Airlines | Travel & Entertainment | $ 300.00 | | Who was on this flight and what was the purpose? |
| 1/13/2017 | Tinto Restaurant | Travel & Entertainment | $ 23.08 | | |
| 1/13/2017 | Tinto Restaurant | Travel & Entertainment | $ 59.05 | | |
| 1/17/2017 | Travel Insurance policy | Travel & Entertainment | $ 184.95 | | |
| 1/17/2017 | The Draughtsman | Travel & Entertainment | $ 110.26 | | |
| 1/19/2017 | Sobhy Yousef Palm Springs | Travel & Entertainment | $ 17.65 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|------|-------|---------|--------|--------|-------|
| 1/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 1/23/2017 | Peohes Coronada | Travel & Entertainment | $ 534.20 | | |
| 1/24/2017 | lambmedia.com | Travel & Entertainment | $ 1.00 | | |
| 1/30/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 23.80 | | |
| 1/30/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 35.79 | | |
| 2/3/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 32.25 | | |
| 2/9/2017 | Total Wine | Travel & Entertainment | $ 150.84 | | |
| 2/14/2017 | NYPD Palm Springs | Travel & Entertainment | $ 47.78 | | |
| 2/21/2017 | Yard House | Travel & Entertainment | $ 108.68 | | |
| 2/21/2017 | Hudson News | Travel & Entertainment | $ 4.48 | | |
| 2/21/2017 | Airmargaritaville | Travel & Entertainment | $ 50.11 | | |
| 2/21/2017 | San Lorenzo | Travel & Entertainment | $ 30.03 | | |
| 2/21/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 2/23/2017 | Conf Camba | Travel & Entertainment | $ 12.88 | | |
| 2/24/2017 | Lux Las Vegas | Travel & Entertainment | $ 32.63 | | |
| 2/24/2017 | Chevron | Travel & Entertainment | $ 52.59 | | |
| 2/27/2017 | Lucky Cab | Travel & Entertainment | $ 27.28 | | |
| 2/27/2017 | Western Cab | Travel & Entertainment | $ 24.30 | | |
| 2/27/2017 | LAX | Travel & Entertainment | $ 210.00 | | |
| 2/27/2017 | Hotel tonight | Travel & Entertainment | $ 34.00 | | |
| 3/3/2017 | Yard House | Travel & Entertainment | $ 51.17 | | |
| 3/6/2017 | The Publican | Travel & Entertainment | $ 78.00 | | |
| 3/7/2017 | Hotel Chicago | Travel & Entertainment | $ 139.71 | | |
| 3/7/2017 | Yellow Cab | Travel & Entertainment | $ 10.75 | | |
| 3/7/2017 | The Publican | Travel & Entertainment | $ 80.00 | | |
| 3/7/2017 | Palm Springs Airport | Travel & Entertainment | $ 28.00 | | |
| 3/7/2017 | Boingo Wireless | Travel & Entertainment | $ 6.95 | | |
| 3/8/2017 | Ernest Coffee | Travel & Entertainment | $ 32.24 | | |
| 3/10/2017 | Honda of the Desert | Travel & Entertainment | $ 234.15 | | To the Trustee's knowledge, the P.C. does not own a vehicle. |
| 3/10/2017 | Honda of the Desert | Travel & Entertainment | $ 121.41 | | To the Trustee's knowledge, the P.C. does not own a vehicle. |
| 3/13/2017 | United Airlines | Travel & Entertainment | $ 8.99 | | |
| 3/17/2017 | Agent fee | Travel & Entertainment | $ 175.00 | | Who was on this flight and what was the purpose? |
| 3/17/2017 | Dream Vacations | Travel & Entertainment | $ 40.00 | | |
| 3/20/2017 | Best Western Bayside | Travel & Entertainment | $ 710.98 | | Who stayed at the hotel and what was the purpose of the trip? |
| 3/20/2017 | San Pasqual Winery | Travel & Entertainment | $ 11.00 | | |
| 3/20/2017 | Blue Boheme | Travel & Entertainment | $ 186.21 | | |
| 3/20/2017 | Shell Service | Travel & Entertainment | $ 49.39 | | |
| 3/20/2017 | Audio books | Travel & Entertainment | $ 14.95 | | |
| 3/22/2017 | Pac of Aos | Travel & Entertainment | $ 90.00 | | The Trustee is informed and believes that Pac of Aos is a political action committee. |
| 3/27/2017 | Travelocity | Travel & Entertainment | $ 103.00 | | |
| 3/28/2017 | United Airlines | Travel & Entertainment | $ 1,425.60 | | Who was on this flight and what was the purpose? |
| 3/28/2017 | The Draughtsman | Travel & Entertainment | $ 53.50 | | |
| 4/10/2017 | Yard House | Travel & Entertainment | $ 96.59 | | |
| 4/10/2017 | The Sandwich Palm | Travel & Entertainment | $ 103.02 | | |
| 4/14/2017 | Brownpapertickets | Travel & Entertainment | $ 21.69 | | |
| 4/17/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 8.00 | | |
| 4/17/2017 | AAA CA | Travel & Entertainment | $ 163.00 | | |
| 4/19/2017 | Blue Coyote Grill | Travel & Entertainment | $ 125.85 | | |
| 4/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 4/24/2017 | Pac of Aos | Travel & Entertainment | $ 90.00 | | The Trustee is informed and believes that Pac of Aos is a political action committee. |
| 4/24/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 21.58 | | |
| 4/24/2017 | The luggage factory | Travel & Entertainment | $ 671.50 | | Why did the P.C. need to purchase luggage? |
| 4/26/2017 | Taxi DC | Travel & Entertainment | $ 18.17 | | |
| 4/26/2017 | Mastro's | Travel & Entertainment | $ 157.00 | | |
| 4/27/2017 | JW Marriott | Travel & Entertainment | $ 22.70 | | |
| 4/27/2017 | Old Ebbitt Grill | Travel & Entertainment | $ 199.42 | | |
| 4/28/2017 | Taxi DC | Travel & Entertainment | $ 12.71 | | |
| 5/1/2017 | JW Marriott | Travel & Entertainment | $ 2,685.95 | | Who stayed at the hotel and what was the purpose of the trip? |
| 5/1/2017 | Farmers & Distrillers | Travel & Entertainment | $ 44.80 | | |
| 5/1/2017 | Intercontinental Hotel | Travel & Entertainment | $ 56.20 | | |
| 5/1/2017 | Plan B Burger Bar | Travel & Entertainment | $ 67.52 | | |
| 5/1/2017 | Uber | Travel & Entertainment | $ 32.03 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 5/1/2017 | Uber | Travel & Entertainment | $ 18.42 | | |
| 5/2/2017 | The Bracket Room | Travel & Entertainment | $ 31.18 | | |
| 5/2/2017 | United | Travel & Entertainment | $ 100.00 | | |
| 5/2/2017 | Palm Springs Airport | Travel & Entertainment | $ 98.00 | | |
| 5/3/2017 | Westin | Travel & Entertainment | $ 325.20 | | Who stayed at the hotel and what was the purpose of the trip? |
| 5/3/2017 | Riviera Palm Springs | Travel & Entertainment | $ 42.63 | | |
| 5/5/2017 | Gelson's Market | Travel & Entertainment | $ 78.63 | | |
| 5/8/2017 | PGA Tour Superstore | Travel & Entertainment | $ 444.93 | | |
| 5/10/2017 | Yard House | Travel & Entertainment | $ 72.67 | | |
| 5/12/2017 | Priceline Hotel | Travel & Entertainment | $ 687.46 | | Who stayed at the hotel and what was the purpose of the trip? |
| 5/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 5/22/2017 | Bobs Steak house | Travel & Entertainment | $ 482.99 | | |
| 5/22/2017 | Apple Store | Travel & Entertainment | $ 85.12 | | |
| 5/22/2017 | Pac of Aos | Travel & Entertainment | $ 90.00 | | The Trustee is informed and believes that Pac of Aos is a political action committee. |
| 5/22/2017 | Seven Eleven | Travel & Entertainment | $ 46.00 | | |
| 5/23/2017 | Hyatt Hotels | Travel & Entertainment | $ 530.14 | | |
| 5/31/2017 | Postal Palm Springs | Travel & Entertainment | $ 57.00 | | |
| 6/1/2017 | United | Travel & Entertainment | $ 22.99 | | |
| 6/5/2017 | Omni Berkshire | Travel & Entertainment | $ 35.62 | | |
| 6/5/2017 | Palm Springs Airport | Travel & Entertainment | $ 42.00 | | |
| 6/12/2017 | United | Travel & Entertainment | $ 848.30 | | |
| 6/12/2017 | Travelocity | Travel & Entertainment | $ 179.00 | | |
| 6/14/2017 | United | Travel & Entertainment | $ 5,505.16 | | Who was on this flight and what was the purpose? |
| 6/15/2017 | Contour Dermatology | Travel & Entertainment | $ 300.00 | | |
| 6/19/2017 | NYPD Palm Springs | Travel & Entertainment | $ 87.20 | | |
| 6/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 6/22/2017 | Pac of Aaos | Travel & Entertainment | $ 90.00 | | The Trustee is informed and believes that Pac of Aos is a political action committee. |
| 6/26/2017 | The Draughtsman | Travel & Entertainment | $ 37.81 | | |
| 6/29/2017 | Uber | Travel & Entertainment | $ 23.42 | | |
| 7/3/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 13.69 | | |
| 7/3/2017 | Grub Hub | Travel & Entertainment | $ 251.90 | | |
| 7/3/2017 | Round Table Pizza | Travel & Entertainment | $ 61.73 | | |
| 7/11/2017 | The Draughtsman | Travel & Entertainment | $ 47.15 | | |
| 7/17/2017 | United | Travel & Entertainment | $ 1,450.00 | | Who was on this flight and what was the purpose? |
| 7/17/2017 | United | Travel & Entertainment | $ 200.00 | | Who was on this flight and what was the purpose? |
| 7/17/2017 | United | Travel & Entertainment | $ 105.01 | | Who was on this flight and what was the purpose? |
| 7/18/2017 | Thrifty Car Rental | Travel & Entertainment | $ 51.65 | | |
| 7/18/2017 | Soundbalance | Travel & Entertainment | $ 248.96 | | |
| 7/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 7/26/2017 | Rest O Gaucho | Travel & Entertainment | $ 281.42 | | |
| 7/28/2017 | Fedex | Travel & Entertainment | $ 58.49 | | |
| 8/1/2017 | Hotel Los Alpes | Travel & Entertainment | $ 6.50 | | |
| 8/1/2017 | Ramos Generales | Travel & Entertainment | $ 30.67 | | |
| 8/1/2017 | LAX Airport Corona Bar | Travel & Entertainment | $ 60.13 | | |
| 8/1/2017 | Taxi | Travel & Entertainment | $ 21.01 | | |
| 8/2/2017 | United | Travel & Entertainment | $ 808.14 | | Who was on this flight and what was the purpose? |
| 8/2/2017 | United | Travel & Entertainment | $ 225.00 | | |
| 8/2/2017 | The Draughtsman | Travel & Entertainment | $ 50.41 | | |
| 8/3/2017 | Travel Insurance | Travel & Entertainment | $ 52.53 | | |
| 8/3/2017 | Uber | Travel & Entertainment | $ 19.39 | | |
| 8/3/2017 | Uber | Travel & Entertainment | $ 1.00 | | |
| 8/3/2017 | Uber | Travel & Entertainment | $ 10.00 | | |
| 8/3/2017 | Uber | Travel & Entertainment | $ 10.73 | | |
| 8/3/2017 | Wasatch Sugarhouse | Travel & Entertainment | $ 70.24 | | |
| 8/4/2017 | United | Travel & Entertainment | $ 600.00 | | Who was on this flight and what was the purpose? |
| 8/4/2017 | United club | Travel & Entertainment | $ 7.00 | | |
| 8/4/2017 | Uber | Travel & Entertainment | $ 11.69 | | |
| 8/4/2017 | Uber | Travel & Entertainment | $ 5.00 | | |
| 8/4/2017 | Uber | Travel & Entertainment | $ 17.87 | | |
| 8/4/2017 | Palm Springs Airport | Travel & Entertainment | $ 34.00 | | |
| 8/7/2017 | Grand America Salt Lake | Travel & Entertainment | $ 392.98 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 8/7/2017 | Market Street | Travel & Entertainment | $ 42.20 | | |
| 8/7/2017 | Grand America Salt Lake | Travel & Entertainment | $ 6.41 | | |
| 8/9/2017 | Yard House | Travel & Entertainment | $ 55.05 | | |
| 8/17/2017 | Bootlegger Tiki Palm Springs | Travel & Entertainment | $ 10.43 | | |
| 8/21/2017 | The Draughtsman | Travel & Entertainment | $ 55.68 | | |
| 8/21/2017 | Homeaway | Travel & Entertainment | $ 3,799.40 | | Who stayed at the vacation rental and what was the purpose of the trip? |
| 8/21/2017 | Homeaway | Travel & Entertainment | $ 1,000.00 | | Who stayed at the vacation rental and what was the purpose of the trip? |
| 8/21/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 8/23/2017 | United | Travel & Entertainment | $ 936.59 | | Who was on this flight and what was the purpose? |
| 8/28/2017 | Brickworks bistro | Travel & Entertainment | $ 526.35 | | |
| 8/28/2017 | Uber | Travel & Entertainment | $ 17.94 | | |
| 8/28/2017 | Venice Ale House | Travel & Entertainment | $ 312.60 | | |
| 8/28/2017 | Uber | Travel & Entertainment | $ 4.00 | | |
| 8/28/2017 | Uber | Travel & Entertainment | $ 93.13 | | |
| 8/28/2017 | Uber | Travel & Entertainment | $ 10.00 | | |
| 8/29/2017 | Yard House | Travel & Entertainment | $ 27.20 | | |
| 9/1/2017 | Western Souther Pac | Travel & Entertainment | $ 1,437.23 | | |
| 9/8/2017 | Hotels | Travel & Entertainment | $ 124.13 | | |
| 9/8/2017 | United Club | Travel & Entertainment | $ 20.00 | | |
| 9/8/2017 | United Club | Travel & Entertainment | $ 17.00 | | |
| 9/11/2017 | Cru Wine Bar | Travel & Entertainment | $ 51.90 | | |
| 9/11/2017 | Palm Springs Airport | Travel & Entertainment | $ 34.00 | | |
| 9/11/2017 | Freshbooks | Travel & Entertainment | $ 139.86 | | |
| 9/14/2017 | Travel Reservation | Travel & Entertainment | $ 172.97 | | |
| 9/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 9/20/2017 | United Club | Travel & Entertainment | $ 20.00 | | |
| 9/20/2017 | Palm Springs Airport | Travel & Entertainment | $ 34.00 | | |
| 9/20/2017 | Trump Hotel | Travel & Entertainment | $ 51.14 | | |
| 9/25/2017 | NYPD Palm Springs | Travel & Entertainment | $ 64.50 | | |
| 9/27/2017 | NYPD Palm Springs | Travel & Entertainment | $ 100.75 | | |
| 9/29/2017 | Palm Canyon Theatre | Travel & Entertainment | $ 95.00 | | |
| 9/29/2017 | The Draughtsman | Travel & Entertainment | $ 62.29 | | |
| 10/2/2017 | Westin South Coast Plaza | Travel & Entertainment | $ 333.19 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/2/2017 | Westin South Coast Plaza | Travel & Entertainment | $ 299.19 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/2/2017 | Mastro's Costa Mesa | Travel & Entertainment | $ 185.63 | | |
| 10/2/2017 | United | Travel & Entertainment | $ 200.00 | | Who was on this flight and what was the purpose? |
| 10/6/2017 | withdrawal | Travel & Entertainment | $ 200.00 | | |
| 10/10/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 233.69 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/10/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 7.01 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/10/2017 | Birba Palm Springs | Travel & Entertainment | $ 116.35 | | |
| 10/10/2017 | Sobhy Yousef Palm Springs | Travel & Entertainment | $ 61.61 | | |
| 10/10/2017 | Mentorbox | Travel & Entertainment | $ 69.00 | | |
| 10/10/2017 | mentornetwork | Travel & Entertainment | $ 37.00 | | |
| 10/12/2017 | Compass Vending | Travel & Entertainment | $ 6.27 | | |
| 10/12/2017 | Compass Vending | Travel & Entertainment | $ 0.18 | | |
| 10/13/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 41.99 | | |
| 10/13/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 1.25 | | |
| 10/13/2017 | Vancouver Taxi | Travel & Entertainment | $ 8.85 | | |
| 10/13/2017 | Vancouver Taxi | Travel & Entertainment | $ 0.26 | | |
| 10/13/2017 | Black Top & Checker Cab | Travel & Entertainment | $ 7.33 | | |
| 10/16/2017 | Canucks Bar & Grill | Travel & Entertainment | $ 41.35 | | |
| 10/16/2017 | Canucks Bar & Grill | Travel & Entertainment | $ 1.24 | | |
| 10/16/2017 | United Club | Travel & Entertainment | $ 14.00 | | |
| 10/16/2017 | Palm Springs Airport | Travel & Entertainment | $ 85.00 | | |
| 10/16/2017 | Maclure's Cab | Travel & Entertainment | $ 5.94 | | |
| 10/16/2017 | Maclure's Cab | Travel & Entertainment | $ 0.17 | | |
| 10/16/2017 | Starbucks | Travel & Entertainment | $ 5.10 | | |
| 10/16/2017 | Starbucks | Travel & Entertainment | $ 0.15 | | |
| 10/16/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 39.22 | | |
| 10/16/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 1.17 | | |
| 10/16/2017 | Starbucks | Travel & Entertainment | $ 5.10 | | |
| 10/16/2017 | Starbucks | Travel & Entertainment | $ 0.15 | | |
| 10/16/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 61.13 | | |
| 10/16/2017 | Cactus Club Coal Harbo Vancouver | Travel & Entertainment | $ 1.83 | | |
| 10/16/2017 | Black Top & Checker Cab | Travel & Entertainment | $ 5.18 | | |
| 10/16/2017 | Maclure's Cab | Travel & Entertainment | $ 33.42 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 10/16/2017 | Maclure's Cab | Travel & Entertainment | $ 1.00 | | |
| 10/17/2017 | Starbucks | Travel & Entertainment | $ 6.74 | | |
| 10/17/2017 | Starbucks | Travel & Entertainment | $ 0.20 | | |
| 10/18/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 736.59 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/18/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 22.09 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/18/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 10.07 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/18/2017 | Pan Pacific Vancouver | Travel & Entertainment | $ 0.30 | | Who stayed at the hotel and what was the purpose of the trip? |
| 10/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 10/20/2017 | Chevron | Travel & Entertainment | $ 58.41 | | |
| 10/23/2017 | Doubletree Modesto | Travel & Entertainment | $ 17.00 | | |
| 10/23/2017 | Fast N Esy | Travel & Entertainment | $ 52.53 | | |
| 10/26/2017 | The Droughtsman Palm Springs | Travel & Entertainment | $ 70.46 | | |
| 10/27/2017 | Jeffrey Smith MD | Travel & Entertainment | $ 100.00 | | |
| 10/30/2017 | Brush Palm Springs | Travel & Entertainment | $ 65.00 | | |
| 10/30/2017 | Act Desertrecdistrict Indio | Travel & Entertainment | $ 140.00 | | |
| 10/31/2017 | Bills Pizza | Travel & Entertainment | $ 35.90 | | |
| 11/6/2017 | Withdrawal | Travel & Entertainment | $ 200.00 | | |
| 11/7/2017 | Mentorbox | Travel & Entertainment | $ 69.00 | | |
| 11/7/2017 | Mentornetwork | Travel & Entertainment | $ 37.00 | | |
| 11/13/2017 | Grandy Hyatt Tampa Bay | Travel & Entertainment | $ 65.90 | | |
| 11/13/2017 | Tpa Term A Ducky's | Travel & Entertainment | $ 19.92 | | |
| 11/13/2017 | Palm Springs Airport | Travel & Entertainment | $ 51.00 | | |
| 11/16/2017 | Withdrawal | Travel & Entertainment | $ 200.00 | | |
| 11/20/2017 | Yard House | Travel & Entertainment | $ 150.00 | | |
| 11/20/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | | |
| 12/7/2017 | Mentorbox | Travel & Entertainment | $ 69.00 | | |
| 12/7/2017 | Mentornetwork | Travel & Entertainment | $ 37.00 | | |
| 12/14/2017 | Withdrawal | Travel & Entertainment | $ 100.00 | | |
| 12/15/2017 | Barnes & Noble | Travel & Entertainment | $ 142.61 | | |
| 12/15/2017 | Withdrawal | Travel & Entertainment | $ 400.00 | | |
| 12/18/2017 | Tommy Bahamas | Travel & Entertainment | $ 701.32 | | |
| 12/18/2017 | NYPD Palm Springs | Travel & Entertainment | $ 25.00 | | |
| 12/18/2017 | Bootlegger Tiki | Travel & Entertainment | $ 20.49 | | |
| 12/19/2017 | Audiobooks | Travel & Entertainment | $ 14.95 | $ 46,678.93 | This amount greatly exceeds the $30,000 in projected Travel and Entertainment expenses for the PC.  Further, many of the expenditures appear to be personal in nature, such that they should not be made by the P.C.  **In January 2018, whcih is not covered by the quarterly reports attached hereto, there was yet another large charge in the amount $4,298.  Again, who was on this flight and what was the purpose?** |
| 1/12/2017 | Time Warner cable | Utilities | $ 74.78 | | |
| 1/17/2017 | Time Warner cable | Utilities | $ 251.85 | | |
| 1/26/2017 | So cal gas | Utilities | $ 33.35 | | |
| 1/27/2017 | Edison | Utilities | $ 109.41 | | |
| 2/9/2017 | ATT | Utilities | $ 642.77 | | |
| 2/13/2017 | Time Warner | Utilities | $ 74.78 | | |
| 2/14/2017 | Time Warner | Utilities | $ 259.48 | | |
| 3/9/2017 | ATT | Utilities | $ 435.38 | | |
| 3/13/2017 | Time Warner Cable | Utilities | $ 70.15 | | |
| 3/14/2017 | Southern California Edison | Utilities | $ 342.28 | | |
| 3/27/2017 | Time Warner Cable | Utilities | $ 415.00 | | |
| 3/27/2017 | So Cal Gas | Utilities | $ 26.34 | | |
| 4/10/2017 | Att Payment | Utilities | $ 554.45 | | |
| 4/12/2017 | Time Warner | Utilities | $ 69.99 | | |
| 4/18/2017 | So Cal Gas | Utilities | $ 7.89 | | |
| 5/9/2017 | ATT | Utilities | $ 728.38 | | |
| 5/12/2017 | Time Warner | Utilities | $ 69.99 | | |
| 6/8/2017 | Time Warner Cable | Utilities | $ 230.51 | | |
| 6/9/2017 | ATT | Utilities | $ 739.00 | | |

| DATE | PAYEE | PURPOSE | AMOUNT | TOTALS | NOTES |
|---|---|---|---|---|---|
| 6/12/2017 | Time Warner Cable | Utilities | $ 69.99 | | |
| 6/19/2017 | AT&T | Utilities | $ 14.26 | | |
| 7/10/2017 | ATT | Utilities | $ 803.15 | | |
| 7/12/2017 | Time Warner Cable | Utilities | $ 69.99 | | |
| 8/9/2017 | ATT | Utilities | $ 652.27 | | |
| 8/14/2017 | Time Warner | Utilities | $ 69.99 | | |
| 9/5/2017 | Time Warner | Utilities | $ 608.65 | | |
| 9/7/2017 | Time Warner | Utilities | $ 306.71 | | |
| 9/11/2017 | ATT | Utilities | $ 835.51 | | |
| 9/12/2017 | Time Warner | Utilities | $ 69.99 | | |
| 10/10/2017 | ATT | Utilities | $ 619.44 | | |
| 10/12/2017 | Time Warner Cable | Utilities | $ 69.99 | | |
| 11/9/2017 | ATT | Utilities | $ 789.96 | | |
| 11/13/2017 | Time Warner Cable | Utilities | $ 69.99 | | |
| 12/6/2017 | Time Warner | Utilities | $ 380.95 | | |
| 12/11/2017 | ATT | Utilities | $ 751.97 | | |
| 12/12/2017 | Time Warner | Utilities | $ 69.99 | | |
| 12/18/2017 | AT&T | Utilities | $ 304.97 | $ 11,693.55 | The Trustee believes that certain of the foregoing utility expenses may be for services provided to the Debtor, his alleged former spouse, or other parties other than the P.C. |

| | | |
|---|---|---|
| Total Questionable Payments Set Forth Above (totals highlighted in green) | | $ 186,032.58 |

EXHIBIT "10"

**Todd M. Arnold**

| | |
|---|---|
| **From:** | Todd A. Frealy |
| **Sent:** | Monday, March 4, 2019 12:18 PM |
| **To:** | 'Swenning Todd A' |
| **Cc:** | Bratton, Sam G. (sbratton@dsda.com); Todd M. Arnold |
| **Subject:** | deposits |

Dr. Swenning,

What is the source of the deposits into your Wells Fargo DIP account checking (x2498) of $12,644 on 12/11/2018 and $28,755.98 on 12/26/2018?

**TODD A. FREALY**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
800 S. Figueroa Street  |   Suite 1260   |   Los Angeles  | California  90017
Phone  310 229 1234  |   Direct  310 229 3366   |   Fax  310 229 1244

Riverside Office:
3403 Tenth Street  |  Suite 709  |  Riverside | California  92501
Phone  951 784 4122  |  Fax 951 784 7143

Main Office:
10250 Constellation Blvd. | Suite 1700  |  Los Angeles  | California  90067
**************************************************

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at
http://www.lnbyb.com/disclaimers.htm.
**************************************************

🌱 Please consider the environment before printing this email

# EXHIBIT "11"

**Todd M. Arnold**

**From:** Todd Swenning <johnnysawbones@yahoo.com>
**Date:** March 6, 2019 at 7:30:06 AM PST
**To:** "Todd A. Frealy" <taf@lnbyb.com>
**Reply-To:** Todd Swenning <johnnysawbones@yahoo.com>

Todd,

Attached are the Oct/Nov savings acct statements.

The deposits to the DIP acct in late December were federal returns that came unexpectedly.  As
these were joint filings with the check written to both Narayani and I, I gave half of the total
amount to her.

TS

**Todd Swenning, MD, FAAOS**
Medical Director
Institute of Clinical Orthopedics and Neurosciences (ICON)
Director of Orthopedic Trauma
Desert Regional Medical Center
Palm Springs, CA
Communications Cabinet-American Academy of Orthopedic Surgeons
Health Policy Committee-Orthopedic Trauma Association

1

# EXHIBIT "12"

**Todd M. Arnold**

| | |
|---|---|
| **From:** | Todd A. Frealy |
| **Sent:** | Monday, March 18, 2019 12:01 PM |
| **To:** | 'Swenning Todd A' |
| **Cc:** | Bratton, Sam G. (sbratton@dsda.com); Todd M. Arnold |
| **Subject:** | FW: Swenning BK - Tax Refunds and Other Issues |
| | |
| **Importance:** | High |

Dr. Swenning,

I am writing to follow up on this email. Also, how are electronic deposits coming along? Are you prepared to return the $7,000 that I wired to you on 3/1/2019 for med mal insurance? Please advise asap regarding these issues. Todd Frealy

**From:** Todd M. Arnold <TMA@lnbyb.com>
**Sent:** Thursday, March 7, 2019 1:53 PM
**To:** 'Swenning Todd A' (johnnysawbones@yahoo.com) <johnnysawbones@yahoo.com>; sbratton@dsda.com
**Cc:** Todd A. Frealy <TAF@lnbyb.com>
**Subject:** Swenning BK - Tax Refunds and Other Issues

Dr. Swenning and Sam:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – i.e., IRS, FTB, etc.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds. As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

- Please let us know who initially deposited the refund checks.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

- Please advise as to the status of Dr. Swenning paying the hospital his ~$60k portion of the cure amount to the hospital. Please be advised that, under the plan, such cure amount is to be paid from non-estate / non-plan funds. Therefore, Dr. Swenning is prohibited from making the payment by having the hospital offset against amounts otherwise owed to Dr. Swenning or the P.C.

1

o  Finally, you previously asked what would be required to make final plan payments and we provided an estimated number.  Is this something Dr. Swenning is contemplating doing?  If so, we can give a firm number.


Regards,
Todd


**From:** "Todd A. Frealy" <TAF@lnbyb.com>
**Date:** March 4, 2019 at 12:17:31 PM PST
**To:** 'Swenning Todd A' <johnnysawbones@yahoo.com>
**Cc:** "Bratton, Sam G. (sbratton@dsda.com)" <sbratton@dsda.com>, "Todd M. Arnold" <TMA@lnbyb.com>
**Subject: deposits**

Dr. Swenning,

What is the source of the deposits into your Wells Fargo DIP account checking (x2498) of $12,644 on 12/11/2018 and $28,755.98 on 12/26/2018?

**TODD A. FREALY**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
800 S. Figueroa Street  |   Suite 1260   |  Los Angeles  | California  90017
Phone  310 229 1234  |   Direct  310 229 3366   |  Fax  310 229 1244

Riverside Office:
3403 Tenth Street  |  Suite 709  |  Riverside | California  92501
Phone  951 784 4122  |  Fax 951 784 7143

Main Office:
10250 Constellation Blvd. |  Suite 1700  |  Los Angeles  | California  90067
********************************************************
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at
http://www.lnbyb.com/disclaimers.htm.
********************************************************

(🌿) Please consider the environment before printing this email


**From:** Todd Swenning <johnnysawbones@yahoo.com>
**Date:** March 6, 2019 at 7:30:06 AM PST
**To:** "Todd A. Frealy" <taf@lnbyb.com>
**Reply-To:** Todd Swenning <johnnysawbones@yahoo.com>

Todd,

Attached are the Oct/Nov savings acct statements.

The deposits to the DIP acct in late December were federal returns that came unexpectedly.  As these were joint filings with the check written to both Narayani and I, I gave half of the total amount to her.

2

TS

**Todd Swenning, MD, FAAOS**
Medical Director
Institute of Clinical Orthopedics and Neurosciences (ICON)
Director of Orthopedic Trauma
Desert Regional Medical Center
Palm Springs, CA
Communications Cabinet-American Academy of Orthopedic Surgeons
Health Policy Committee-Orthopedic Trauma Association

# EXHIBIT "13"

## Todd M. Arnold

**From:** Todd M. Arnold
**Sent:** Tuesday, March 26, 2019 4:19 PM
**To:** 'Swenning Todd A' (johnnysawbones@yahoo.com); sbratton@dsda.com
**Cc:** Todd A. Frealy; Martin J. Brill
**Subject:** FW: Swenning BK - Tax Refunds and Other Issues


Dr. Swenning and Sam:

We need a response to the below and the requested documents, information, and funds. Without the foregoing and better plan performance we are edging toward a motion to dismiss and the loss of any discharge of ~$3mm in debt. That would not be good for anyone involved.

Please advise ASAP.

Thanks,
Todd

**From:** Todd M. Arnold
**Sent:** Thursday, March 7, 2019 1:53 PM
**To:** 'Swenning Todd A' (johnnysawbones@yahoo.com) <johnnysawbones@yahoo.com>; sbratton@dsda.com
**Cc:** Todd A. Frealy <TAF@lnbyb.com>
**Subject:** Swenning BK - Tax Refunds and Other Issues

Dr. Swenning and Sam:

- Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – i.e., IRS, FTB, etc.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds. As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

- Please let us know who initially deposited the refund checks.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

1

- Please advise as to the status of Dr. Swenning paying the hospital his ~$60k portion of the cure amount to the hospital. Please be advised that, under the plan, such cure amount is to be paid from non-estate / non-plan funds. Therefore, Dr. Swenning is prohibited from making the payment by having the hospital offset against amounts otherwise owed to Dr. Swenning or the P.C.

- Finally, you previously asked what would be required to make final plan payments and we provided an estimated number. Is this something Dr. Swenning is contemplating doing? If so, we can give a firm number.

Regards,
Todd

**From:** "Todd A. Frealy" <TAF@lnbyb.com>
**Date:** March 4, 2019 at 12:17:31 PM PST
**To:** 'Swenning Todd A' <johnnysawbones@yahoo.com>
**Cc:** "Bratton, Sam G. (sbratton@dsda.com)" <sbratton@dsda.com>, "Todd M. Arnold" <TMA@lnbyb.com>
**Subject: deposits**

Dr. Swenning,

What is the source of the deposits into your Wells Fargo DIP account checking (x2498) of $12,644 on 12/11/2018 and $28,755.98 on 12/26/2018?

**TODD A. FREALY**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
800 S. Figueroa Street | Suite 1260 | Los Angeles | California  90017
Phone  310 229 1234 | Direct  310 229 3366 | Fax  310 229 1244

Riverside Office:
3403 Tenth Street | Suite 709 | Riverside | California  92501
Phone  951 784 4122 | Fax 951 784 7143

Main Office:
10250 Constellation Blvd. | Suite 1700 | Los Angeles | California  90067
*************************************************
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at
http://www.lnbyb.com/disclaimers.htm.
*************************************************

Please consider the environment before printing this email

**From:** Todd Swenning <johnnysawbones@yahoo.com>
**Date:** March 6, 2019 at 7:30:06 AM PST
**To:** "Todd A. Frealy" <taf@lnbyb.com>
**Reply-To:** Todd Swenning <johnnysawbones@yahoo.com>

Todd,

Attached are the Oct/Nov savings acct statements.

The deposits to the DIP acct in late December were federal returns that came unexpectedly. As these were joint filings with the check written to both Narayani and I, I gave half of the total amount to her.

TS

**Todd Swenning, MD, FAAOS**
Medical Director
Institute of Clinical Orthopedics and Neurosciences (ICON)
Director of Orthopedic Trauma
Desert Regional Medical Center
Palm Springs, CA
Communications Cabinet-American Academy of Orthopedic Surgeons
Health Policy Committee-Orthopedic Trauma Association

# EXHIBIT "14"

**Todd M. Arnold**

| | |
|---|---|
| **From:** | Bratton, Sam G. <sbratton@dsda.com> |
| **Sent:** | Thursday, April 11, 2019 4:20 PM |
| **To:** | Todd A. Frealy; Todd Swenning |
| **Cc:** | Todd M. Arnold |
| **Subject:** | RE: Swenning operating accts |

Todd A. and Todd F.,  See responses below.
Sam



**Sam G. Bratton II**

Two West Second Street, Suite 700 | Tulsa, OK 74103-3117 | p: 918.591.5215 | f: 918.925.5215
sbratton@dsda.com | www.dsda.com

**CONFIDENTIALITY NOTICE:** This e-mail and any attachments are intended only for the use of those to whom it is addressed and may contain information that is confidential and prohibited from further disclosure under law. If you have received this e-mail in error, its review, use, retention and/or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and any attachments.

**TAX NOTICE:** This communication may contain federal tax advice. IRS regulations require us to advise you that unless expressly stated otherwise, nothing in this communication was intended or written to be used and cannot be used or relied upon by any taxpayer to avoid any penalty under federal tax law or to promote, market or recommend any transaction or matter addressed herein. Only formal, written tax opinions meeting IRS requirements may be relied upon for the purpose of avoiding tax-related penalties. Please contact one of the firm's tax attorneys if you have any questions regarding federal tax advice.

MEMBER OF MERITAS LAW FIRMS WORLDWIDE I www.meritas.org

**From:** Todd A. Frealy <TAF@lnbyb.com>
**Sent:** Thursday, April 11, 2019 5:18 PM
**To:** Todd Swenning <johnnysawbones@yahoo.com>
**Cc:** Bratton, Sam G. <sbratton@dsda.com>; Todd M. Arnold <TMA@lnbyb.com>
**Subject:** RE: Swenning operating accts

Dr. Swenning:

Todd Arnold sent his request over a month ago now.  This seems to be more delay and talk, which is par for the course.  You are in material default on your payments to me and, therefore, there are material defaults under the plan.  We need money (a situation that is not helped by the continued spending out of the entity without any corresponding return), not discussion.  We are talking internally tomorrow whether to proceed with a motion to dismiss the case based on payment and plan defaults tomorrow.  Thus, if you want to have any chance of a discharge, I suggest that Sam respond immediately to Todd Arnold with the requested documents and concrete answers and/or offers to fund out the plan, not points of discussion or inquiries or anything else.  While all requests are important, the requested information about the additional tax refund is very important.  To reiterate what Todd Arnold asked for in that regard, here it is again:

• Please advise as to the year for which the $41,400 in refunds were made and the source of the refunds – i.e., IRS, FTB, etc.

Bill Healey has this information. Dr. Swenning has requested it to be forwarded to you. I don't know the status, but I suspect that Healey's tax season has slowed down his response time. Dr.Swenning,

1

please contact Bill and either have the documents sent immediately or advise the Trustee what Bill says.

- Please send us a copy of the tax returns pursuant to which the refunds were made.

Same as above. Bill Healey has the returns and can get them to the Trustee. Dr. Swenning, incude this in your call to Healey.

- Please send a copy of the checks pursuant to which the refunds were made or some other document from the relevant taxing authorities so we can confirm you received half.

Bill Healey should also have this documentation, although Dr. Swenning or his bank should have copies of the refund checks. Dr. Swenning, when you call Healey confirm how the refunds were processed. He will know what documentation the trustee needs.

Dr. Swenning is glad to work with Healey to get any and all information to the trustee and will continue to do so, but we also have no objection if the trustee desires to contact Healey directly by letter, call or otherwise to  discuss any aspect or request any financial information, at any time, without notice to Dr. Swenning or me.

- Please send the operative separation/divorce agreement with Ms. Swenning so we can ascertain whether she was entitled to any portion of the refunds.  As an initial matter since almost all of the income was made by Dr. Swenning, the bulk, if not all, of the refund should go to Dr. Swenning.

I have the divorce case documents and will send them to you tomorrow.

- Please let us know who initially deposited the refund checks.

I believe Dr. Swenning deposited his half and gave Mrs. Swenning her half. Dr. Swenning please confirm to the Trustee or let the Trustee know how the refund checks were otherwise processed.

- Since (1) Dr. Swenning is well behind on plan funding, which has resulted in collection letters from the IRS and the hospital suggesting that the IRS and/or hospital may seek dismissal if they are not brought current and (2) Dr Swenning is in default under the plan for failing to timely make the $9,500 payment to purchase non-exempt equity in vehicles, please confirm that Dr. Swenning will transfer the $41,400 in refunds to the Trustee and make the transfer of such funds to the Trustee.

Presently Dr. Swenning has no money to transfer to the trustee, which he has reported to you. We are working in earnest to secure private funding to make a proposal to the trustee to pay a lump sum to satisfy all plan payments. The tax refund would figure into that solution.  I can commit to you to have a proposal by the end of this month.

**TODD A. FREALY**
**LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.**
800 S. Figueroa Street  |   Suite 1260  |  Los Angeles  | California   90017
Phone  310 229 1234  |   Direct  310 229 3366   |   Fax  310 229 1244

Riverside Office:
3403 Tenth Street  |  Suite 709  |  Riverside | California  92501
Phone  951 784 4122  |  Fax 951 784 7143

Main Office:
10250 Constellation Blvd. | Suite 1700  |  Los Angeles  | California  90067
**************************************************

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at http://www.lnbyb.com/disclaimers.htm.

*************************************************

 Please consider the environment before printing this email

**From:** Todd Swenning <johnnysawbones@yahoo.com>
**Sent:** Thursday, April 11, 2019 2:56 PM
**To:** Todd A. Frealy <TAF@lnbyb.com>
**Subject:** Swenning operating accts

Todd,

Sam is working on responses to the questions from Todd Arnold, including discussions regarding possibly financing out of the remainder of the BK.

So far, in March and April, I have had $11,634 in electronic deposits, which is roughly $5800 per month. I am now roughly $500 negative in my operating account. I have Bill Healy ($1500), Med mal ($4k) as my large remaining expenses this month, as well as having to purchase a ticket to Nashville for the AAOE.

Nesha assures me that March was a very good month from a billing stand point, and hopefully electronic deposits will resume soon.

Let me know how you would like to proceed.

TS

## **Todd Swenning, MD, FAAOS**

Medical Director
Institute of Clinical Orthopedics and Neurosciences (ICON)
Director of Orthopedic Trauma
Desert Regional Medical Center
Palm Springs, CA
Communications Cabinet-American Academy of Orthopedic Surgeons
Health Policy Committee-Orthopedic Trauma Association

# EXHIBIT "15"

**Todd M. Arnold**

| | |
|---|---|
| **From:** | Todd A. Frealy |
| **Sent:** | Tuesday, April 23, 2019 2:20 PM |
| **To:** | Todd Swenning |
| **Cc:** | Bratton, Sam G. (sbratton@dsda.com); Todd M. Arnold |
| **Subject:** | RE: DIP |

Dr. Swenning,

Please send me copies of the following checks from your Wells Fargo DIP checking account:

1. Check number 443 in the amount of $6,300 dated 12/28/2018;
2. Check number 376 in the amount of $14,377 dated 12/28/2018;
3. Check number 445 in the amount of $3,000 date 1/14/2019;
4. Check number 377 in the amount of $1,226.50 dated 1/17/2019.

**TODD A. FREALY**
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
800 S. Figueroa Street | Suite 1260 | Los Angeles | California  90017
Phone 310 229 1234 | Direct 310 229 3366 | Fax 310 229 1244

Riverside Office:
3403 Tenth Street | Suite 709 | Riverside | California 92501
Phone 951 784 4122 | Fax 951 784 7143

Main Office:
10250 Constellation Blvd. | Suite 1700 | Los Angeles | California 90067
**************************************************
The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Brill L.L.P.'s email policies which can be found at
http://www.lnbyb.com/disclaimers.htm.
**************************************************

 Please consider the environment before printing this email

**From:** Todd Swenning <johnnysawbones@yahoo.com>
**Sent:** Tuesday, April 23, 2019 12:18 PM
**To:** Todd A. Frealy <TAF@lnbyb.com>
**Subject:** DIP

Apologies for the delay.  Here you go...

_____

# Todd Swenning, MD, FAAOS
Medical Director
Institute of Clinical Orthopedics and Neurosciences (ICON)
Director of Orthopedic Trauma
Desert Regional Medical Center
Palm Springs, CA
Communications Cabinet-American Academy of Orthopedic Surgeons
Health Policy Committee-Orthopedic Trauma Association

1

# EXHIBIT "16"

Filed/Docketed
Mar 08, 2018

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

In re                                           Case No. 15-11408-R
TODD A. SWENNING,                               Chapter 11

          **Debtor**

# ORDER RE: CHAPTER 11 TRUSTEE'S MOTION TO COMPEL PERFORMANCE UNDER SECOND AMENDED PLAN OF REORGANIZATION DATED NOVEMBER 10, 2016

Upon consideration of the following papers, **(A)** the *Notice Of Motion And Motion To Compel Performance Under Second Amended Plan Of Reorganization Dated November 10, 2016; And Notice Of Opportunity For Hearing* (the "Motion to Compel") [Dkt. 226], which was filed on February 2, 2018 by Todd A. Frealy, the Chapter 11 Trustee (the "Trustee") of the bankruptcy estate of Todd A. Swenning, the Chapter 11 debtor herein (the "Debtor"), together with the exhibits to the Motion to Compel; **(B)** the *Response To Chapter 11 Trustee's Notice Of Motion And Motion To Compel Performance Under Second Amended Plan Of Reorganization Dated November 10, 2016; And Notice Of Opportunity For Hearing* (the "Motion to Compel Opposition") [Dkt. 227], which was filed on February 19, 2018 by the Debtor; **(C)** the *Chapter 11 Trustee's Request (1) To Strike Debtor's Untimely Response To Chapter 11 Trustee's Motion To Compel Performance Under Second Amended Plan Of Reorganization Dated November 10, 2016 And (2) For Entry Of Order Granting Trustee's Motion* (the "Request to Strike and Enter Order") [Dkt. 228], which was filed on February 20, 2018 by the Trustee; and **(D)** this Court's concurrently entered *Order Re: Chapter 11 Trustee's Request (1) To Strike Debtor's Untimely Response To Chapter 11 Trustee's Motion To Compel Performance Under Second Amended Plan Of Reorganization Dated November 10, 2016 And (2) For Entry Of Order Granting Trustee's Motion*, pursuant to which the Court granted the Trustee's Request to Strike and Enter Order and struck the Debtor's untimely Motion to Compel Opposition from the record,

1

**THE COURT HEREBY FINDS, RULES, AND ORDERS AS FOLLOWS:**

1.      Notice of the Motion to Compel complied with the requirements of Rule 9013-1 of Local Rules of the United States Bankruptcy Court for the Northern District of Oklahoma and Fed. R. Bankr. P. 9006(f).

2.      Based the foregoing, the lack of any timely response or opposition to the Trustee's Motion to Compel, the reasons set forth in the Trustee's Motion to Compel, the lack of any response or opposition to the Trustee's Request to Strike and Enter Order, and for good cause shown, the Trustee's Motion to Compel, with the modification requested in the Trustee's Request to Strike and Enter Order, is hereby **GRANTED**.

3.      The Debtor is hereby required to immediately cause Todd Swenning, M.D., P.C. (the "P.C.") to transfer all funds in any P.C. accounts into a trust account maintained by the Trustee (the "Trustee Account"), less $10,000 for operating expenses.

4.      The Debtor is hereby required to cause the P.C. to (a) sign over and deposit all payments made to the P.C. into the Trustee Account within three (3) business days of receipt and/or (b) sign over to the Trustee and send to the Trustee within three (3) business days of receipt all payments made to the P.C., which the Trustee shall deposit into the Trustee Account.

5.      The Debtor is hereby required to (a) sign over and deposit all payments made to the Debtor into the Trustee Account within three (3) business days of receipt and/or (b) sign over to the Trustee and send to the Trustee within three (3) business days of receipt all payments made to the Debtor, which the Trustee shall deposit into the Trustee Account.

6.      The Trustee is hereby authorized to direct entities and individuals regularly making payments to the P.C. and/or the Debtor to make such payments directly into the Trustee Account or by checks payable to the Trustee to be deposited into the Trustee Account.

7.      Desert Regional Medical Center ("Desert Regional") is hereby required to pay directly to the Trustee all amounts due to the P.C. and/or the Debtor from Desert Regional.

8.      The Trustee is hereby required to provide the Debtor and P.C. with monthly bank statements showing payments to the P.C. and/or the Debtor received into the Trustee Account.

2

9.     The Debtor and/or P.C. are hereby required to provide a monthly budget (the "P.C. Budget") for the P.C. to the Trustee no later than one week before the following subject month, which P.C. Budget shall include (a) line items in the amounts set forth in the P.C. Projections, plus (b) any adjustments thereto and any additional line items and an explanation therefor.

10.     The Trustee is hereby authorized and required to disburse to the P.C. (a) funds in the amounts set forth in the P.C. Projections, plus, (b) subject to the Trustee's discretion, any additional amounts the Trustee deems necessary to operate the P.C..

11.     The Debtor is hereby required to pay the Tax Refund or an amount equal to the Tax Refund to the Trustee.

12.     The Debtor is hereby required to explain, under oath, (a) the P.C. disbursements described in the Motion to Compel and set forth in **Exhibit "13"** to the Motion to Compel and (b) (i) whether the 2015 Amended Return was ever actually executed and filed with the IRS and (ii) if the 2015 Amended Return was actually filed with the IRS, whether, thereafter, a further amended 2015 Amended Return was filed with the IRS or the IRS was otherwise directed by the Debtor to apply the Tax Refund to 2016 income taxes instead of paying the Tax Refund to the Debtor.

13.     The information required by paragraph 12 hereof shall be provided by a declaration signed by the Debtor under oath and penalty of perjury, which shall be filed with the Court and served on the Office of the United Stated Trustee and counsel to the Trustee by no later than March 28, 2018.

**SO ORDERED** this 8th day of March, 2018.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT "17"



SMALL BUSINESS / SELF EMPLOYED DIVISION

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
Washington, D.C. 20224

February 15, 2019

Todd A. Frealy
Chapter 11 Trustee
3403 Tenth St., Suite 709
Riverside, CA 92501

DOCKET NUMBER: 15-11408-R
SSN:
REPLY TO:      M. Rita Galvan
TELEPHONE NO:    346-227-6543
ADDRESS:   Internal Revenue Service
1919 Smith Street
Mail Stop: 5025HOU
Houston, Texas 77002

RE: Todd A. Swenning Confirmed Plan Payments

To Whom It May Concern:

The above mentioned case has been transferred to the Houston Bankruptcy Office.

The Order Confirming Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 was entered on 01-03-2017

The Stipulation Resolving the United States' Objection to Confirmation of Confirmation of Chapter 11 Trustee's Second Amended Plan of Reorganization Dated November 10, 2016 was entered on 12-15-2016.

The Stipulation states in part:
"Notwithstanding any language to the contrary in the Disclosure Statement, Plan, and this Confirmation Order, the IRS' proof of claim (Claim 1-2) (the "IRS Claim") shall be deemed to be allowed in the amounts and priorities set forth in the IRS Claim and shall be paid in accordance with Plan terms—more specifically, the IRS Claim shall be paid from the Plan Funds (1) in regular quarterly installment payments starting no later than 120 days after the Effective Date (a) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of the claim, plus statutory interest thereon at the rate of 4% compounded annually."

Plan payments were due Quarterly on the January 18, April 18, August 18 and December 18 of each year beginning in January 18, 2017.

The Plan Payment computations were:

**Priority**
Total Priority of $250,770.95 with 4% interest to be paid in 20 quarterly payments (60-month plan) of $13,896.55 each.

**Unsecured General:**
Total Unsecured General of $164,827.85, paying 21% which is $34,613.85 to be paid in 20 quarterly payments (60-month plan of $1,730.69 each.

As of the date of this letter the Service has only received payments totaling $53,760.82 which is not current with the Confirmed Plan.

In order to complete your Plan within the timeframe shown in the Confirmed Plan all future payments must be received timely.

**Proposed Payment Plan:**
Since there are only 11 quarters remaining in your plan, Quarterly plan payments are due on January 18th, April 18th, August 18th and December 18th beginning with the April 18, 2019 payment for Priority of $20,683.25 and Unsecured General of $3,146.71.

If the Quarterly payment plan will not work, I will accept a monthly plan payment schedule beginning with the March 18, 2019 payment for 35 months due on the 18th of each month for Priority of $6,501.29 and Unsecured General of $988,97.

Please send separate checks for each payment clearly marked "Priority" and "General" notated with your case number and Taxpayer Identification Number to the person and address shown above.

If you do not comply with these terms, the Plan will be in default and the account will be accelerated to be immediately due and owing and will be transferred to a Revenue Officer for collection.

If you have any questions regarding this matter, please contact me at the number listed above.

Thank you for your cooperation in this matter.

Sincerely,

M. Rita Galvan
Bankruptcy Specialist

Cc:
Todd A. Swenning

# EXHIBIT "18"

## Todd M. Arnold

| | |
|---|---|
| **From:** | Smith BEDEAUX, Tracie <Tracie1.Bedeaux@tenethealth.com> |
| **Sent:** | Monday, December 3, 2018 6:05 PM |
| **To:** | Todd A. Frealy |
| **Cc:** | Todd M. Arnold; Marshall, Ryan; Atteberry, Judi |
| **Subject:** | RE: Processing of amts owed to Dr. Swenning |
| | |
| **Importance:** | High |

Hello Todd,

The Hospital is reporting that they have yet to receive the past due quarterly payments pursuant to the bankruptcy court order for Dr. Swenning. Can you advise when the Hospital can expect payment?

Appreciate your assistance.

Thanks,

**Tracie Smith Bedeaux, JD, MBA**
Senior Counsel
Law Department, Operations Group

Tenet Healthcare
1445 Ross Avenue
Suite 1400
Dallas, Texas 75202
**o** 469-893-2040
**c** 469-203-9028
**f** 469-893-3040
Tracie1.Bedeaux@tenethealth.com

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

**From:** Todd A. Frealy [mailto:TAF@lnbyb.com]
**Sent:** Tuesday, May 29, 2018 9:04 AM
**To:** Duran, Maria <Maria.Duran@tenethealth.com>
**Cc:** Todd M. Arnold <TMA@lnbyb.com>; Smith BEDEAUX, Tracie <Tracie1.Bedeaux@tenethealth.com>; Stimson, Judi <Judi.Stimson@tenethealth.com>; Finney, Michele <Michele.Finney@tenethealth.com>; Marshall, Ryan <Ryan.Marshall@tenethealth.com>
**Subject:** Re: Processing of amts owed to Dr. Swenning

I received it in Friday. Thanks.

Todd Frealy

1

# EXHIBIT "19"

# PROFESSIONAL ACTIVITY SUMMARY

**Swenning, Todd**                                          **5/3/2019**

**CASE  #  7868**

|  |  | **From Date** | **1/18/2017** |
|--|--|--------------|---------------|
|  |  | **To Date**   | **5/3/2019**  |

| | | | | |
|-----|-----|-----------|--------|-------------|
| **LC**  | 16.3 | Hours @ | 250.00 | $4,075.00 |
| **MJB** | 3.8  | Hours @ | 595.00 | $2,261.00 |
| **MJB** | 1.9  | Hours @ | 625.00 | $1,187.50 |
| **SR**  | 0.7  | Hours @ | 250.00 | $175.00 |
| **TAF** | 0.2  | Hours @ | 580.00 | $116.00 |
| **TMA** | 53.7 | Hours @ | 555.00 | $29,803.50 |
| **TMA** | 38.2 | Hours @ | 565.00 | $21,583.00 |
| **TMA** | 20.7 | Hours @ | 580.00 | $12,006.00 |

| **Total Hours** | 135.5 | **Total Fees** | $71,207.00 |
|-----------------|-------|----------------|------------|

# COSTS  SUMMARY

5/3/2019

**Swenning, Todd**
**FILEE #  7868**

**From Date**  1/18/2017
**To Date**  5/3/2019

| | |
|---|---:|
| REPRODUCTION COSTS | 406.60 |
| FEDERAL EXPRESS | 132.64 |
| COURT RESEARCH    PACER | 33.90 |
| POSTAGE | 57.67 |
| WESTLAW RESEARCH | 183.45 |
| **TOTAL COSTS** | **$814.26** |

# CERTIFICATE OF SERVICE

I hereby certify that on  May 3, 2019                          (Date), I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

on all the persons who are on the Electronic Mail Notice List to Receive NEF

transmission at their respective email addresses

I hereby certify that on  May 3, 2019                     (Date), I served the same document by

☑ U.S. Postal Service          ☐ In Person Delivery

☐ Courier Service              ☑ E-Mail   Todd A. Swenning: johnnysawbones@yahoo.com

on the following, who are not registered participants of the ECF system:

Name(s) and Address(es):  See Attached MML (Service by U.S. Mail)

 /s/ Todd M. Arnold
 Signature

TODD M. ARNOLD
Cal. Bar No. 221868
(Pro Hac Vice Application Approved)
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: tma@lnbyb.com
Counsel for Chapter 11 Trustee,
Todd A. Frealy

Label Matrix for local noticing
1085-4
Case 15-11408-R
Northern District of Oklahoma
Tulsa
Fri May  3 17:14:22 CDT 2019

Gretchen K. Archer
2310-C North Hwy. 66
Catoosa, OK 74015-3070

Todd Morris Arnold
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067-6253

Ascension Capital Group
Attn: Capital One Auto Finance,
A division of Capital One, N.A. Dept
PO Box 201347
Arlington, TX 76006-1347

Robert Samuel Boughner
U.S. Trustee's Office
1961 Stout St., Ste. 12-200
Denver, CO 80294-6004

Sam G. Bratton II
Doerner Saunders Daniel & Anderson
Two West Second Street
Suite 700
Tulsa, OK 74103-3117

James W. Brewer
Kemp Smith LLP
221 N. Kansas
Suite 1700
El Paso, TX 79901-1401

Martin James Brill
Levene, Neale, Bender, Yoo & Brill LLP
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067-6253

Byrd Pool Service
6966 South Utica Avenue
Tulsa, OK 74136-3903

Capital One Auto Finance
PO Box 60511
City of Industry, CA 91716-0511

Capital One Auto Finance, division of Capita
P.O. Box 201347
Arlington, TX 76006-1347

Capital One Bank (USA), N.A.
PO Box 71083
Charlotte, NC  28272-1083

Carol M. Tallichet
PO Box 2807
Palm Springs, CA 92263-2807

Adam P. Carroll
Feamster & Carroll, PLLC
35 E. 18th Street
Tulsa, OK 74119-5201

Chief, Civil Trial Section - Central Region
Tax Division, U.S. Department of Justice
P.O. Box 7238
Washington, DC 20044-7238

Commerce Bank
Mailstop SACRF
8000 Forsyth Blvd
St. Louis, MO 63105-1707

Commerce Bank, Successor to Summit Bank
c/o Charles Greenough
McAfee & Taft
1717 S. Boulder, Suite 900
Tulsa, OK 74119-4844

Credit First NA
PO Box 818011
Cleveland, OH 44181-8011

Demetra Ellis
P.O. Box 1885
Owasso, OK 74055-1885

Desert Regional Medical Center
c/o Kemp Smith LLp
Attn:  James W. Brewer
El Paso, TX 79901

Desert Regional Medical Center, Inc.
1150 N Indian Canyon Drive
Palm Springs, CA 92262-4872

Dwight L. Smith, PLLC
1636 South Cincinnati Avenue
Tulsa, OK 74119-4418

Elevation Property Management
235 Montgomery Street, Suite 665
San Francisco, CA 94104-2909

F. Will DeMier, Esq.
2700 Mid-Continent Tower
410 S. Boston
Tulsa, OK 74103

Farmers Insurance Company, Inc.
PO Box 268992
Oklahoma City, OK 73126-8992

James Feamster III
Feamster & Carroll, PLLC
35 E. 18th Street
Tulsa, OK 74119-5201

Donald Fife
Hahn Fife & Company, LLP
790 East Colorado Blvd.
9th Floor
Suite 900
Pasadena, CA 91101-2113

Todd A. Frealy
3403 Tenth St., Suite 709
Riverside, CA 92501-3641

Great Lakes
PO Box 78480
Milwaukee, WI 53278-8480

Charles Greenough
McAfee & Taft
2 W 2nd St
Suite 1100
Tulsa, OK 74103-3125

Bonnie N. Hackler
Office of the United States Trustee
224 South Boulder Ave, Room 225
Tulsa, OK 74103-3026

Healey & Associates, P.C.
1445 N. Sunrise Way
Suite 201
Palm Springs, CA   92262-3703

Hibdon Tires Plus
PO Box 81410
Cleveland, OH 44181-0410

Ila Swenning
303 E 1st Street
Volga, SD 57071-9039

Anna Emen Imose
McAfee & Taft, P.C.
Two W. Second Street, Suite 1100
Tulsa, OK 74103-3125

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Melissa Ann (Naryani) Swenning
655 E. Vereda Sur
Palm Springs, CA 92262-4815

Office of the United States Trustee
224 South Boulder Avenue
Suite 225
Tulsa, OK 74103-3026

Okla Empl. Sec. Comm.
P.O. Box 53039
Oklahoma City, OK 73152-3039

Oklahoma Empl. Sec. Comm.
PO Box 53039
Oklahoma City, OK 73152-3039

Oklahoma Tax Commission
General Counsel's Office
100 N Broadway Ave, Suite 1500
Oklahoma City, OK 73102-8601

Kelly Parker
Lamun Mock Cunnyngham & Davis PC
5613 N. Classen Blvd.
Oklahoma City, OK 73118-4015

Paul and Cynthia Coury
7134 South Yale
Suite 400
Tulsa, OK 74136-6351

RMS (on behalf of Chubb & Son)
77 Hartland Street
Suite 401
PO Box 280431
East Hartford, CT 06128-0431

Todd A Swenning
140 W Via Lola, #113
Palm Springs, CA 92262-4375

Jeffrey E. Tate
Christensen Law Group, P.L.L.C.
3401 N.W. 63rd Street, Suite 600
Suite 600
Oklahoma City, OK 73116-3796

Tulsa County Treasurer
500 S. Denver
Suite 323
Tulsa, OK 74103-3840

Tulsa County Treasurer
500 South Denver Ave.
Tulsa, OK 74103-3840

U.S. Attorney
110 West Seventh Street
Suite 300
Tulsa, OK 74119-1013

US SEC & EXCHANGE COMM.
Midwest Regional Office
175 W. Jackson Boulevard, Ste 900
Chicago, IL 60604-2815

US Security & Exchange Comm.
175 W. Jackson Boulevard
Suite 900
Chicago, IL 60604-2908

Wells Fargo Bank, N.A.
Wells Fargo Education Financial Services
301 E 58th Street N
Sioux Falls, SD 57104-0422

Wells Fargo-EFS
PO Box 5119
Sioux Falls, SD 57117-5119

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Internal Revenue Service
PO Box 21125
Philadelphia, PA 19114-1125

(d)Oklahoma Tax Commission
2501 Lincoln Blvd.
Oklahoma City, OK 73194

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Capital One Auto Finance, a division of Ca          (u)Doerner, Saunders, Daniel & Anderson, LLP          (u)Demetra Ellis

(d)Todd A. Frealy                                       (d)Internal Revenue Service                           (u)United States of America, ex. rel., Intern
3403 Tenth St., Suite 709                               PO Box 7346
Riverside, CA 92501-3641                                Philadelphia PA 19101-7346

End of Label Matrix
Mailable recipients    53
Bypassed recipients     6
Total                  59